Appeal Nos. 14-1198, 14-1227, 14-1245, 14-1389

=====

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

=====

NICK PEARSON, *et al.*¸ and RICHARD JENNINGS,

*Plaintiffs-Appellees, Cross-Appellants*

v.

NBTY, INC., *et al.*

*Defendants-Appellees.*

APPEALS OF: THEODORE H. FRANK, KATHLEEN MCNEAL, and
ALISON PAUL

*Objectors-Appellants, Cross-Appellees.*

---

Appeal from the United States District Court for the Northern District of
Illinois, Honorable James B. Zagel, Case No. 1:11-cv-07972

---

Joint Supplemental Appendix to Response Brief of Defendants-Appellees
NBTY, Inc., Rexall Sundown, Inc., and Target Corporation

---

Michael W. Davis
Robert N. Hochman
Kara L. McCall
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853−7000

*Counsel for Defendants-Appellees
NBTY, Inc., Rexall Sundown, Inc., and
Target Corporation*

# Joint Supplemental Appendix
# Table of Contents

Objections of Kathleen McNeal and Alison Paul to
Settlement and Notice of Intent to Appear
(Dkt. 104) (Aug. 9, 2013) ........................................................ Supp. A1

Affidavit of Michael E. Hamer with Exhibits A–C
(Dkt. 113-2) (Sep. 4, 2013) ................................................... Supp. A12

Declaration of Michael Collins
(Dkt. 113-11) (Sep. 4, 2013) ................................................. Supp. A52

Affidavit of Mark D. Schey with Exhibits
(Dkt. 113-1) (Sep. 4, 2013) ................................................... Supp. A54

Declaration of Dan Ross
(Dkt. 113-4) (Sep. 4, 2013) ................................................... Supp. A70

*Herfert v. Crayola, LLC*, No. 2:11-cv-01301,
Order Denying Application of Claimant's Counsel
Darrell Palmer to Appear Pro Hac Vice
(Dkt. 113-14) (W.D. Wash. Aug. 17, 2012) ......................... Supp. A73

*Arthur v. Sallie Mae, Inc.*, No. 2:10-cv-00198,
Excerpts from September 14, 2012
Motion Hearing Transcript
(Dkt. 113-15) (W.D. Wash. Sept. 21, 2012) ......................... Supp. A75

Report of Keith A. Reutter, Ph.D., Regarding Settlement,
with Exhibit 6
(Dkt. 113-20) (Sep. 4, 2013) ................................................. Supp. A86

*Desai v. ADT Sec. Servs., Inc.*, No. 1:11-cv-01925,
Excerpts from Plaintiffs' Memorandum in Support of
Motion for Final Approval of Class Action Settlement
[D.E. 240] (N.D. Ill. June 7, 2013) .................................... Supp. A106

*Fogel v. Farmers Grp, Inc.*, No. BC300142,
Excerpts from Judgment, Final Order and Decree
(Cal. Super. Ct. L.A. Cnty. Dec. 21, 2011)......................... Supp. A124

*Watson v. Dell Inc.*, No. 3:05-cv-05200,
    Excerpts from Declaration of David C. Holland
     Concerning Notification
    [D.E. 93] (W.D. Wash. Oct. 13, 2006) ................................................ Supp. A137

Supplemental Report of Keith A. Reutter, Ph.D.
    (Dkt. 137-1) (Nov. 6, 2013) ............................................................. Supp. A142



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

NICK PEARSON, FRANCISCO
PADILLA, CECILIA LINARES,
AUGUSTINA BLANCO, ABEL
GONZALEZ, and RICHARD JENNINGS,
individually and on behalf of all others
similarly situated;

             Plaintiffs,

v.

NBTY, INC., a Delaware Corporation; and
REXALL SUNDOWN, INC., a Florida
Corporation; TARGET CORPORATION,
a Minnesota Corporation,

             Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

11 CV 07972
Judge James Zagel

**OBJECTIONS OF KATHLEEN
MCNEAL AND ALISON PAUL TO
SETTLEMENT AND NOTICE OF
INTENT TO APPEAR**

**FILED**

AUG X 9 2013
8-9-13
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## I.    INTRODUCTION

Kathleen McNeal and Alison Paul ("Objectors") object to the Proposed Class Action.
Objectors declare they are Class Members qualified to make a claim.  Copies of the
notices sent to them are attached as Exhibit A.

## II.    OBJECTIONS

### A.  The Court Must Protect the Class

The court has a duty under Rule 23 of the Federal Rules of Civil Procedure as the
guardian of the absent class members' interests to independently determine whether the
settlement agreement is fair, reasonable, and in the best interests of the class.  *Waters* v.
*City of Chicago*, 95 Ill. App. 3d 919, 924, 420 N.E.2d 599, 603 (Ill. App. Ct. 1981).  The
Seventh Circuit has warned that "the structure of class actions under Rule 23 . . . gives

1

**Supp. A1**

class action lawyers an incentive to negotiate settlements that enrich themselves but give
scant reward to class members, while at the same time the burden of responding to class
plaintiffs' discovery demands gives defendants an incentive to agree to early settlement
that may treat the class action lawyers better than the class." *Thorogood* v. *Sears,
Roebuck & Co.*, 627 F.3d 289, 293 (7th Cir. 2010). Accordingly, courts are instructed to
"exercise the highest degree of vigilance in scrutinizing proposed settlements of class
actions." *Synfuel Techs., Inc.* v. *DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir.
2006.)

The district court's scrutiny does not end with a detailed analysis of the settlement
terms, but rather, extends to the fee request made by counsel as well. The 2003
Committee Notes to Rule 23(h) state that "[a]ctive judicial involvement in measuring fee
awards is singularly important to the proper operation of the class-action process.
Continued reliance on case law development of fee-award measures does not diminish
the court's responsibility. In a class action, the district court must ensure that the amount
and mode of payment of attorney fees are fair and proper whether the fees come from a
common fund or are otherwise paid. Even in the absence of objections, the court bears
this responsibility." Committee Notes to Rule 23(h), 2003. Therefore, the Court
becomes the fiduciary for the class and must monitor disbursement to the class and
attorneys. *Skelton v. General Motors Corp.*, 860 F.2d 250, 253 (7th Cir. 1988), *cert.
denied,* 493 U.S. 810 (1989.)

The Proposed Settlement is not reasonable, fair or adequate. Based on all of the
objections lodged to the Proposed Settlement, the settlement should be set aside in its
entirety. *See,Schulte v. Fifth Third Bank,* 805 F.Supp.2d 560 (N.D.Ill 2011):

2

**Supp. A2**

"The courts have held that their function is not to modify the terms of a proposed

settlement; but rather to approve or disapprove of the proposed settlement as a

whole." 8 Newberg on Class Actions, §24:126 (4th ed.)(citing *Evans v. Jeff D.,* 475

U.S. 717 (1986)("the power to approve or reject a settlement negotiated by the parties

before trial does not authorize the court to require the parties to accept a settlement to

which they have not agreed."); *see also, Turner v. Murphy Oil, USA, Inc.,* 472

F.Supp.2d 830, 843 (E.D.La. 2007)("the court is also limited in that it may not make

unilateral modifications or alterations to the proposed settlement, but rather may only

accept or reject the agreement as a whole.").

805 F.Supp.2d at 591-92. Accordingly, if any portion of the settlement is unfair,

unreasonably, or inadequate, the entire settlement must be rejected.

## B. THE PROOF REQUIREMENT TO MAKE A CLAIM IS INHERENTLY UNFAIR AND UNREASONABLE

The settlement provides for a bifurcated settlement class: those who save drug

store receipts and those who do not. Those few class members who save itemized

receipts are entitled to up to $50 (ten times $5 per bottle of product), if they saved their

receipts and used bottles. This requirement is patently unreasonable. One California

court noted the unreasonableness of this requirement: "Consumers are not likely to retain

records of small purchases for long periods of time." *State of California v. Levi Strauss

& Co.,* 41 Cal.3d 460, 472 (1986).

Additionally, although a class member can submit used bottles, the postage

required to send in these used bottles of product with their claim form would outweigh

the additional $2 per bottle one is entitled to by submitting these bottles. Ultimately, this

3

**Supp. A3**

class distinction is inherently unfair and the bifurcated award level is ethereal at best. A perusal of the settlement documents did not reveal any research to support such an unreasonable distinction, nor the estimate of the number of class members who might actually have retained such documentation (or empty bottles of product).

Further, the nature of the harm to the class members is identical: perceived deceptive claims regarding the efficacy of the product. Accordingly, the distinction between those who save drug store receipts and those who do not is unfair and must be rejected.

### C. THE CLAIMS PROCESS IS CONFUSING, TIME CONSUMING, AND EXPENSIVE.

Due to the tiered nature of the benefits, and because this is a claims-made settlement, the process of disbursing the benefits is unduly complicated and expensive, and further exacerbates the difference between those who save receipts and those who do not, while suffering the same advertising injury.

There can be no disagreement that claims-made settlements have notoriously low participation rates, especially when class members must spending time making a claim form to collect as little as $3. *See, e.g., Sylvester v. CIGNA Corp.,* 369 F.Supp.2d 34, 52 (D.Me. 2005)("claims-made settlements regularly yield response rates of 10% or less"). That Defendants have guaranteed a $2 million payout does not ameliorate the confusing, expensive and time-consuming claims procedure.

The parties concede that it will be difficult to hit the $2 million target in the Settlement Agreement. If, after the claims deadline, the claims do not equal $2 million, there will be a second level of payout. Those who saved receipts will then get a pro rata

4

additional distribution of up to three times what they were eligible for. Then, if it still

does not hit $2 million, those who did not save receipts will be eligible for a pro rate

additional distribution of up to twice what they were eligible for. Then, if there is still

money in the settlement fund, it will be distributed to an appropriate named charity

(which these Objectors do not find any fault with). Accordingly, there is the first round

of distribution, then a second round of distribution, then a third round of distribution, and

then, most likely, a distribution to the *cy pres* recipient. These four separate rounds of

administration are costly and time-consuming, and not fully justified when viewing the

actual benefits to the class members: a distribution of $3 to $50, depending on whether

one saved his receipts. In other words, the costs do not justify the ends. Accordingly,

this constitutes a separate basis upon which to reject the settlement.

### D. THE OBJECTION REQUIREMENTS ARE ONEROUS AND NOT SUPPORTED BY THE LANGUAGE IN RULE 23

The Notice provides that in order to preserve one's objections, one "must" appear

at the fairness hearing in Illinois on September 4, or give notice that he or she will not

appear, and can request that the Court excuse this requirement. Rule 23 contains no such

requirement, which is contrary to due process. *See, e.g., State of California v. Levi*

*Strauss & Co.,* 41 Cal.3d 460, 484 (1986)(C.J.Bird, concurring)("Class members have a

due process interest in expressing their own views to the courts."). To require a class

member in a nationwide class to appear at the fairness hearing to preserve his objection is

patently unreasonable, and can only be interpreted as an attempt to quash all objectors,

whether serial or other. Because a class action releases rights on a large scale, due

process and the right to object are important and must not be undermined by zealous class

5

**Supp. A5**

counsel and defense counsel, admittedly eager to put this litigation behind it ("Rexall is settling to avoid the expense, inconvenience, and inherent risk of litigation," section 3 of Class Notice).

The *Manual for Complex Litigation* notes the importance of objectors in evaluating the fairness of a class action settlement:

> Objectors can play a useful role in the court's evaluation of the proposed settlement terms. They might, however, have interests and motivations vastly different from other attorneys and parties. [¶] Objectors can provide important information regarding the fairness, adequacy, and reasonableness of settlements. Objectors can also play a beneficial role in opening a proposed settlement to scrutiny and identifying areas that need improvement. For example, an organization's decision in one case transformed a settlement from one in which the lawyers received a majority of the funds to one that primarily benefited class members.

*Manual for Complex Litigation, Fourth,* §21.643, p. 326, "Role of Objectors in Settlement." The requirement that an objector appear at the fairness hearing, or request the Court's permission for relief from this onerous requirement in a nationwide class, is a transparent attempt to discourage any objections whatsoever, and must be rejected outright as a condition for objecting. This, too, constitutes a basis upon which the Court can reject the settlement as unfair. It is not reasonable to invite California residents to object but only if they are willing to pay the price to travel to Illinois.

### E.  THE ATTORNEYS' FEES APPEAR UNREASONABLE

Attorneys' fees must reflect the actual value recouped by the class members. *In*

6

**Supp. A6**

*re Excess Value Ins. Coverage Litig.*, No. M-21-84RMB, MDL-1139, 2004 WL 1724980, at 13 (S.D.N.Y. July 30, 2004). When the process for awarding attorneys' fees is non-adversarial, courts must be particularly diligent in comparing the value of the settlement with the fee award. *See*, *Weinberger* v. *Great N. Nekoosa Corp.*, 925 F.2d 518, 525 (1st Cir. 1991). While these Objectors appreciate that this case began in multiple district courts and was subsequently consolidated, there is no attorneys' fee application on file with the Court as of the date objections are due. This runs afoul of Rule 23(h):

> The district court abused its discretion when it erred as a matter of law by misapplying Rule 23(h) in setting the objection deadline for class members on a date before the deadline for lead counsel to file their fee motion. Moreover, the practice borders on a denial of due process because it deprives objecting class members of a full and fair opportunity to contest class counsel's fee motion. [¶] The plain text of the rule requires a district court to set the deadline for objections to counsel's fee request on a date *after* the motion and documents supporting it have been filed. The relevant portions of Rule 23(h) provide:
>
> (1)  A claim for an award must be made by motion under rule 54(d)(2), subject to the provisions of this subdivision (h), at a time the court sets. Notice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner.
>
> (2) A class member, or a party from whom payment is sought, may object to the motion.

*In re Mercury Interactive Corp. Securities Litigation,* 618 F.3d 988, 993 (9th Cir. 2010). In fact, the fee request, at $4.5 million, appears especially suspect, given that the total class recovery will not exceed $2 million.

7

**Supp. A7**

These Objectors have grave concerns about the fee request, given that the settlement was reached *prior to* the Court's ruling in February, 2013, that the initial disclosures pursuant to Rule 26 would be made by March 31, 2013. A minute order dated March 22, 2013, prior to the date for initial disclosures, indicates that the parties reached a settlement agreement apparently before any discovery had been completed. While clearly these Objectors have not had the opportunity to review class counsel's fee request because they have not filed one, they are skeptical that any fee request could be justified in the absence of any completed discovery. There is no lodestar justification, nor any "percentage of the fee" justification, most likely because the requested fees dwarf the class recovery.

These Objectors contend that they have been denied their due process rights to inspect the fee petition, as guaranteed in Rule 23(h), and that the fee request must be delayed until after it has been posted for the class' inspection.

## III.    JOINDER IN OTHER OBJECTIONS

These Objectors adopt and join in all other objections filed by other class members in this case, and incorporate them by reference as if they appeared in full herein.

## IV.    CONCLUSION

For the foregoing reasons and all others presented at oral argument, these Objectors respectfully request that the Court sustain their objections and grant the following relief:

Supp. A8

    A.  Upon proper hearing, enter such Orders as are necessary and just to adjudicate these Objections and to alleviate the inherent unfairness, inadequacies and unreasonableness of the proposed settlement;

    B.  Award an incentive fee to these Objectors for their service in improving the fairness of the settlement, as well as consider awarding an attorneys' fee to their attorney.

LAW OFFICES OF DARRELL PALMER PC

Dated:  August 1, 2013

Joseph Darrell Palmer
Attorney for Objector

Law Offices of Darrell Palmer PC
603 N. Highway 101, Suite A
Solana Beach, CA 92075
Phone: 858-792-5600
Fax: 866-583-8115
Email: Darrell.palmer@palmerlegalteam.com

Attorney for Objectors Kathleen McNeal and
Alison Paul

9

**Supp. A9**

### CERTIFICATE OF SERVICE

I hereby certify that on August 1, 2013, I mailed this document to:

Clerk of Court, United States District Court, Northern District of Illinois, Everett McKinley Dirksen United States Courthouse, 219 South Dearborn Street, Chicago, Illinois 60604

Settlement Class Counsel:
Peter N. Freiberg, DENLEA & CARTON, LLP, One North Broadway, Suite 509, White Plains, New York 10601

Stewart M. Weltman, STEWART M. WELTMAN, LLC (Of Counsel Levin Fishbein Sedran & Berman), 53 W. Jackson Suite 364, Chicago, Illinois 60604

Rexall's Counsel:
Kara L. McCall, SIDLEY AUSTIN LLP, One S. Dearborn Street, Chicago, Illinois 60603

_____
Joseph Darrell Palmer
Attorney for Objector

10

**Supp. A10**

Glucosamine Settlement c/o Claims Administrator
P.O. Box 170
Philadelphia, PA 19105-0170

PRSRT First Class
US Postage
PAID
Permit #2019
San Diego, CA

**LEGAL NOTICE**
SEE OTHER SIDE FOR DETAILS

KATHLEEN MC NEAL
1546 31ST ST
SAN DIEGO CA 92102-1506

Glucosamine Settlement c/o Claims Administrator
P.O. Box 170
Philadelphia, PA 19105-0170

PRSRT First Class
US Postage
PAID
Permit #2019
San Diego, CA

**LEGAL NOTICE**
SEE OTHER SIDE FOR DETAILS

ALISON PAUL
PO BOX 755
CARDIFF BY THE SEA CA 92007-0755

# EXHIBIT A

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| NICK PEARSON, FRANCISCO PADILLA, CECILIA LINARES, AUGUSTINA BLANCO, ABEL GONZALEZ, and RICHARD JENNINGS, On Behalf of Themselves and All Others Similarly Situated, | |
| Plaintiffs, | Case No.:    11 CV 07972 |
| v. | <u>CLASS ACTION</u> |
| NBTY, INC., a Delaware corporation; and REXALL SUNDOWN, INC., a Florida corporation; TARGET CORPORATION, a Minnesota Corporation, | **Judge James B. Zagel** |
| Defendants. | |

### <u>AFFIDAVIT OF MICHAEL E. HAMER</u>

I, Michael E. Hamer, being first duly sworn according to law, depose and say under penalty of perjury as follows:

1. I am a Project Manager for Heffler Claims Group, LLC ("Heffler"). Our business address is 1515 Market Street, Suite 1700, Philadelphia, PA 19102. Our main telephone number is (215) 665-8870. I am over twenty-one years of age and am authorized to make this affidavit on behalf of Heffler and myself.

2. I am the Project Manager assigned to administration of the settlement reached in this case. I submit this affidavit to demonstrate Heffler's compliance with regard to the duties required of Settlement Administrator as required by the Settlement Agreement and General Release

("Agreement") and this Court's "Preliminarily Approval Order" dated May 24, 2013 ("Preliminary Approval Order") (Document #87).

3. Heffler has extensive experience in class action matters, having provided notice and claims administration services in class action settlements involving antitrust, securities, employment wage and hour, and consumer class action settlements, as well as Securities & Exchange Commission and Government Enforcement actions.  We have provided notification and/or claims administration in more than 700 cases.

4. Heffler was appointed as Settlement Administrator pursuant to paragraph 6 of the Preliminary Approval Order to perform the functions specified in the Agreement, including but not limited to: (a) confirming or updating addresses for the known Class Members eligible to participate in the Settlement; (b) preparing, printing, and mailing or e-mailing Notice to known Class Members; (c) logging and seeking new addresses for known Class Members and re-sending a Notice to them if the original notification (mail or e-mail) was undeliverable; (d) arranging for publication notice for unknown Class Members; (e) establishing a website and posting the Long Form Notice, Claim Form, and other documents and information on that website; (f) tracking written Requests for Exclusion from the Settlement; (g) responding to requests for claim forms; (h) maintaining a toll-free telephone number; (i) claims administration; and (j) such other tasks to which Counsel mutually agrees, or the Court orders or requests Heffler to perform.

5. Heffler opened and used the post office box address of "Glucosamine Settlement, c/o Heffler Claims Group, P.O. Box 170, Philadelphia, PA 19105-0170" to receive written Requests for Exclusion, completed paper Claim Forms, undeliverable Postcard Notices, requests for paper Claim Forms, inquiries, and other communications about the Settlement.  The address of that

**Supp. A13**

post office box was provided in the Long Form Notice, the Postcard Notice, the E-mail Notice, and the Claim Form.

6. Heffler received text for the Long Form Notice, the Postcard Notice, the E-mail Notice, and the Claim Form from Parties' counsel. Drafts of these documents were prepared by Heffler and approved by the Parties' counsel. The Notices provided to the Class, either through direct mailing, e-mailing, publication, and/or through the Settlement Website, provided adequate notice of the terms of the Settlement and the Class Members' rights to object or be excluded from the Settlement. Copies of the Long Form Notice, the Postcard Notice, the E-mail Notice, and the Claim Form are attached hereto as Exhibit A.

7. On or about June 15, 2013, Heffler established a website ("Settlement Website"), *www.GlucosamineSettlement.com,* that provides an explanation of the litigation, the settlement, and important dates; allows for on-line Claim Form submission; and posts copies of: (i) the Preliminary Approval Order; (ii) the Agreement; (iii) the Long Form Notice; (iv) the Postcard/E-mail Notice; and (iv) the Claim Form in .pdf format. Potential Class Members who learn of the settlement through any means were able to obtain copies of these documents through the Settlement Website, 24 hours per day, even if they had not directly received a Notice by mail or e-mail. The Settlement Website continues to be fully operational and fully functional. Printouts of the front pages of the Settlement Website are attached hereto as Exhibit B. As of August 29, 2013, the Settlement Website statistics show 246,121 visits (216,932 unique); 432,275 page views; 27,921 downloads of the Claim Form; and 26,130 downloads of the Class Notice.

8. Heffler received from Defendants' Counsel two lists of known Class Members: one of Ambassadors Club members (purchasers of Osteo-Bi-Flex who joined the loyalty club), and

3

**Supp. A14**

one of customers who purchased Covered Products from Vitamin World's internet store, or signed up for Vitamin World's loyalty program (combined, "the Class List").  The Class List contains names and last known mailing and/or e-mail addresses of 1,734,139 Class Members, as follows: (i) a total of 1,082,385 had an e-mail address; (ii) a total of 651,754 did not have an e-mail address.  An E-mail Notice was to be e-mailed to those with an e-mail address and a Postcard Notice was to be mailed to those without an e-mail address.

9.  On or about June 15, 2013, Heffler set up, and continues to maintain, a toll-free telephone number (1-888-972-6583) for the purpose of allowing Class Members to access recorded, general information about the litigation and the settlement.  As of August 29, 2013, the toll-free telephone system has logged a total of 30,547 calls representing a total of 112,698 minutes.  The script used to record the information for the IVR system is attached as Exhibit C.

10. During the period June 17-18, 2013, Heffler coordinated and arranged the sending of the E-mail Notice to those known Class Members with an e-mail address.  Of the 1,082,385 e-mails attempted, a total of 1,058,596 were successfully sent, and a total of 23,789 could not be sent because they were malformed (*i.e.*, did not contain a "@" symbol, contained nothing after the ".", etc.), invalid, or duplicative e-mail addresses.  Heffler continues to process these malformed e-mails.  The E-mail Notice (Ex. B) advised Class Members of the settlement, directed them to the settlement website or to the Claims Administrator for more information, and told them that they could submit a written Request for Exclusion postmarked by August 1, 2013 or a completed Claim Form postmarked by December 3, 2013.  As of August 29, 2013, a total of 115,386 E-mail Notices are confirmed as "bounced" (and considered undeliverable). Heffler continues to process these bounced e-mails.

4

**Supp. A15**

Case: 1:11-cv-07972 Document #: 113-2 Filed: 09/04/13 Page 6 of 50 PageID #:1514

11. For the 651,754 known Class Members without an e-mail address, Heffler removed 6,103 as exact duplicates, and 645,651 Class Members' mailing addresses were processed and updated utilizing the National Change of Address Database ("NCOA") maintained by the U.S. Postal Service ("USPS"). The NCOA contains change of address notifications filed with the USPS. In the event that an individual had filed a USPS change of address notification, the address listed with NCOA was used in connection with the mailing of the Class Notice package.

12. On June 17, 2013, Postcard Notices were addressed and mailed to the 645,651 known Class Members described above via postage prepaid, first-class U.S. Mail. The Postcard Notice (Ex. B) advised Class Members of the settlement, directed them to the Settlement Website or to the Claims Administrator for more information, and told them that they could submit a written Request for Exclusion postmarked by August 1, 2013 or a completed Claim Form postmarked by December 3, 2013.

13. As of August 29, 2013, Heffler has received a total of 144,399 Postcard Notices returned by the USPS as undeliverable. Of these, 2,328 were returned by the USPS with forwarding addresses noted and were re-mailed to those Class Members via postage prepaid, first-class U.S. Mail.; and 142,071 Postcard Notices were returned by the USPS as undeliverable without a forwarding address, and were handled as follows: (i) Heffler performed address traces on 51,688 Notices. The address trace utilizes the Class Member's name and last known address for locating a current address. After the traces were performed, updated addresses were obtained and Postcard Notices were re-mailed to 35,596 Class Members via postage prepaid, first-class U.S. Mail; and (ii) a total of 90,383 continue to be processed.

**Supp. A16**

14. The publication notice program, designed to reach unknown Class Members, is the subject of a separate affidavit from Mark Schey of Digital Settlement, LLC, which I understand is being submitted herewith.

15. In response to inquiries received from class members, and with the agreement of the Parties, Heffler made two changes to the Claim Form after preliminary approval:

    a. On or about July 16, 2013, the Claim Form was revised to note, with respect to Documented Purchases: "If you are a member of the Osteo Bi-Flex Ambassador's Club and have previously submitted Reward Points to Rexall, (a) current Ambassador's Club data will be reviewed as part of the consideration of your claim, and (b) you may be entitled to recovery based on proof of purchase previously submitted to Rexall." Consistent with this change, as part of the claims process, Heffler is checking claims made against Rexall's data to determine whether any claimant had previously submitted proof of purchase to Rexall as part of Rexall's Osteo Bi-Flex Ambassador's Club, which is a loyalty purchaser club through which Osteo Bi-Flex purchasers can submit proof of purchase to earn reward points and coupons.

    b. On or about August 7, 2013, the Claim Form was revised to allow class members to submit "hybrid" claims (*i.e.*, claims for both documented *and* undocumented purchases). The revised claim form included the following language: "You may claim up to ten (10) bottles of Documented Purchases. You may claim up to four (4) bottles of Undocumented Purchases. However, your entire claim cannot exceed a total of ten (10) bottles of Documented and Undocumented Purchases."

16. Heffler is responsible for receipt of all written Requests for Exclusion from the Settlement. Pursuant to paragraph 8 of the Preliminary Approval Order, Requests for Exclusion were to be

**Supp. A17**

postmarked no later than August 1, 2013. As of August 29, 2013, Heffler has received a total of 1,620 communications from potential Class Members that it interpreted as Requests for Exclusion. Heffler has reviewed each Request for Exclusion and has noted that only 58 Requests for Exclusions have fully complied with the requirements for requesting exclusion specified in paragraph 19 of the Agreement (also paragraph 8 of the Preliminary Approval Order). Attached as Exhibit D is a listing of the 1,620 Requests for Exclusion received as of August 29, 2013, including the Requestor's assigned number, name and address, and an indicator noting compliance ("Y") or non-compliance ("N") with each specific requirements of paragraph 19 of the Agreement/paragraph 8 of the Preliminary Approval Order.

17. Heffler is responsible for receipt of all Claim Forms filed by Class Members. In addition to being able to submit an on-line Claim Form through the Settlement Website, a Class Member may obtain a paper copy of the Claim Form either through the Settlement Website or by requesting a Claim Form from Heffler, directly. The deadline to submit a Claim Form is December 3, 2013. As of August 29, 2013, Heffler has received a total of 19,593 Claim Forms, as follows: (i) 16,894 Claim Forms filed on-line through the Settlement Website; and (ii) 2,699 Claim Forms filed on paper and submitted through the U.S. Mail.

18. Heffler employs numerous methods to detect claims that are submitted fraudulently. In our experience, these methods are appropriate, as it is sometimes the case that in settlements where proof is not required to support a claim, there are non-class member consumers who will receive notice of the settlement and elect to file a claim for compensation. As a general proposition, it has been our experience that the higher the potential recovery amount available to an individual without proof of purchase, the more likely an attempt to submit a fraudulent claim may be. In order to protect against such fraudulent filings, Heffler runs

**Supp. A18**

programmatic audits to identify duplicate claims, outliers, known fraudulent filers, and other situations. Also, this settlement attempts to avoid fraud by limiting the recovery of a consumer without proof of purchase to $12 (possibly doubled to $24).

19. In my experience, the process for making claims, requesting exclusion, and submitting objections that was used in this case is typical of the processes most frequently used in consumer class action settlements.

20. It is Heffler's experience that claims rate in consumer class actions like this one cannot be predicted with complete accuracy and can vary significantly from case to case.

I declare under the penalty of perjury under the laws of the Commonwealth of Pennsylvania and the United States that the above is true and correct to the best of my knowledge.

BY: _____

MICHAEL E. HAMER

Sworn to and subscribed before me
this      30th      day of August, 2013

_____
Notary Public

NOTARIAL SEAL
David J Guglielmo
NOTARY PUBLIC
Philadelphia City, Philadelphia County
My Commission Expires 01/15/2017

8

**Supp. A19**

# Exhibit A

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| NICK PEARSON, FRANCISCO PADILLA, CECILIA LINARES, AUGUSTINA BLANCO, ABEL GONZALEZ, and RICHARD JENNINGS, On Behalf of Themselves and All Others Similarly Situated,<br><br>     Plaintiffs,<br><br>   v.<br><br>NBTY, INC., a Delaware corporation; and REXALL SUNDOWN, INC., a Florida corporation; TARGET CORPORATION, a Minnesota Corporation,<br><br>     Defendants. | Case No.:   11 CV 07972<br><br>CLASS ACTION<br><br>**Judge James B. Zagel** |

## NOTICE OF CLASS ACTION SETTLEMENT

**If you have purchased certain joint health dietary supplements containing glucosamine that were manufactured or sold by Rexall Sundown, Inc. or NBTY, Inc. or their affiliates, you could get a payment from a class action settlement.**

(A federal court authorized this Notice. This is not a solicitation from a lawyer.)

Your legal rights are affected whether or not you act.  Please read this Notice carefully.

1

**Supp. A21**

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT | |
|---|---|
| SUBMIT A CLAIM FORM POSTMARKED OR COMPLETED ONLINE BY DECEMBER 3, 2013 | The only way to receive a payment. |
| EXCLUDE YOURSELF FROM THE CLASS BY AUGUST 1, 2013 | Receive no payment. This is the only option that allows you to pursue claims by filing your own lawsuit at your own expense. |
| COMMENT BY AUGUST 1, 2013 | Write to the Court about why you do, or do not, like the settlement. You must remain in the Settlement Class to comment in support of or in opposition to the settlement. |
| ATTEND A HEARING ON SEPTEMBER 4, 2013 | Ask to speak to the Court about the fairness of the settlement. |
| DO NOTHING | Receive no payment, and give up rights to sue. |

- These rights and options, and the deadlines to exercise them, are explained in this Notice.

- The Court still has to decide whether to approve the settlement. Payments will be made if the Court approves the settlement and after any appeals are resolved.

## 1. Why should I read this notice?

This Notice is to inform you that on May 16, 2013, this Court preliminarily approved a settlement of this case (the "Litigation"), brought on behalf of the Settlement Class. This Notice describes the settlement. Please read this Notice carefully to determine whether you wish to participate in the settlement. Your rights and options—and the deadlines to exercise them—are explained in this Notice. Your legal rights are affected regardless of whether you act or not.

## 2. What is the Litigation about?

Rexall Sundown, Inc. and NBTY, Inc. (and their affiliated companies) (collectively, "Rexall") manufacture and sell joint health dietary supplements containing the ingredients glucosamine and chondroitin, among other ingredients ("the Glucosamine Products"). Since 2011, class actions have been filed in which the

2

**Supp. A22**

plaintiffs, on behalf of themselves and other purchasers, allege that certain claims made on the labeling of certain Rexall Glucosamine Products are false, deceptive, and misleading. These claims have been brought under various state consumer protection acts. No allegations related to safety or physical injury have been made.

### 3. Why is there a settlement?

The Court has not decided in favor of either side in the case. Rexall denies all allegations of wrongdoing or liability against it and contends that its conduct was lawful. Rexall stands by the Glucosamine Products and their efficacy. Rexall is settling to avoid the expense, inconvenience, and inherent risk of litigation, as well as the concomitant disruption of its business operations. Plaintiffs and their attorneys assert that the settlement is in the best interests of the Settlement Class, because it provides a fair and reasonable recovery now while avoiding the risk, expense, and delay of pursuing the case through trial and any appeals.

### 4. Who is included in the settlement?

The Settlement Class is defined as all consumers who, during particular time periods and in certain U.S. locations, purchased for personal use and not resale or distribution certain joint health dietary supplements (a) sold by Rexall or any of its affiliates under the brand names of Rexall or its affiliates; or, (b) manufactured by Rexall or any of its affiliates but sold under another brand name by a company not affiliated with Rexall (collectively, "Covered Products"). The Covered Products and their geographic locations and time periods of sale covered by this Settlement are identified in Attachment A to this Notice.

Excluded from the Settlement Class are all persons who submit valid requests for exclusion from the Settlement Class (see Question #7).

### 5. What does the settlement provide?

**a.** **Monetary Recovery.** If you submit a claim postmarked or submitted online by December 3, 2013, you may be eligible to receive a check. If you submit a claim with Adequate Proof of Purchase of a Covered Product, you shall be entitled to receive $5.00 per bottle of Covered Product purchased, up to a maximum of ten (10) bottles of Covered Products purchased per household. "Adequate Proof of Purchase" shall mean (i) cash register receipts; (ii) an intact box or bottle for a Covered product that clearly displays a readable UPC code and readable lot number; or (iii) similar documentation that identifies the Covered Product and date and location of purchase. If you <u>cannot</u> provide Adequate Proof of Purchase, but submit a claim confirming certain facts regarding your purchase(s) of Covered Products, you may be entitled to

3

**Supp. A23**

receive $3.00 per bottle of Covered Product purchased, up to a maximum of four (4) bottles of Covered Products purchased per household.

      b.    **Minimum Total Payment.** If the total dollar value of valid claims submitted is less than $2 million, then the payment to each Settlement Class member who submitted a valid claim with Adequate Proof of Purchase shall be increased *pro rata* up to a maximum of triple what he or she was otherwise entitled to until the total payments reach $2 million. If, after increasing the payment for valid claims with Adequate Proof of Purchase, the total payments is still less than $2 million, then the payment to each Settlement Class member who submitted a valid claim without Adequate Proof of Purchase shall be increased *pro rata* up to a maximum of double what he or she was otherwise entitled to until the total payments reach $2 million, with any residual amounts up to $2 million paid to the Orthopaedic Research and Education Foundation (OREF), subject to Court approval.

      c.    **Notice and Administration Costs.** A third-party, Heffler Claims Group, shall serve as the settlement administrator to administer the settlement (the "Settlement Administrator"). Rexall shall pay for all notice and administration costs. This payment is separate and apart from the $2 million minimum payment for claims and charitable donations.

      d.    **Labeling Changes.** Rexall has also agreed to make certain modifications to the labeling of Covered Products, which are described in Paragraph 7 and Exhibit B to the Settlement Agreement.

## 6. Who represents the Settlement Class?

      a.    **Class Representatives.** For purposes of the settlement, the Court has appointed the following plaintiffs named in the Litigation to serve as the class representatives: Richard Jennings, Francisco Padilla, Cecilia Linares, Abel Gonzalez, Nick Pearson, and Augustina Blanco. Settlement Class Counsel will request incentive awards up to the amount of $5,000 for each class representative, to be paid separately by Rexall, without diminishing or eroding the payments available to Settlement Class members.

      b.    **Settlement Class Counsel.** The Court has appointed the following attorneys and law firms to represent the Settlement Class as legal counsel: Jeffrey I. Carton and Peter N. Freiberg, DENLEA & CARTON, LLP, One North Broadway, Suite 509, White Plains, New York 10601; Elaine A. Ryan, BONNETT, FAIRBOURN, FRIEDMAN & BALINT, P.C., 2325 E. Camelback Road, Suite 300, Phoenix, Arizona 85016; and Stewart M. Weltman, STEWART M. WELTMAN, LLC (Of Counsel Levin Fishbein Sedran & Berman), 53 W. Jackson Suite 364, Chicago, Illinois 60604. From the inception of the litigation in 2011 to the present, Settlement Class Counsel have not

**Supp. A24**

received any payment for their services in prosecuting the case or obtaining the settlement, nor have they been reimbursed for any out-of-pocket expenses they have incurred. When they ask the Court to approve the settlement, Settlement Class Counsel will also make motions to the Court for awards of attorneys' fees and reimbursement of expenses, in a total amount not to exceed $ 4.5 million. Rexall has agreed not to oppose these attorneys' fee requests. If the Court approves the attorneys' fee applications, they will be paid separately by Rexall, without diminishing or eroding the payments available to Settlement Class members. The Settlement Class members will not have to pay anything toward the fees or expenses of Settlement Class Counsel. Settlement Class Counsel will seek final approval of the settlement on behalf of all Settlement Class members.

### 7.  How can I exclude myself from the Settlement Class?

To exclude yourself from the Settlement Class, you must send a letter saying that you want to be excluded from the class in the Glucosamine Products Litigation. Your written exclusion request must include your name, address, telephone number, and signature, and a statement to the effect that: "I/We hereby request to be excluded from the proposed Settlement Class in the Glucosamine Products Litigation." Your exclusion request must be postmarked and sent to the following address no later than August 1, 2013:

> Glucosamine Settlement
> c/o Claims Administrator
> P.O. Box 170
> Philadelphia, PA 19105-0170

If you elect to opt-out, you will (i) <u>not</u> be able to submit a claim to receive any monetary payment, (ii) <u>not</u> be bound by any further orders or judgments in this case, and (iii) remain able to pursue claims alleged in the Litigation against Rexall by filing your own lawsuit at your own expense. If you proceed on an individual basis, you may receive nothing at all, or more, or less, of a benefit than you would otherwise receive under this settlement.

### 8.  How can I tell the Court what I think about the settlement?

If you do not exclude yourself from the Settlement Class, you can comment in support of or in opposition to the settlement. Your objection or comment must be submitted in writing to all four (4) of the following addresses below and must be postmarked by August 1, 2013:

**Supp. A25**

Court:

    Clerk of Court, United States District Court, Northern District of Illinois, Everett McKinley Dirksen United States Courthouse, 219 South Dearborn Street, Chicago, Illinois 60604

Settlement Class Counsel:

    Peter N. Freiberg, DENLEA & CARTON, LLP, One North Broadway, Suite 509, White Plains, New York 10601

    Stewart M. Weltman, STEWART M. WELTMAN, LLC (Of Counsel Levin Fishbein Sedran & Berman), 53 W. Jackson Suite 364, Chicago, Illinois 60604

Rexall's Counsel:

    Kara L. McCall, SIDLEY AUSTIN LLP, One S. Dearborn Street, Chicago, Illinois 60603

    The objection or comment must include the case name and number *Pearson, et al. v. NBTY, Inc., et al.*, No. 1:11-cv-07972, and also include: (a) your full name, address, and telephone number; (b) a signed declaration that states that you are a member of the Settlement Class and that identifies the Covered Product(s) purchased as well as the approximate date and location of the purchase(s); (c) the specific grounds for the objection; (d) all documents, writings, or testimony of witnesses that you desire the Court to consider; and (e) notice of your intention to appear at the Fairness Hearing, if any, that lists the name, address, and telephone number of the attorney, if any, who will appear.

    The Court will consider all comments from Settlement Class members. If you intend to appear at the Fairness Hearing through counsel, your comment must also state the identity of all attorneys representing you who will appear at the Fairness Hearing. To appeal from any provision of the order approving the Settlement as fair, reasonable, and adequate, the award of incentive payments, or the award of reasonable attorneys' fees and expenses paid by Rexall and awarded to Settlement Class Counsel, you must appear in person or through your counsel, or as otherwise may be permitted by the Court at the Fairness Hearing. (You may, however, ask the Court in your objection to excuse such appearance prior to the Fairness Hearing.)

## 9. What is the effect of final settlement approval?

    If the Court grants final approval to the settlement, all members of the Settlement Class will release all claims or causes of action arising from or relating to (i) claims that were or could have been asserted in the Litigation; (ii) the Covered Products, including

6

**Supp. A26**

their efficacy or performance and any and all advertising, labeling, packaging, marketing, claims, or representations of any type whatsoever regarding the Covered Products; and (iii) all labels or packaging for the Covered Products that conform to the terms of the Settlement. The Released Claims do not include claims for personal injury. All members of the Settlement Class who do not exclude themselves from the Settlement Class will release any claims they may have against Rexall or other persons and entities that are described in and covered by the release. Please refer to Paragraphs 11 and 12 of the Settlement Agreement for a full description of the claims and persons that will be released upon final approval of the settlement. You can obtain a copy of the Settlement Agreement (i) from the Clerk of the Court, (ii) online at www.GlucosamineSettlement.com, (iii) by writing to the Settlement Administrator at Glucosamine Settlement, c/o Claims Administrator, P.O. Box 170, Philadelphia, PA 19105-0170, or (iv) calling the toll-free number ((888) 972-6583). If you do not wish to be a Settlement Class member, you must exclude yourself from the Settlement Class (see Question #7 above).

**If the settlement is not approved, the case will proceed as if no settlement had been attempted. There can be no assurance that if the settlement is not approved and litigation resumes, the Settlement Class will recover more than is provided for under the settlement, or will recover anything.**

### 10. When and where will the Court hold a hearing on the fairness of the settlement?

A Fairness Hearing has been set for September 4, 2013, at 11:00 a.m., before Judge Zagel in the Northern District of Illinois. At the hearing, the Court will hear any comments, objections, and arguments concerning the fairness of the proposed settlement, including the amount requested by Settlement Class Counsel for attorneys' fees and expenses, and incentive awards for the Plaintiffs. You do not need to attend the Fairness Hearing to remain a Class member or obtain a settlement payment.

### 11. How do I receive my share of the settlement?

If you do not exclude yourself from the Settlement Class, and would like to receive money, you must submit a timely and valid claim form as set forth in Question #5 above. Claim forms must be submitted online or postmarked by December 3, 2013. You can download a copy of the appropriate claim form online at www.GlucosamineSettlement.com, or obtain a copy by writing to the Settlement Administrator at Glucosamine Settlement, c/o Claims Administrator, P.O. Box 170, Philadelphia, PA 19105-0170, or obtain a copy by calling the toll-free number ((888) 972-6583).

**Supp. A27**

## 12. What happens if I do nothing at all?

If you do nothing, you will receive no payment from the settlement. You will still be part of the Settlement Class, however, and, subject to the release described in Paragraphs 11 and 12 of the Settlement Agreement. Please refer to Paragraphs 11 and 12 of the Settlement Agreement for a full description of the claims and persons that will be released upon final approval of the settlement.

## 13. Where do I get additional information?

This Notice provides only a summary of the matters relating to the settlement. For more detailed information, you may wish to review the Settlement Agreement dated April 15, 2013. You can view the Settlement Agreement and get more information at www.GlucosamineSettlement.com. You can also get more information by writing to Settlement Class Counsel at the addresses listed in Question #8 or calling toll-free ((888) 972-6583). The Settlement Agreement and all other pleadings and papers filed in connection with the Settlement are available for inspection and copying during regular business hours at the office of the Clerk of the United States District Court, Northern District of Illinois, Everett McKinley Dirksen United States Courthouse, 219 South Dearborn Street, Chicago, Illinois 60604.

PLEASE DO <u>NOT</u> CONTACT THE COURT OR REXALL WITH QUESTIONS ABOUT THE SETTLEMENT.

**Supp. A28**

| EXHIBIT A - COVERED PRODUCTS | | | |
|---|---|---|---|
| **Brand** | **Product** | **Dates of Sale** | **Geographic Location** |
| American Health | All Glucosamine Products | 2005-5/16/13 | U.S. |
| CVS | Double Strength Glucosamine Chondroitin | 2005-2006 | U.S. |
| CVS | Regular Strength Glucosamine Chondroitin | 2005-5/16/13 | U.S. |
| CVS | Cosaflex | 2007 | U.S. |
| CVS | Double Strength Glucosamine Chondroitin with MSM | 2008-5/16/13 | U.S. |
| CVS | Triple Strength Glucosamine Chondroitin with MSM | 2008/5/16/13 | U.S. |
| CVS | Advanced Formula Triple Strength Glucosamine Chondroitin with Univestin | 2010-5/16/13 | U.S. |
| CVS | Advanced Formula Double Strength Glucosamine Chondroitin with Univestin and MSM | 2010-5/16/13 | |
| CVS | Triple Strength Glucosamine Chondroitin | 2005-5/16/13 | U.S. |
| CVS | Glucosamine Chondroitin Plus MSM and Hyaluronic Acid | 2008-5/16/13 | U.S. |
| CVS | Glucosamine HCl plus Boswellia Serrata and Vitamin D3 | 2012-5/16/13 | U.S. |
| CVS | Glucosamine Sulfate MSM | 2007-5/16/13 | U.S. |
| CVS | Triple Strength Glucosamine Chondroitin and Vitamin D3 | 2010-5/16/13 | U.S. |
| CVS | Glucosamine Chondroitin MSM | 2005-5/16/13 | U.S. |
| CVS | Glucosamine 2KC1 (sulfate) | 2005-5/16/13 | U.S. |
| Duane Reade | Double Strength Glucosamine Chondroitin | 2005-2009 | U.S. |
| Duane Reade | Double Strength Glucosamine Chondroitin with MSM | 2009-2011 | U.S. |
| Duane Reade | Triple Strength Glucosamine Chondroitin | 2007-2009 | U.S. |
| Duane Reade | Triple Strength Glucosamine Chondroitin with MSM | 2009-2011 | U.S. |
| Duane Reade | Glucosamine Chondroitin plus MSM and Hyaluronic Acid | 2009-2011 | U.S. |
| Duane Reade | Glucosamine Chondroitin plus MSM | 2007-2009 | U.S. |
| Equate | Advanced Triple Strength Glucosamine Chondroitin MSM (160-count) | 2008-1/31/13 | U.S. |
| Equate | Advanced Triple Strength Glucosamine Chondroitin MSM (80-count) | 2008-2010 | U.S. |
| Equaline | Glucosamine Chondroitin MSM with Hyaluronic Acid | 2007-5/16/13 | U.S. |
| Finest Naturals | Double Strength Glucosamine Chondroitin | 2011-5/16/13 | U.S. |
| Finest Naturals | Triple Strength Glucosamine Chondroitin | 2010-5/16/13 | U.S. |
| Finest Naturals | Glucosamine Sulfate | 2011-5/16/13 | U.S. |
| Finest/Finest Naturals | Double Strength Glucosamine MSM | 2011-5/16/13 | U.S. |
| Flex-a-Min | All Glucosamine Products | 2005-5/16/13 | U.S. |
| Good N Natural | All Glucosamine Products | 2005-5/16/13 | U.S. |
| Hannaford | Glucosamine Chondroitin MSM | 2008-2011 | U.S. |
| Hannaford | Double Strength Glucosamine Chondroitin | 2008-5/16/13 | U.S. |
| Hannaford | Triple Strength Glucosamine Chondroitin | 2008-2011 | U.S. |
| Healthy Accents | Glucosamine Chondroitin MSM | 2011-5/16/13 | U.S. |
| Healthy Accents | Double Strength Glucosamine Chondroitin with MSM | 2012-5/16/13 | U.S. |
| Healthy Accents | Triple Strength Glucosamine Chondroitin with MSM | 2012-5/16/13 | U.S. |
| Kirkland | Glucosamine HCl 500 mg Chondroitin Sulfate 400 mg | 2005-2006 | U.S. |
| Kirkland | Extra Strength Glucosamine HCl 1500 mg Chondroitin Sulfate 1200 mg | 2006-2010 | US, EXCEPT for NE region |
| Kirkland | Extra Strength Glucosamine HCl 1500 mg with MSM 1500 mg | 2006-2010 | U.S. |
| Kirkland | Extra Strength Glucosamine HCl 1500 mg with MSM 1500 mg | 2011-5/16/13 | San Diego, Texas, Midwest, Southeast, and Northeast regions of U.S. |
| Knox | All Glucosamine Products | 2005-5/16/13 | U.S. |
| Kroger | Glucosamine HCl 1500 mg Chondroitin Sulfate 1200 mg | 2009-5/16/13 | U.S. |
| Kroger | Glucosamine Chondroitin MSM Complex | 2009-5/16/13 | U.S. |
| Kroger | Extra Strength Glucosamine HCl 1500 mg Chondroitin Sulfate 1200 mg | 2009-5/16/13 | U.S. |
| Kroger | Glucosamine Chondroitin and Joint Lubricant Two-Per-Day | 2008-2011 | U.S. |
| Kroger | Glucosamine Chondroitin with MSM | 2008-5/16/13 | U.S. |
| Kroger | Glucosamine Chondroitin with MSM and Vitamin D | 2005-5/16/13 | U.S. |
| Kroger | Joint Support Glucosamine Chondroitin with MSM and  Univestin | 2010-2011 | U.S. |
| Kroger | Joint Support Glucosamine Chondroitin B88 with Univestin | 2010-2011 | U.S. |
| Kroger | Glucosamine Chondroitin Plus MSM with Vitamin D and Univestin | 2010-2011 | U.S. |
| Kroger | Glucosamine HCl | 2008-5/16/13 | U.S. |
| Kroger | Glucosamine HCl with MSM | 2009-5/16/13 | U.S. |
| Life Fitness | Double Strength Glucosamine Chondroitin | 2005-5/16/13 | U.S. |
| Life Fitness | Glucosamine Sulfate | 2005-5/16/13 | U.S. |
| Life Fitness | Triple Strength Glucosamine Chondroitin | 2005-5/16/13 | U.S. |
| Life Fitness | Glucosamine Chondroitin MSM | 2005-5/16/13 | U.S. |
| MET-Rx | All Glucosamine Products | 2005-5/16/13 | U.S. |
| Member's Mark | Triple Strength Glucosamine Chondroitin | 2008-5/16/13 | U.S. |

| Brand | Product | Dates of Sale | Geographic Location |
|---|---|---|---|
| Member's Mark | Glucosamine | 2008-5/16/13 | U.S. |
| Member's Mark | Glucosamine and MSM | 2008-5/16/13 | U.S. |
| Member's Mark | Triple Strength Glucosamine and MSM | 2008-5/16/13 | U.S. |
| Natural Wealth | All Glucosamine Products | 2005-5/16/13 | U.S. |
| Nature's Bounty | All Glucosamine Products | 2005-5/16/13 | U.S. |
| Origin | Triple Strength Glucosamine | 2007-2009 | U.S. |
| Origin | Glucosamine Sulfate | 2009-5/16/13 | U.S. |
| Osteo Bi-Flex | All Glucosamine Products | 2005-5/16/13 | U.S. |
| Physiologics | All Glucosamine Products | 2005-5/16/13 | U.S. |
| Rexall | All Glucosamine Products | 2005-5/16/13 | U.S. |
| Safeway | Triple Strength Glucosamine HCl and Chondroitin Sulfate | 2008-5/16/13 | U.S. |
| Safeway | Glucosamine HCl | 2008-5/16/13 | U.S. |
| Safeway | Glucosamine Chondroitin MSM | 2008-5/16/13 | U.S. |
| Safeway | Triple Strength Glucosamine HCl MSM | 2010-5/16/13 | U.S. |
| Safeway | Advanced Triple Strength Glucosamine Chondroitin MSM | 2008-5/16/13 | U.S. |
| Safeway | Double Strength Glucosamine Chondroitin MSM | 2008-5/16/13 | U.S. |
| Safeway | Triple Strength Glucosamine HCl Chondroitin Sulfate | 2008-5/16/13 | U.S. |
| Safeway | Glucosamine Chondroitin MSM with Hyaluronic Acid | 2008-5/16/13 | U.S. |
| Safeway | Triple Strength Glucosamine MSM | 2008-2010 | U.S. |
| Safeway | Advanced Double Strength Glucosamine Chondroitin MSM | 2008-5/16/13 | U.S. |
| ShopRite | Double Strength Glucosamine Chondroitin | 2006-5/16/13 | U.S. |
| ShopRite | Triple Strength Glucosamine Chondroitin | 2009-5/16/13 | U.S. |
| ShopRite | Triple Strength Glucosamine Chondroitin with MSM | 2012-5/16/13 | U.S. |
| Solgar | All Glucosamine Products | 2005-5/16/13 | U.S. |
| Spring Valley | Double Strength Glucosamine Chondroitin | 2005-5/16/13 | U.S. |
| Spring Valley | Triple Strength Glucosamine Chondroitin | 2011-5/16/13 | U.S. |
| Spring Valley | Glucosamine Chondroitin | 2008-5/16/13 | U.S. |
| Spring Valley | Glucosamine Chondroitin Plus MSM | 2005-5/16/13 | U.S. |
| Sundown/Sundown Naturals | All Glucosamine Products | 2005-5/16/13 | U.S. |
| SunMark | Glucosamine Chondroitin MSM Advanced Double Strength | 2008-5/16/13 | U.S. |
| SunMark | Glucosamine Chondroitin MSM with Joint Lubricant | 2008-5/16/13 | U.S. |
| SunMark | Glucosamine HCl | 2007-2011 | U.S. |
| SunMark | Triple Strength Glucosamine HCl and MSM | 2007-5/16/13 | U.S. |
| SunMark | Glucosamine with Calcium and D | 2007-2010 | U.S. |
| SunMark | Triple Strength Glucosamine Chondroitin  MSM | 2008-2011 | U.S. |
| Target | Triple Strength Glucosamine Chondroitin with MSM | 2009-5/16/13 | U.S. |
| Target | Glucosamine Chondroitin plus MSM and Hyaluronic Acid | 2009-5/16/13 | U.S. |
| Up and Up | Triple Strength Glucosamine Chondroitin plus MSM | 2009-5/16/13 | U.S. |
| Vitamin World | All Glucosamine Products | 2005-5/16/13 | U.S. |
| Walgreens | Glucosamine Chondroitiin | 2007 | U.S. |
| Walgreens | Glucosamine Chondroitin MSM | 2007 | U.S. |

**If You Purchased Certain Joint Health Dietary Supplements,
You May Be Part of a Class Action Settlement**

If you purchased certain joint health dietary supplements containing glucosamine that were manufactured or sold by Rexall Sundown, Inc. or NBTY, Inc. or their affiliates ("Rexall"), during certain periods of time and in certain geographic locations, you may be part of a class action settlement. As part of the settlement, you may be able to file a claim for cash. This notice is only a summary. For more complete information, and a list of all products covered by this settlement, please read the full notice by visiting the website www.GlucosamineSettlement.com, by writing to the address at the bottom of the notice, or by calling toll-free (888) 972-6583.

**What Are My Legal Rights?**

- **If you wish to remain a member of the settlement class,** you do not have to do anything. To receive money, you must file a claim. If the Court approves the proposed settlement, you will be bound by all of the Court's orders. This means you will not be able to make any claims against Rexall or its customers that are covered by the settlement.

- **If you wish to submit a claim, visit** www.GlucosamineSettlement.com, and follow the instructions, or call toll-free (888) 972-6583 to obtain a claim form. All claims must be submitted or postmarked by December 3, 2013.

- **If you do not wish to be a member of the settlement class,** you must submit a letter to the Settlement Administrator at the address below postmarked by August 1, 2013. If you request to be excluded from the settlement class you cannot submit a claim form.

Glucosamine Settlement
c/o Claims Administrator
P.O. Box 170
Philadelphia, PA 19105-0170
(888) 972-6583

**Supp. A31**

Glucosamine Settlement
c/o Claims Administrator
P.O. Box 170
Philadelphia, PA 19105-0170

PRSRT FIRST CLASS
U.S. POSTAGE
**PAID**
PHILADELPHIA, PA
PERMIT NO. 2323

Mike Hamer
_____

| | |
|---|---|
| From: | Glucosamine Settlement Administrator <rexall@del2.com> |
| Sent: | Friday, June 14, 2013 11:25 AM |
| To: | Mike Hamer |
| Subject: | Class Action Settlement Notification Ordered by the U.S. District Court for the Northern District of Illinois, Eastern Division |

## If You Purchased Certain Joint Health Dietary Supplements, You May Be Part of a Class Action Settlement

If you purchased certain joint health dietary supplements containing glucosamine that were manufactured or sold by Rexall Sundown, Inc. or NBTY, Inc. or their affiliates ("Rexall"), during certain periods of time and in certain geographic locations, you may be part of a class action settlement. As part of the settlement, you may be able to file a claim for cash. This notice is only a summary.

For more complete information, and a list of all products covered by this settlement, please read the full notice by visiting the website www.GlucosamineSettlement.com, by writing to the address at the bottom of the notice, or by calling toll-free (888) 972-6583.

## What Are My Legal Rights?

**If you wish to remain a member of the settlement class,** you do not have to do anything. To receive money, you must file a claim. If the Court approves the proposed settlement, you will be bound by all of the Court's orders. This means you will not be able to make any claims against Rexall or its customers that are covered by the settlement.

**If you wish to submit a claim,** visit www.GlucosamineSettlement.com, and follow the instructions, or call toll-free (888) 972-6583 to obtain a claim form. All claims must be submitted or postmarked by December 3, 2013.

**If you do not wish to be a member of the settlement class,** you must submit a letter to the Settlement Administrator at the address below postmarked by August 1, 2013. If you request to be excluded from the settlement class you cannot submit a claim form.

Glucosamine Settlement

c/o Claims Administrator

P.O. Box 170

Philadelphia, PA 19105-0170

(888) 972-6583

1

**Supp. A33**

## GLUCOSAMINE SETTLEMENT CLAIM FORM

Use this claim form only if you purchased for personal use, and not resale or distribution, certain joint health dietary supplements listed in Exhibit A, during the identified time frames and in the identified geographical locations ("Covered Products"). You may claim up to ten (10) bottles of Documented Purchases. You may claim up to four (4) bottles of Undocumented Purchases. **However**, your entire claim cannot exceed a total of ten (10) bottles of Documented and Undocumented Purchases.

### YOU MUST SUBMIT YOUR CLAIM FORM NO LATER THAN DECEMBER 3, 2013

**CLAIM INFORMATION (Please type or print the following information):**

Name:_____

Name of Legal Representative (if applicable): _____

Mailing Address:_____

City: _____ State: _____ Zip Code: _____

Daytime Telephone (_____) _____ Evening Telephone _____

Email Address: _____

** If you move or your name changes, please send your new contact information to the Claims Administrator via the settlement website or First-Class U.S. Mail, at the address listed below.

### CLAIM OF COVERED PRODUCTS PURCHASED

☐ **Documented purchases** (You should attach (i) cash register receipts; (ii) an intact box or bottle for a Covered Product that displays a readable UPC code and readable lot number; <u>or</u> (iii) similar documentation that identifies the Covered Product(s) and date(s) and location(s) of purchase. If you choose to file online, you will need to submit your Adequate Proof of Purchase as a .pdf file online. Instructions can be found at the website.) If you are a member of the Osteo Bi-Flex Ambassador's Club and have previously submitted Reward Points to Rexall, (a) current Ambassador's Club data will be reviewed as part of the consideration of your claim, and (b) you may be entitled to recovery based on proof of purchase previously submitted to Rexall.

☐ **Undocumented Purchases**

**DOCUMENTED PURCHASES ($5 PER BOTTLE, MAXIMUM OF 10 BOTTLES PER HOUSEHOLD):**

I purchased _____ (number) bottles of the products listed in Table 1 during the time periods and in the geographic locations identified in Table 1, for which I have Adequate Proof of Purchase as defined in the Claim Form Instructions. **Proof of purchase should be attached for each bottle of the product for which you are making a claim.**

**UNDOCUMENTED PURCHASES ($3 PER BOTTLE, MAXIMUM OF 4 BOTTLES PER HOUSEHOLD):**

| 1 | Approx. Date of Purchase: _____ | Product Name: _____ | Store Name: _____ | Store Location (City/State): _____ |
|---|---|---|---|---|
| 2 | Approx. Date of Purchase: _____ | Product Name: _____ | Store Name: _____ | Store Location (City/State): _____ |
| 3 | Approx. Date of Purchase: _____ | Product Name: _____ | Store Name: _____ | Store Location (City/State): _____ |
| 4 | Approx. Date of Purchase: _____ | Product Name: _____ | Store Name: _____ | Store Location (City/State): _____ |

**DISCLOSURE:**

The Settlement Administrator and the Parties have the right to audit all claims for completeness, waste, fraud, and abuse. Filing a false claim may violate certain criminal or civil laws.

**CERTIFICATION:**

I have read and am familiar with the contents of the Instructions accompanying this Claim Form and I certify that the information I have set forth in the foregoing Claim Form and in any documents attached by me are true, correct, and complete to the best of my knowledge. I am not an officer, director, agent, servant, or employee of Rexall Sundown, Inc. or any related entity thereof; a judge in this lawsuit; or an immediate family member of such persons; and I have not requested exclusion from the Settlement. **I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge and that this Claim Form was executed this _____ day of _____, 2013.**

_____     _____     _____
Signature                             Type/Print Name                    Date

If the Claimant is not the person completing this form, the following must be provided:

_____     _____     _____
Name of person signing      Capacity of person signing      Date
                                          (Executor, President, Trustee, etc.)

Upon completion, please mail this form to: Glucosamine Settlement; c/o Claims Administrator; P.O. Box 170; Philadelphia, PA 19105-0170. Or, submit the form electronically at www.GlucosamineSettlement.com.

Failure to provide all the requested information may result in the denial of your Claim and you will receive no cash payment from this Settlement. Pursuant to the terms of the Settlement Agreement, the Settlement Administrator's determination is final and cannot be appealed by anyone. **CLAIM PROCESSING TAKES A SIGNIFICANT AMOUNT OF TIME. THANK YOU FOR YOUR PATIENCE.**

**Supp. A35**

# Exhibit B

**Home** | About | Documents | Contact Us | Submit Claim

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION
The Court authorized this notice. This is <u>not</u> a solicitation from a lawyer.

**If you have purchased certain joint health dietary supplements containing glucosamine that were manufactured or sold by Rexall Sundown, Inc. or NBTY, Inc. or their affiliates, you could get a payment from this class action settlement.**

The Notice is to inform you that on May 16, 2013, the Court preliminarily approved a settlement of this case (the "Litigation"), brought on behalf of the Settlement Class. The Notice describes the settlement. Please read the Notice carefully to determine whether you wish to participate in the settlement. Your rights and options—**and the deadlines to exercise them**—are explained in the Notice. Your legal rights are affected regardless of whether you act or not.

Rexall Sundown, Inc. and NBTY, Inc. (and their affiliated companies) (collectively, "Rexall") manufacture and sell joint health dietary supplements containing the ingredients glucosamine and chondroitin, among other ingredients ("the Glucosamine Products"). Since 2011, class actions have been filed in which the plaintiffs, on behalf of themselves and other purchasers, allege that certain claims made on the labeling of certain Glucosamine Products are false, deceptive, and misleading. These claims have been brought under various state consumer protection acts. No allegations related to safety or physical injury have been made.

The Court has not decided in favor of either side in the case. Rexall denies all allegations of wrongdoing or liability against it and contends that its conduct was lawful. Rexall stands by the Glucosamine Products and their efficacy. Rexall is settling to avoid the expense, inconvenience, and inherent risk of litigation, as well as the disruption of its business operations. Plaintiffs and their attorneys assert that the settlement is in the best interests of the Settlement Class, because it provides a fair and reasonable recovery now while avoiding the risk, expense, and delay of pursuing the case through trial and any appeals.

The Settlement Class is defined as all consumers who, during particular time periods and in certain U.S. locations, purchased for personal use and not resale or distribution certain joint health dietary supplements (a) sold by Rexall or any of its affiliates under the brand names of Rexall or its affiliates; or, (b) manufactured by Rexall or any of its affiliates but sold under another brand name by a company not affiliated with Rexall (collectively, "Covered Products"). The Covered Products and their geographic locations and time periods of sale covered by this Settlement are identified in Attachment A to the Notice. Excluded from the Settlement Class are all persons who submit valid requests for exclusion from the Settlement Class.

**Your rights and options, and the deadlines to exercise them, are explained in the Notice.**

Contact us for more information about this page.

---

**Submit Claim**
Easily and securely submit your claim electronically.

**Documents**
Please read for a full explanation of the settlement and your options and all applicable timelines.

**Contact Us**
Contact us with any inquiries, comments, and/or requests.

## Important Documents

- Preliminary Approval Order (PDF: 2.7 MB)
- Settlement Agreement (PDF: 3.6 MB)
- Full Class Notice (PDF: 168.2 KB)
- Postcard Notice (PDF: 24.3 KB)
- Claim Form (PDF: 113.2 KB)
- Exhibit A - Covered Products (PDF: 83.3 KB)

## Important Dates

- **August 1, 2013**
  *Exclude yourself from the Class.*
  You must mail your exclusion request so that it is postmarked no later than August 1, 2013.

- **August 1, 2013**
  *Comments and/or Objections.*
  You must mail your comments, objections, and/or notice of intent to appear at the Fairness Hearing so that it/they are postmarked no later than August 1, 2013.

- **September 4, 2013**
  *Fairness Hearing Date.*
  The Fairness Hearing is scheduled for September 4, 2013. Please check this website for updates.

- **December 3, 2013**
  *Claim Form Deadline.*
  You must submit your Claim Form on-line on or before December 3, 2013, or mail your completed paper Claim Form so that it is postmarked no later than December 3, 2013.

---



Glucosamine Settlement c/o Claims Administrator
P.O. Box 170 - Philadelphia, PA 19105-0170 USA - (888) 972-6583

Copyright © 2013 Heffler Claims Group - All Rights Reserved.
This site designed and developed by Heffler Claims Group.

**Supp. A37**

Home  |  **About**  |  Documents  |  Contact Us  |  Submit Claim

## Your Legal Rights and Options in this Settlement

**Submit a Claim Form Postmarked or Completed Online by December 3, 2013**: The only way to receive a payment.

**Exclude Yourself from the Class by August 1, 2013**: Receive no payment. This is the only option that allows you to pursue claims by filing your own lawsuit at your own expense.

**Comment by August 1, 2013**: Write to the Court about why you do, or do not, like the settlement. You must remain in the Settlement Class to comment in support of or in opposition to the settlement.

**Attend the Hearing on September 4, 2013**: Ask to speak to the Court about the fairness of the settlement. You must remain in the Settlement Class to comment at the hearing.

**Do Nothing**: Receive no payment, and give up rights to sue.

- Your rights and options—and the deadlines to exercise them—are explained in the Class Notice (PDF: 168.2 KB).
- The Court still has to decide whether to approve the settlement. Payments will be made if the Court approves the settlement and after any appeals are resolved. Please be patient.

**Contact us for more information about this page.**

---

**Submit Claim**
Easily and securely submit your claim electronically.

**Documents**
Please read for a full explanation of the settlement and your options and all applicable timelines.

**Contact Us**
Contact us with any inquiries, comments, and/or requests.

### Important Documents

- Preliminary Approval Order (PDF: 2.7 MB)
- Settlement Agreement (PDF: 3.6 MB)
- Full Class Notice (PDF: 168.2 KB)
- Postcard Notice (PDF: 24.3 KB)
- Claim Form (PDF: 113.2 KB)
- Exhibit A – Covered Products (PDF: 83.3 KB)

---

Home
**About**
Documents

Contact Us
Submit Claim

 Heffler Claims GROUP

Glucosamine Settlement c/o Claims Administrator
P.O. Box 170 · Philadelphia, PA 19105-0170 USA · (888) 972-6583
Copyright © 2013 Heffler Claims Group - All Rights Reserved.
This site designed and developed by Heffler Claims Group.

Home  |  About  |  **Documents**  |  Contact Us  |  Submit Claim

## Documents

- Preliminary Approval Order (PDF: 2.7 MB)
- Settlement Agreement (PDF: 3.6 MB)
- Full Class Notice (PDF: 168.2 KB)
- Postcard Notice (PDF: 24.3 KB)
- Claim Form (PDF: 113.2 KB)
- Exhibit A – Covered Products (PDF: 83.3 KB)

### Having Trouble?

Having trouble opening .pdf files? You can download
Acrobat Reader for free from www.adobe.com.

**Contact us for more information about this page.**

Home
About
**Documents**

Contact Us
Submit Claim



Glucosamine Settlement c/o Claims Administrator
P.O. Box 170 · Philadelphia, PA 19105-0170 USA · (888) 972-6583

Copyright © 2013 Heffler Claims Group – All Rights Reserved.
This site designed and developed by Heffler Claims Group.

Home  | About  | Documents  | **Contact Us**  | Submit Claim

## Contact Us

### Submit Claim
Easily and securely submit your claim electronically.

### Documents
Please read for a full explanation of the settlement and your options and all applicable timelines.

**Glucosamine Settlement**
**c/o Claims Administrator**
P.O. Box 170
Philadelphia, PA 19105-0170
(888) 972-6583

Fields marked with an asterisk (*) are required.

First Name *

Last Name *

Address 1

Address 2

City

State

Zip Code

Country

Email Address *

Confirm Email Address *

Day Phone *

Night Phone *

Fax

Subject *

Message (Limited to 5000 characters) *     (5000 characters left)

## Important Documents

- Preliminary Approval Order (PDF: 2.7 MB)
- Settlement Agreement (PDF: 3.6 MB)
- Full Class Notice (PDF: 168.2 KB)
- Postcard Notice (PDF: 24.3 KB)
- Claim Form (PDF: 113.2 KB)
- Exhibit A - Covered Products (PDF: 83.3 KB)

## Important Dates

- **August 1, 2013**
  *Exclude yourself from the Class.*
  You must mail your exclusion request so that it is postmarked no later than August 1, 2013.

- **August 1, 2013**
  *Comments and/or Objections.*
  You must mail your comments, objections, and/or notice of intent to appear at the Fairness Hearing so that it/they are postmarked no later than August 1, 2013.

- **September 4, 2013**
  *Fairness Hearing Date.*
  The Fairness Hearing is scheduled for September 4, 2013. Please check this website for updates.

- **December 3, 2013**
  *Claim Form Deadline.*
  You must submit your Claim Form on-line on or before December 3, 2013, or mail your completed paper Claim Form so that it is postmarked no later than December 3, 2013.

## Having Trouble?

Having trouble opening .pdf files? You can download Acrobat Reader for free from www.adobe.com.

Supp. A40



  Clear

**PLEASE NOTE:** We will take every measure appropriate to ensure your comment/request and contact information is kept confidential.

Home
About
Documents

**Contact Us**
Submit Claim

Heffler Claims
GROUP

Glucosamine Settlement c/o Claims Administrator
P.O. Box 170 · Philadelphia, PA 19105-0170 USA · (888) 972-6583

Copyright © 2013 Heffler Claims Group - All Rights Reserved.
This site designed and developed by Heffler Claims Group.

Supp. A41

Home   |   About   |   Documents   |   Contact Us   |   **Submit Claim**

## Claim Form

Use this claim form only if you purchased for personal use, and not resale or distribution, certain joint health dietary supplements listed in Exhibit A, during the identified time frames and in the identified geographical locations ("Covered Products"). You may claim up to ten (10) bottles of Documented Purchases. You may claim up to four (4) bottles of Undocumented Purchases. However, your entire claim cannot exceed a total of ten (10) bottles of Documented and Undocumented Purchases.

**YOU MUST SUBMIT YOUR CLAIM FORM NO LATER THAN DECEMBER 3, 2013**
Your Claim Form is **NOT** considered submitted and received until you receive a message that it has been received that also contains the assigned Claim Number.

Fields marked with an asterisk (*) are required.

### CLAIM INFORMATION:

**First Name \***

**Last Name \***

**Legal Representative First Name**
(if applicable)

**Legal Representative Last Name**
(if applicable)

**Mailing Address 1 \***

**Mailing Address 2**

**Mailing City \***

**Mailing State \***

**Mailing Zip Code \***

**Email Address \***

**Confirm Email Address \***

**Daytime Telephone \***

**Evening Telephone \***

** If you move or your name changes, please send your new contact information to the Claims Administrator via the settlement website or First Class U.S. Mail, at the address listed below.

### CLAIM OF COVERED PRODUCTS PURCHASED *

☐ **Documented Purchases –** You should attach photocopies of (i) cash register receipts; (ii) an intact box or bottle for a Covered Product that displays a readable UPC code and readable lot number; or (iii) similar documentation that identifies the Covered Product(s) and date(s) and location(s) of purchase. If you choose to file online, you should submit your Adequate Proof of Purchase as a .pdf file. If you are a member of the Osteo Bi-Flex Ambassador's Club and

**Supp. A42**

have previously submitted Reward Points to Rexall, (a) current Ambassador's Club data will be reviewed as part of the consideration of your claim, and (b) you may be entitled to recovery based on proof of purchase previously submitted to Rexall.

☑ **Undocumented Purchases**

## DOCUMENTED PURCHASES ($5 PER BOTTLE, MAXIMUM OF 10 BOTTLES PER HOUSEHOLD) *

I purchased [____] (number) bottles of the products listed in Table 1 during the time periods and in the geographic locations identified in Table 1, for which I have Adequate Proof of Purchase as defined in the Claim Form Instructions. **Proof of purchase should be attached for each bottle of the product for which you are making a claim.**

| | Approximate Date of Purchase | Product Name | Store Name | Store Location (City, State) |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | | | | |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |

**Upload Proof of Purchase**

**Click here** to upload your proof of purchase which should be attached for each bottle of the product for which you are making a claim.

## UNDOCUMENTED PURCHASES ($3 PER BOTTLE, MAXIMUM OF 4 BOTTLES PER HOUSEHOLD): *

| | Approximate Date of Purchase | Product Name | Store Name | Store Location (City, State) |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |

**DISCLOSURE:**

Supp. A43

The Claims Administrator and the Parties have the right to audit all claims for completeness, waste, fraud, and abuse. Filing a false claim may violate certain criminal or civil laws.

## CERTIFICATION

 * I have read and am familiar with the contents of the Instructions accompanying this Claim Form and I certify that the information I have set forth in the foregoing Claim Form and in any documents attached by me are true, correct, and complete to the best of my knowledge. I am not an officer, director, agent, servant, or employee of Rexall Sundown, Inc. or any related entity thereof; a judge in this lawsuit; or an immediate family member of such persons; and I have not requested exclusion from the Settlement. **I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge and that this Claim Form was executed this 7 day of August, 2013.**

If the Claimant is not the person completing this form, the following must be provided:

**First Name**

**Last Name**

**Capacity of person signing**
(Executor, President, Trustee, etc.)

Failure to provide all the requested information may result in the denial of your Claim and you will receive no cash payment from this Settlement. Pursuant to the terms of the Settlement Agreement, the Claims Administrator's determination is final and cannot be appealed by anyone.

**CLAIM PROCESSING TAKES A SIGNIFICANT AMOUNT OF TIME. THANK YOU FOR YOUR PATIENCE.**

Your Claim Form is **NOT** considered submitted and received until you receive a message that it has been received that also contains the assigned Claim Number.

 Clear

Home
About
Documents

Contact Us
**Submit Claim**

Glucosamine Settlement c/o Claims Administrator
P.O. Box 170 · Philadelphia, PA 19105-0170 USA · (888) 972-6583
Copyright © 2013 Heffler Claims Group - All Rights Reserved.
This site designed and developed by Heffler Claims Group.

# Exhibit C

**1-888-972-6583**

Welcome to the 'Rexall Glucosamine Products Settlement' Voice Information System.   This system uses a "Frequently Asked Questions" format to briefly describe the proposed class action settlement involving all consumers who, during particular time periods and in certain U.S. locations, purchased for personal use and not resale or distribution certain joint health dietary supplements either (a) sold by Rexall or any of its affiliates under the brand names of Rexall or its affiliates; or, (b) manufactured by Rexall or any of its affiliates but sold under another brand name by a company not affiliated with Rexall.  If you fit the description of the settlement class, your rights and options under the Settlement — and the deadlines to exercise them — are explained here, and in more detail  at  *www.GlucosamineSettlement.com*.   That's:  "G-L-U-C-O-S-A-M-I-N-E  Settlement.com."    This  Voice Information System is only a summary of the settlement and your rights.  To obtain the full class notice, the claim form, the Settlement Agreement or for more information, go to *www.GlucosamineSettlement.com* or write to the Settlement Administrator at: Glucosamine Settlement Administrator, P.O. Box 170, Philadelphia, PA 19102-0170. Note that a live operator is <u>not</u> available with this service.  Please do not contact the court with any questions.

**Main Menu (Voiced)**

For "How can I file a claim or request a claim form, full notice or Settlement Agreement be sent to me?" Press '1'

For "Why should I read the Notice?" Press '2'

For "What is the Litigation about?" Press '3'

For "Why is there a settlement?" Press '4'

For "Who is included in the settlement?" Press '5'

For "What recovery is available under the settlement?" Press '6'

For "Who represents the Settlement Class?" Press '7'

For "How can I exclude myself from the Settlement Class?" Press '8'

For "How can I tell the Court what I think about the settlement?" Press '9'

For Additional Frequently Asked Questions Press '0'

**Additional FAQ's (Voiced)**

For "What is the effect of final settlement approval?" Press '1'

For "When and where will the Court hold a hearing on the fairness of the settlement?" Press '2'

For "How and when do I receive my share of the settlement?" Press '3'

For "What happens if I do nothing at all?" Press '4'

For "Where do I get additional information?" Press '5'

**1. How can I file a claim or request a claim form, full notice or copy of the Settlement Agreement be sent to me? (Voiced)**

To file a claim electronically, please visit *www.GlucosamineSettlement.com* and select "Claim Form" from the homepage. To view, download or print a claim form, full Notice or copy of the Settlement Agreement, please visit *www.GlucosamineSettlement.com* and select "Important Documents" from the homepage. To have a claim form, full notice or copy of the Settlement Agreement mailed to you, please visit *www.GlucosamineSettlement.com* and select "Contact Us" from the homepage. In the body of your request, please identify to whom the requested documents should be addressed and where you would like the form sent; OR you may write to the Settlement Administrator at: Glucosamine Settlement Administrator, P.O. Box 170, Philadelphia, PA 19102-0170 and request which document or documents you would like sent to you.

You may hang up or press "*" to return to the main menu.

**2. Why should I read the notice? (Voiced)**

The notice is to inform you that on May 16, 2013, the Court preliminarily approved a settlement of the case, brought on behalf of the Settlement Class. The notice describes the settlement. Please read the notice carefully to determine whether you wish to participate in the settlement. Your rights and options—**and the deadlines to exercise them**—are explained in the notice. Your legal rights are affected regardless of whether you act or not.

You may hang up or press "*" to return to the main menu.

**3. What is the Litigation about? (Voiced)**

Rexall Sundown, Inc. and NBTY, Inc. and their affiliated companies - collectively, "Rexall" - manufacture and sell joint health dietary supplements containing the ingredients glucosamine and chondroitin, among other ingredients - "the Glucosamine Products." Since 2011, class actions have been filed in which the plaintiffs, on behalf of themselves and other purchasers, allege that certain claims made on the labeling of certain Rexall Glucosamine Products are false, deceptive, and misleading. These claims have been brought under various state consumer protection acts. Rexall denies all allegations of wrongdoing or liability against it and contends that its conduct was lawful. No allegations related to safety or physical injury have been made.

You may hang up or press "*" to return to the main menu.

**4. Why is there a settlement? (Voiced)**

The Court has not decided in favor of either side in the case. Rexall denies all allegations of wrongdoing or liability against it and contends that its conduct was lawful. Rexall stands by the Glucosamine Products and their efficacy. Rexall is settling to avoid the expense, inconvenience, and inherent risk of litigation, as well as the disruption of its business operations. Plaintiffs and their attorneys assert that the settlement is in the best interests of the Settlement Class, because it provides a fair and reasonable recovery now while avoiding the risk, expense, and delay of pursuing the case through trial and any appeals.

You may hang up or press "*" to return to the main menu.

## 5.   Who is included in the settlement? (Voiced)

The Settlement Class is defined as all consumers who, during particular time periods and in certain U.S. locations, purchased for personal use and not resale or distribution certain joint health dietary supplements either (a) sold by Rexall or any of its affiliates under the brand names of Rexall or its affiliates; or, (b) manufactured by Rexall or any of its affiliates but sold under another brand name by a company not affiliated with Rexall collectively, the "Covered Products". The Covered Products and their geographic locations and time periods of sale covered by this Settlement are identified in Attachment A to the Notice. Excluded from the Settlement Class are all persons who submit valid requests for exclusion from the Settlement Class. For questions or information related to excluding yourself from the Settlement please select question 8 from the main menu.

You may hang up or press "*" to return to the main menu.

## 6.   What recovery is available under the settlement? (Voiced)

**a.     Monetary Recovery.** If you submit a claim postmarked or submitted online by December 3, 2013, you may be eligible to receive a check. If you submit a claim with Adequate Proof of Purchase of a Covered Product, you shall be entitled to receive $5.00 per bottle of Covered Product purchased, up to a maximum of ten bottles of Covered Products purchased per household. "Adequate Proof of Purchase" shall mean (i) cash register receipts; (ii) an intact box or bottle for a Covered product that clearly displays a readable UPC code and readable lot number; or (iii) similar documentation that identifies the Covered Product and date and location of purchase. If you <u>cannot</u> provide Adequate Proof of Purchase, but submit a claim confirming certain facts regarding your purchase or purchases of Covered Products, you may be entitled to receive $3.00 per bottle of Covered Product purchased, up to a maximum of four bottles of Covered Products purchased per household.

**b.     Minimum Total Payment.** If the total dollar value of valid claims submitted is less than $2 million, then the payment to each Settlement Class member who submitted a valid claim with Adequate Proof of Purchase shall be increased *pro rata* up to a maximum of triple what he or she was otherwise entitled to until the total payments reach $2 million. If, after increasing the payment for valid claims with Adequate Proof of Purchase, the total payments is still less than $2 million, then the payment to each Settlement Class member who submitted a valid claim without Adequate Proof of Purchase shall be increased *pro rata* up to a maximum of double what he or she was otherwise entitled to until the total payments reach $2 million, with any residual amounts up to $2 million paid to the Orthopaedic Research and Education Foundation, subject to Court approval.

**c.     Notice and Administration Costs.** A third-party, Heffler Claims Group, shall serve as the settlement administrator to administer the settlement. Rexall shall pay for all notice and administration costs. This payment is separate and apart from the $2 million minimum payment for claims and charitable donations.

**d.     Labeling Changes.** Rexall has also agreed to make certain modifications to the labeling of Covered Products, which are described in Paragraph 7 and Exhibit B to the Settlement Agreement.

You may hang up or press "*" to return to the main menu.

## 7.   Who represents the Settlement Class? (Voiced)

The Class Representatives and Settlement Class Counsel represent the Settlement Class:

**Who are the Class Representatives**? For purposes of the settlement, the Court has appointed the following plaintiffs named in the Litigation to serve as the class representatives: Richard Jennings, Francisco Padilla, Cecilia Linares, Abel Gonzalez, Nick Pearson, and Augustina Blanco. Settlement Class Counsel will request incentive

awards up to the amount of $5,000 for each class representative, to be paid separately by Rexall, without diminishing or eroding the payments available to Settlement Class members.

**Who are Settlement Class Counsel?**  The Court has appointed the following attorneys and law firms to represent the Settlement Class as legal counsel: Jeffrey I. Carton and Peter N. Freiberg, DENLEA & CARTON, LLP, One North Broadway, Suite 509, White Plains, New York 10601; Elaine A. Ryan, BONNETT, FAIRBOURN, FRIEDMAN & BALINT, P.C., 2325 E. Camelback Road, Suite 300, Phoenix, Arizona 85016; and Stewart M. Weltman, STEWART M. WELTMAN, LLC (Of Counsel Levin Fishbein Sedran & Berman), 53 W. Jackson Suite 364, Chicago, Illinois 60604. From the inception of the litigation in 2011 to the present, Settlement Class Counsel have not received any payment for their services in prosecuting the case or obtaining the settlement, nor have they been reimbursed for any out-of-pocket expenses they have incurred.  When they ask the Court to approve the settlement, Settlement Class Counsel will also make motions to the Court for awards of attorneys' fees and reimbursement of expenses, in a total amount not to exceed $ 4.5 million.  Rexall has agreed not to oppose these attorneys' fee requests.  If the Court approves the attorneys' fee applications, they will be paid separately by Rexall, without diminishing or eroding the payments available to Settlement Class members.  The Settlement Class members will not have to pay anything toward the fees or expenses of Settlement Class Counsel.   Settlement Class Counsel will seek final approval of the settlement on behalf of all Settlement Class members.

You may hang up or press "*" to return to the main menu.

| 8. | How can I exclude myself from the Settlement Class? (Voiced) |
|---|---|

To exclude yourself from the Settlement Class, you must send a letter saying that you want to be excluded from the class in the Glucosamine Products Litigation.  Your written exclusion request must include your name, address, telephone number, and signature, and a statement to the effect that: "I or We hereby request to be excluded from the proposed Settlement Class in the Glucosamine Products Litigation."  Your exclusion request must be postmarked and sent to the following address no later than August 1, 2013:

> Glucosamine Settlement
> c/o Claims Administrator
> P.O. Box 170
> Philadelphia, PA 19105-0170

If you elect to opt-out, you will (i) <u>not</u> be able to submit a claim to receive any monetary payment, (ii) <u>not</u> be bound by any further orders or judgments in this case, and (iii) remain able to pursue claims alleged in the Litigation against Rexall by filing your own lawsuit at your own expense.  If you proceed on an individual basis, you may receive nothing at all, or more, or less, of a benefit than you would otherwise receive under this settlement.

You may hang up or press "*" to return to the main menu.

| 9. | How can I tell the Court what I think about the settlement? (Voiced) |
|---|---|

If you do not exclude yourself from the Settlement Class, you can comment in support of or in opposition to the settlement.  Your objection or comment must be submitted in writing to all four of the following addresses below and must be postmarked by August 1, 2013:

**The Court:** Clerk of Court, United States District Court, Northern District of Illinois, Everett McKinley Dirksen United States Courthouse, 219 South Dearborn Street, Chicago, Illinois 60604;

**Supp. A49**

**Settlement Class Counsel:** Peter N. Freiberg, DENLEA & CARTON, LLP, One North Broadway, Suite 509, White Plains, New York 10601; **and** Stewart M. Weltman, STEWART M. WELTMAN, LLC (Of Counsel Levin Fishbein Sedran & Berman), 53 W. Jackson Suite 364, Chicago, Illinois 60604;

**Rexall's Counsel:** Kara L. McCall, SIDLEY AUSTIN LLP, One S. Dearborn Street, Chicago, Illinois 60603.

The objection or comment must include the case name and number *Pearson, et al. v. NBTY, Inc., et al.*, No. 1:11-cv-07972, and also include: (a) your full name, address, and telephone number; (b) a signed declaration that states that you are a member of the Settlement Class and that identifies the Covered Product or products purchased as well as the approximate date and location of the purchase or purchases; (c) the specific grounds for the objection; (d) all documents, writings, or testimony of witnesses that you desire the Court to consider; and (e) notice of your intention to appear at the Fairness Hearing, if any, that lists the name, address, and telephone number of the attorney, if any, who will appear.

The Court will consider all comments from Settlement Class members. If you intend to appear at the Fairness Hearing through counsel, your comment must also state the identity of all attorneys representing you who will appear at the Fairness Hearing. To appeal from any provision of the order approving the Settlement as fair, reasonable, and adequate, the award of incentive payments, or the award of reasonable attorneys' fees and expenses paid by Rexall and awarded to Settlement Class Counsel, you must appear in person or through your counsel, or as otherwise may be permitted by the Court at the Fairness Hearing. You may, however, ask the Court in your objection to excuse such appearance prior to the Fairness Hearing.

You may hang up or press "*" to return to the main menu.

## 1. What is the effect of final settlement approval? (Voiced)

If the Court grants final approval to the settlement, all members of the Settlement Class will release all claims or causes of action arising from or relating to (i) claims that were or could have been asserted in the Litigation; (ii) the Covered Products, including their efficacy or performance and any and all advertising, labeling, packaging, marketing, claims, or representations of any type whatsoever regarding the Covered Products; and (iii) all labels or packaging for the Covered Products that conform to the terms of the Settlement. The Released Claims do not include claims for personal injury. All members of the Settlement Class who do not exclude themselves from the Settlement Class will release any claims they may have against Rexall or other persons and entities that are described in and covered by the release. Please refer to Paragraphs 11 and 12 of the Settlement Agreement for a full description of the claims and persons that will be released upon final approval of the settlement. You can obtain a copy of the Settlement Agreement (i) from the Clerk of the Court, (ii) online at *www.GlucosamineSettlement.com*, (iii) by writing to the Settlement Administrator at Glucosamine Settlement, c/o Claims Administrator, P.O. Box 170, Philadelphia, PA 19105-0170. If you do not wish to be a Settlement Class member, you must exclude yourself from the Settlement Class. For questions or information related to excluding yourself from the Settlement, please select question 8 from the main menu.

If the settlement is not approved, the case will proceed as if no settlement had been attempted. There can be no assurance that if the settlement is not approved and litigation resumes, the Settlement Class will recover more than is provided for under the settlement, or will recover anything.

You may hang up or press "*" to return to the main menu.

## 2. When and where will the Court hold a hearing on the fairness of the settlement? (Voiced)

A Fairness Hearing has been set for September 4, 2013, at 11:00 a.m., before Judge Zagel in the Northern District of Illinois. At the hearing, the Court will hear any comments, objections, and arguments concerning the

fairness of the proposed settlement, including the amount requested by Settlement Class Counsel for attorneys' fees and expenses, and incentive awards for the Plaintiffs. You do not need to attend the Fairness Hearing to remain a class member or obtain a settlement payment.

You may hang up or press "*" to return to the main menu.

**3.    How and when do I receive my share of the settlement? (Voiced)**

If you do not exclude yourself from the Settlement Class, and would like to receive money, you must submit a timely and valid claim form as set forth in Question 6 from the main menu. Claim forms must be submitted online, or postmarked, by December 3, 2013. You can download a copy of the appropriate claim form online at *www.GlucosamineSettlement.com*, or obtain a copy by writing to the Settlement Administrator at Glucosamine Settlement, c/o Claims Administrator, P.O. Box 170, Philadelphia, PA 19105-0170. Payments to persons who file timely, valid claim forms cannot be made until after the Fairness Hearing scheduled for September 4, 2013, and after the Court has issued an order finally approving the settlement that is no longer subject to appeal. Please be patient.

You may hang up or press "*" to return to the main menu.

**4.    What happens if I do nothing at all? (Voiced)**

If you do nothing, you will receive no payment from the settlement. You will still be part of the Settlement Class, and bound by the release described in Paragraphs 11 and 12 of the Settlement Agreement. Please refer to Paragraphs 11 and 12 of the Settlement Agreement for a full description of the claims and persons that will be released upon final approval of the settlement.

You may hang up or press "*" to return to the main menu.

**5.    Where do I get additional information? (Voiced)**

The notice provides only a summary of the matters relating to the settlement. For more detailed information, you may wish to review the Settlement Agreement dated April 15, 2013. You can view the Settlement Agreement and get more information at *www.GlucosamineSettlement.com*. You can also get more information by writing to Settlement Class Counsel at the addresses from Question 9 in the main menu. The Settlement Agreement and all other pleadings and papers filed in connection with the Settlement are available for inspection and copying during regular business hours at the office of the Clerk of the United States District Court, Northern District of Illinois, Everett McKinley Dirksen United States Courthouse, 219 South Dearborn Street, Chicago, Illinois 60604.

PLEASE DO <u>NOT</u> CONTACT THE COURT OR REXALL WITH QUESTIONS ABOUT THE SETTLEMENT.

You may hang up or press "*" to return to the main menu.

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NICK PEARSON, FRANCISCO PADILLA, CECILIA LINARES, AUGUSTINA BLANCO, ABEL GONZALEZ, and RICHARD JENNINGS, On Behalf of Themselves and All Others Similarly Situated, | Case No.:   11 CV 07972 |
| Plaintiffs, | CLASS ACTION |
| v. | **Judge James B. Zagel** |
| NBTY, INC., a Delaware corporation; and REXALL SUNDOWN, INC., a Florida corporation; TARGET CORPORATION, a Minnesota Corporation, | |
| Defendants. | |

I, MICHAEL COLLINS, declare under the penalty of perjury as follows:

1.    I, MICHAEL COLLINS, make this Declaration of behalf of NBTY, Inc., Rexall Sundown, Inc., and their subsidiaries ("Settling Defendants").

2.    I am the Chief Financial Officer of NBTY, Inc. and have authority to make this Declaration on behalf of the Settling Defendants.

3.    None of the Settling Defendants currently have, or in the knowable past have had, any relationship whatsoever with the Orthopaedic Research and Education Foundation.

4.    None of the Settling Defendants currently are providing, or in the knowable past have provided, any monetary contributions or other support to the Orthopaedic Research and Education Foundation.

5.    None of the Settling Defendants currently are receiving, or in the knowable past have received, any monetary contributions or other support from the Orthopaedic Research and Education Foundation.

6.    As NBTY, Inc.'s Chief Financial Officer, I have knowledge regarding the sales of Osteo Bi-Flex.

7.    

8.    

**Supp. A52**

9.    I declare under penalty of perjury that the foregoing is true and correct.

_____                    _8. 30. 13_____

MICHAEL COLLINS                                     DATE
CHIEF FINANCIAL OFFICER
NBTY, Inc.
Rexall Sundown, Inc.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NICK PEARSON, FRANCISCO PADILLA, CECILIA LINARES, AUGUSTINA BLANCO, ABEL GONZALEZ, and RICHARD JENNINGS, On Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>NBTY, INC., a Delaware corporation; and REXALL SUNDOWN, INC., a Florida corporation; TARGET CORPORATION, a Minnesota Corporation,<br><br>Defendants. | Case No.:    11 CV 07972<br><br>CLASS ACTION<br><br>Judge James B. Zagel |

**AFFIDAVIT OF MARK D SCHEY**

I, Mark Schey, being first duly sworn according to law, depose and say under penalty of perjury as follows:

1.        I am the CEO of Digital Settlement LLC ("DS"), a firm specializing in developing and executing targeted class action notice plans. I submit this affidavit at the request of Counsel in regards to the settlement in the case styled Pearson et al. v. NBTY, Inc. (the "Action").

2.        I have been professionally involved in marketing and advertising for over 15 years. During that time, I have managed millions of dollars in on-line advertising campaigns for my clients (which include various Fortune 500 and private companies). In addition to Internet advertising, I have a strong background in television advertising where I have created award-winning commercial campaigns that have been featured in BrandWeek and AdWeek magazines.

CH1 8025634v.1

I am also a recognized expert in the Direct Response industry, where I develop print creative and on-line marketing for products that appear in over 50,000 retail locations (including Walmart, Walgreens, and CVS). One of my core responsibilities in that regard is the targeting, using various methodologies, of groups of consumers who are most likely to see the advertisements and buy the products at retail stores.

3.     I have substantial expertise in marketing a broad range of dietary supplement products, including joint health supplements like those at issue in the Action. Over the years, several of my clients have been in the dietary supplement business, and the scope of my responsibilities for those companies has included the oversight of Print and Internet marketing campaigns that involved the expenditure of millions of dollars in costs, and resulted in tens of millions of dollars of retail sales. As a result, I have a substantial amount of experience in "locating" consumers who purchase dietary supplements (*i.e.,* the same group that should receive notice of this settlement).

4.     DS has served as a Court-approved notice provider in multiple state and federal court class actions. Furthermore, I work regularly with Heffler Claims Group, LLC ("Heffler") to support their media and notice planning.

5.     This declaration is based upon my personal knowledge, information provided by the Parties' Counsel and by Heffler, and proprietary research done by DS.

NOTICE PLAN OBJECTIVE AND DESIGN

6.     The goal of this DS plan was to create a Print and Internet-based class action notice plan that targeted consumers who purchased Rexall glucosamine products ("Products"). The plan used methodologies and components that have proven to successfully drive retail sales for consumer products (including tens of millions of dietary supplement sales) by leveraging the "assets" of Internet and Print, and, more specifically, the ability to target segmented groups of consumers. As such, the same methods, experience, and technology that drive retail sales can be used to effectively target and notify potential class members of this settlement, as those consumers were likely initially targeted for purchasing the products by utilizing some of these very methods.

CHI 8025634v.1     2

7.      The plan for this Action is attached hereto as Exhibit "A," and summarized below.  Prior to creating that plan, DS first researched and defined the "target audience."  In terms of demographics, the plan targeted, generally, individuals aged 35 and older, with a further focus on dietary supplement users.  Where available, glucosamine supplement users were specifically targeted.  Based upon my experience and knowledge, these targeted groups are likely to make up the vast majority, if not the entirety, of those individuals who purchased the Products.  Using media planning tools from GfK MRI, comScore, and other companies that report marketing data, we were able to evaluate our media plan's reach to the targeted audience.

8.      A comprehensive Print notice plan was developed using the media planning tools described above.  The summary notice was published nationwide in each of the following publications as follows:

   a.  People Magazine (On sale July 5th, 2013);

   b.  Prevention (On sale July 23rd, 2013);

   c.  First For Women (On sale July 22nd, 2013);

   d.  Woman's World (On sale July 15th, 2013); and

   e.  Guideposts (On sale July 13th, 2013).

The text contained in the short-form notice was provided to DS by Heffler and all final advertisements were approved by Heffler before being submitted for publication.  Copies of the final advertisements are attached hereto as Exhibit "B."  Based on media planning research, primarily through GfK MRI, these Print publications alone had an audience reach of over 26% of the targeted class.

9.      The Internet notice plan included placements on: 1) social media (*i.e.*, Facebook), and 2) Internet sites and portal ads (*i.e.*, Google, Yahoo, AOL).  These Internet notices directed viewers to the Settlement Website during the period of June 30th- July 29th, 2013.  The Internet plan generated 182,021,440 total impressions (an impression is the display of the advertisement), and resulted in 109,679 "clicks" to the Settlement Website, segmented as follows:

   a.  Facebook (132,374,875 impressions; 41,938 clicks);

   b.  Yahoo (18,500,792 impressions; 29,388 clicks);

Supp. A56

    c.   AOL (6,715,934 impressions; 3,985 clicks); and

    d.   Google (24,429,839 impressions; 34,368 clicks).

Based on media planning research, these Internet advertisements alone had an audience reach of approximately 36% of the targeted class.

## TOTAL NOTICE REACH

10.    Using media planning tools from GfK MRI, comScore, and other companies that report Internet data, we were able to evaluate our media plan's reach for the demographics of the class members.  Heffler provided DS with detailed information about the Email and Direct Mail portions of the notice plan.   My understanding, based in part on the Declarations of Dan Ross and Mike Hamer, is that approximately 4.7 million households received direct, individual notice.  Direct notice of this type (approximately 40% of the class) is rare in a case like this one where the product involved is an over-the-counter consumer product.  When combining all the parts of the notice plans (Print, Direct Mail, Internet, and Email) and adjusting for duplication across the various mediums, the overall notice plan had a reach of over 76% of the defined class.

I declare under the penalty of perjury under the laws of the Commonwealth of Pennsylvania and the United States that the above is true and correct to the best of my knowledge.

BY:    _____

                 MARK D SCHEY

Sworn to and subscribed before me this _____ day of August, 2013

_____
           Notary Public

DOROTHY PRIESTNER
A Notary Public of New Jersey
My Commission Expires 12-____

CHI 8025634v.1    4

EXHIBIT A

**Rexall Glucosamine Notice Plan Overview**

**The Audience "The Class":**  The Class is defined as all persons in the United States who purchased a Rexall glucosamine product. The class size is estimated at 12 million consumers in the United States. In building the targeted media campaign,  GfK MRI data[1] was used to further define the class as "supplement users aged 35 years and older." Where available, GfK MRI data was used to identify adults who used glucosamine, specifically.

**Objective of Print and Internet Notice Program:**  Create, execute, and manage a Print and Internet notice program in a targeted, consumer friendly manner. The program will have extensive reach to potential Class participants. The media will be run in a timely manner that is consistent with the settlement agreement and the orders of the court.

**Rexall Glucosamine Marketing Analysis:**  This media plan to inform the public of both the long form and summary notices is the result of a campaign analysis which included a thorough analysis of print publication and the potential Internet usage by consumers who may have purchased a glucosamine product, as well as  industry cross-references. An analysis of the product categories in which the product falls, using proprietary historical data trends and reach indexing from over 400 Direct to Consumer products, was performed. Furthermore, industry standard information from GfK MRI was used to validate the analysis of the media's reach.

---

[1]    Based upon GfK MRI Fall 2012 data. GfK MRI  is the leading provider of media and consumer research in the country. They are the primary source for audience data for the magazine industry in the United States.

5
CH1 7883378V.2

**Part 1: Print Advertising / Magazine Ads**

To develop the print notice plan, both proprietary data and GfK MRI data was used to evaluate the reach to the class. As noted earlier, the goal of the campaign is to reach a substantial portion of adults, aged 35 and older, who are also supplement users. In addition to raw data, an extensive marketing analysis was performed to ensure publications used by people with joint problems would be represented. Where available, GfK MRI data was utilized to specifically target adult glucosamine users.

The magazine selection includes:

"People Magazine" which, according to GfK MRI, has 42.5 million readers, 17.64 million of which are adults over 35 who use supplements. According to the Alliance for Audited Media, People Magazine is the ninth largest publication in the United States, based on circulation numbers. Again, using GfK MRI data, People Magazine alone reaches 18% of all adults over 35 who use supplements.

"Prevention" is the 16th most circulated magazine in the United States. Its readership represents 5,944,000 adults over 35 who use supplements or 6.2% of the defined class. Using available data (also through MRI), we can further quantify that this publication alone reaches 8.3% of adult glucosamine users. This publication has an index of 171 for the defined class, with 70.4% of its readership being in this demographic.

"First For Women" has a readership of 2,511,000 supplement users over 35. This publication also has an index of 152 for the defined class, with 62.7% of its readership being in this demographic. Using MRI data, it reaches 2.6% of all adult supplement users over 35, while specifically reaching 3.4% of all glucosamine users.

"Woman's World" reaches 4,133,000 readers who are supplement users over 35 years old. Like "First For Women", it also indexes high (151) with the demographic, with 62% of its readership in the defined class. This represents a reach of 4.3% of adults over 35 who use supplements and 5.1% of all glucosamine users.

"Guideposts" which, according to GfK MRI, reaches 3,556,000 adults over age 35 who use supplements (or 3.7% of the defined class). This publication has a strong index of 157 for the defined class.

**Supp. A59**

These magazines were selected for their excellent targeting and wide reach of adults in the United States.  Combined, the magazines have a reach of 35.2% of the defined class members of 35+ supplement users and an aggregate reach of 38.5% of glucosamine users, where available[2].

Taking this a step further, we used additional GfK MRI reporting (along with Reach and Frequency calculations based upon the Metheringham Formula) to calculate the duplication of readership in the above magazines.

This additional analysis suggests that the overall magazine portion of the notice plan will reach 18.00% of glucosamine users one time, 6.22% of glucosamine users two times, and 2.69% of glucosamine users three or more times. This results in a reach of 26.91% of glucosamine users seeing the settlement notice at least one time.

(Note: Further overlap of duplicated readers across the various media categories will also be calculated and applied on the overall campaign.)

Glucosamine User Research

GfK MRI data tells us that there is a population of 95.6 million supplement users over the age of 35. The subset of actual glucosamine users is estimated at 8.19 million in the past 6 months.

Where data is available specifically for glucosamine users, the reach to this group is  larger than the broader group of adults 35+ who are supplement users. In a health-related magazine, like "Prevention", the reach increases by 33.8% (from 6.2% to 8.3%) when targeting glucosamine users. The smallest increase in reach was a more general magazine, "Women's World", where reach to actual glucosamine users increased by 18.6% (from 4.3% to 5.1%) over the more broadly defined adults over 35 who use supplements.

---

[2]    When researching this notice plan, GfK MRI Fall 2012 data was available for glucosamine users(as opposed to only supplement users) with respect to specific publications. These included "Women's World", "First For Women", and "Prevention" magazines.

**Part 2: Direct Mailing To Known Customers**

4.7 million unique Rexall glucosamine customers will be notified through retail and loyalty program information.

With a class size of 12 million, a direct mailing to 4.7 million unique customers represents 39.16% of the class.

## Part 3: Demographic Website Relevant & On-line Portal Ads

The Internet is an extremely powerful tool for reaching potential class members and driving them to the settlement website. Past experience with Internet Notice Plans has been used to design the most effective plan.

**Demographic Website Relevant and Information Ads:** 500 of the top on-line information websites have been analyzed, along with Affinity Indexes of pertinent demographic sites as they pertain to glucosamine users. Furthermore, marketing plans of over 100 related media campaigns have been studied in an effort to reach potential buyers in our target categories. The sites below are the top properties, which will offer the deepest reach and fastest execution time to inform the public of the class action settlement. Further refinement of targeting adults aged 35 and over will be included. These advertisements will instruct people of the class action and direct them to the settlement website to participate.

| Media Placement | Estimated Targeted Impressions |
|---|---:|
| Yahoo RMX | 18,500,792 |
| Google Content Network | 24,429,839 |
| AOL Network | 6,715,934 |
| **Subtotal** | **49,646,565** |

"Yahoo" (and its partner sites) reach 90.2% of adults over the age of 35 in the United States who use the Internet[3], with a potential target of 107 million. This notice plan will deliver an estimated 18.5 million impressions with a frequency of 1.5 or less to ensure widespread reach. Yahoo Sites are the third most popular on the United States Internet, based upon comScore (September 2012) data.

"Google" (and its partner sites) reach 87.9% of Internet-using adults over 35 in the United States. This notice plan will display an estimated 24 million impressions with a frequency cap of 1.5 to ensure a large percentage of class members are reached. According to comScore (September 2012), Google Sites are the most popular on the United States Internet. This portion of the campaign will also target specific "search terms" for the highest possible targeting of potential class members.

"AOL" (and its partner sites) have an extensive reach of Internet-using adults over 35 in the United States. This notice plan will deliver 6.7 million impressions to the 35+ adult demographic with a frequency of 1.5 or less.

Based upon the potential reach to the class and the specific number of impressions (with a frequency cap of 1.5), the online advertising portion of the notice plan will reach an estimated 35.5% of the class (when combined with social media in Part 4 of this notice plan).

---

[3]    Data Source: comScore, September 2012. comScore is a global leader in online business analytics, providing industry standard Internet audience measurement and demographics.

**Supp. A62**

**TARGETED DEMOGRAPHIC INTERNET IMPRESSIONS IN REXALL CAMPAIGN: 49,646,565**

### Part 4: Facebook and Social Media

**Facebook's Reach:** Facebook has a total U.S. reach of 170 million consumers on-line, making it the largest proactive social engine in the country. This media vehicle has proven over the last 24 months to be the most effective way to quickly execute and engage a targeted audience with the ability to drive them to an independent website, such as a class action settlement notice site. The ability for one class member to pass along the information to others utilizing social media can have the potential to triple the reach index. For the online media plan, the most widely used social media sites were researched

Independent data from Quantcast and comScore, two of the industry standards in Affinity and Reach analysis for consumer behaviors, were utilized. Our research indicates a total social media reach of over 140 million unique users per month in the United States.

Below is the strategy to get the proper notifications out to the public with social media via the Facebook platform:

**Facebook Creative Unit:** A banner with clear text informing the public of Rexall Settlement will be displayed with a hyper link directing consumers to the proposed website in which they will have all the necessary information related to the case.

**Facebook Targeting:** Facebook has proprietary banner advertising targeting capabilities. Ads will be segmented to target potential class members in order to more effectively target these consumers with proper notice in a timely manner.

**Facebook Settlement Page:** A dedicated settlement page will be posted and used to educate people on the class action and direct those who wish to participate to the main settlement website.

Based upon the total reach of Facebook, the number of impressions delivered, and the frequency cap of 1.5, the social networking portion of the notice plan will reach an estimated 35.5% of the class (when combined with targeted Internet advertising in part 3 of this notice plan).

**TARGETED SOCIAL MEDIA IMPRESSIONS IN REXALL CAMPAIGN: 132,374,875**

**Rexall Glucosamine Notice Summary**

Media placements will be adjusted in order to maximize the number of claims filed. A reporting system will allow optimization of placements that are producing the greatest numbers of claims. Summary of the media impressions is segmented as follows:

| Media Category | Type | Targeted Impressions |
|---|---|---|
| Print Magazines | Graphic and Text | 33,783,000 |
| Direct Mail | Graphic and Text | 4,700,000 |
| Online Banners & Ads | Graphic and Text | 49,646,565 |
| Social Media/Facebook | Graphic and Text | 132,374,875 |

**Ad Units and Copy for Notices:**  All ad units and the notices that are presented will be submitted for prior approval before the online media program is to begin. All creative will be done in a straightforward manner that is consistent with all applicable laws and is consistent with the wishes of the court and the spirit of the settlement.

**Summary:** The Notice Plan designed for this settlement is based on the tools and techniques that companies use to develop marketing programs for similar products and audiences. Wherever available, data is verified using industry-standard data from GfK MRI and comScore.

This plan will provide for the execution of the notices to go out to the target audience in an efficient and timely manner, and to meet the legal requirements as set forth by the court as well as in the Class Action Settlement agreement. The plan will be specifically designed to target the settlement class and notify a substantial number of them of the settlement.

While duplication has already been calculated for magazine, direct mail, and Internet individually, this notice plan allows for a further 23.9% duplication of audience across the various notice methods. In other words, we expect 23.9% of people who see a notice in a magazine to also receive a direct mail piece.

Taking into account a 23.9% duplication and *without* factoring in spread of the message through social media and word of mouth, we estimate the campaign will <u>reach 76.34% of the defined class</u>.

11
CH1 7883378V.2

**Supp. A64**

EXHIBIT B



Prevention Magazine

**Supp. A65**



# Circle of Kindness!

Have you done something kind for someone . . . or been on the receiving end of a thoughtful gesture? Share your heartwarming story *here*!

## "She gave us a warm welcome home!"

**When my daughter was rushed to the hospital with an asthma attack, we had to stay in the pediatric unit for a week.**

I was worried sick over my little girl, and because I'm a single mom, things were difficult. Staying at Grace's side meant I hadn't even had time to grocery shop! When Grace was feeling better, we came home to spoiled milk and an empty fridge. Still, though I was overwhelmed, I was grateful my daughter was okay. Just then, a friend stopped by. "I picked up a few extra things for you while I was shopping," she said. It turns out "a few extra things" were bags full of juices, muffins and all the fixings for a week's worth of meals! Tears sprang to my eyes. Her thoughtful gift made a difficult time so much better!
—*Kathy Brennan, Las Vegas*

## Big Apple kindness

**Our daughter and her family recently moved to upstate New York, near the Adirondack Mountains.**



So as my husband and I were driving up to visit them, we decided to go through New York City. Needless to say, we found ourselves hopelessly lost. While sitting in traffic, we saw a police officer in her car next to us. I rolled down my window and asked if she could help. "Pull out in front of me," she said, "and I'll direct you." When the light changed, she slipped in line behind us. At every intersection, she put her loudspeaker on and told us which way to go. Soon, we were back on track. Without that officer's incredible kindness, we might still be driving in circles around New York City!
—*Rachel Roberts, Apopka, FL*

## "We treated another family to dinner!"

**I was out to dinner with my husband at a local pizza place for half-price night.**

We had just ordered our food when we noticed a young family seated next to us. The parents had three little ones, all of whom were so well behaved! We couldn't help but smile seeing that happy family enjoy a night out together, and we wanted to do something special. We told our waitress we wanted to pay for their meal anonymously. The family was so surprised when they found out a stranger had taken care of their tab! And it turned out the kindness we'd shown came right back to us: After a long wait for our order, the manager said that there'd been a mix-up when they were making our pizzas. "Your fresh pies will be right out—on the house!" he said. We couldn't believe that we were part of our own little circle of kindness that night. What a sweet way to end the day!
—*Cindy Hoffman, Joplin, MO*

## Making lemonade out of lemons

**I was shocked to discover my car had been broken into one day.** The ignition was damaged, too, leaving me without transportation. And I couldn't afford my insurance deductible to get it repaired. When a co-worker saw me riding my bike to work, I told him the whole story. The next day, my co-worker gave me a card. *We know life can throw you lemons,* it read. *That's why we're throwing some cash your way!* Inside was enough money to pay my deductible! He'd secretly told my co-workers what happened, and they all chipped in to help me get my car repaired! They reminded me that there's always somebody—or many somebodies—willing to lend a hand!
—*Cassie Soukup, Isanti, MN*

Do you have an act of kindness to share? E-mail it with your name and address to: CircleofKindness@WomansWorldMag.com. Or mail it to: Circle of Kindness, Woman's World, 270 Sylvan Ave., Englewood Cliffs, NJ 07632. We'll pay you $25 if we publish your story; submissions may be edited for style.

**IF YOU PURCHASED CERTAIN JOINT HEALTH DIETARY SUPPLEMENTS, YOU MAY BE PART OF A CLASS ACTION SETTLEMENT**

If you purchased certain joint health dietary supplements containing glucosamine that were manufactured or sold by Rexall Sundown, Inc. or NBTY, Inc. or their affiliates ("Rexall"), during certain periods of time and in certain geographic locations, you may be part of a class action settlement. As part of the settlement, you may be able to file a claim for cash. This notice is only a summary. For more complete information, and a list of all products covered by this settlement, please read the full notice by visiting the website www.GlucosamineSettlement.com, by writing to the address at the bottom of the notice, or by calling toll-free (888) 972-6583.

**WHAT ARE MY LEGAL RIGHTS?**

• If you wish to remain a member of the settlement class, you do not have to do anything. To receive money, you must file a claim. If the Court approves the proposed settlement, you will be bound by all of the Court's orders. This means you will not be able to make any claims against Rexall or its customers that are covered by the settlement.

• If you wish to submit a claim, visit www.GlucosamineSettlement.com, and follow the instructions, or call toll-free (888) 972-6583 to obtain a claim form. All claims must be submitted or postmarked by December 3, 2013.

• If you do not wish to be a member of the settlement class, you must submit a letter to the Settlement Administrator at the address below postmarked by August 1, 2013. If you request to be excluded from the settlement class you cannot submit a claim form.

**GLUCOSAMINE SETTLEMENT C/O CLAIMS ADMINISTRATOR P.O. BOX 170 PHILADELPHIA, PA 19105-0170 (888) 972-6583**

Woman's World

# *supper*





## Creamy Mashed Cauliflower

ACTIVE TIME: **20 min.** TOTAL TIME: **30 min.** SERVES: **4**

Feta cheese makes this cauliflower mash extra creamy—plus keeps it low-fat and alkalinizing for easy slimming

- **1** **head** (1 lb.) **cauliflower,** *cut into florets*
- **1** **small onion,** *quartered*
- **1** **clove garlic,** *peeled*
- ¼ **cup feta cheese**
- **1** **Tbs. extra virgin olive oil**
- **2** **Tbs. chopped chives**

❶ Place steamer basket in large pot. Add enough water to pot to reach just below the steamer basket. Arrange cauliflower florets, onion quarters and garlic in basket.

❷ Place pot over high heat. Bring to a boil. Reduce heat to medium; cover and cook 10 min. or until cauliflower florets are tender; drain.

❸ In food processor, combine cauliflower, onion and garlic mixture. Add feta cheese and oil. Process 30 sec. or until smooth and creamy, scraping down sides of bowl as needed.

❹ Season mashed cauliflower with sea salt and pepper to taste. Stir in chives. Garnish as desired.

Per serving: Cal. 90 Pro. 4g Carb. 7g Fiber 3g Sug. 3g Chol. 8mg Sod. 122mg Total fat: 6g Sat. 2g Trans. 0g

## Ginger-Coconut Cream Pie

ACTIVE TIME: **30 min.** TOTAL TIME: **1½ hrs.** SERVES: **8**

This no-bake beauty owes its rich texture to a cashew cream made from pureed raw cashews and coconut milk—not dairy

- **1** **cup unsweetened shredded coconut**
- **1** **cup walnuts**
- ⅓ **cup soft dried apricots** (about 10)
- **1** **cup shaken coconut milk**
- **2** **tsp. minced fresh ginger**
- **1½** **cups cashews,** *soaked in water overnight and drained*
- ⅓ **cup coconut oil**
- ¼ **cup maple syrup**
- **8** **fresh strawberries,** *sliced*
- ¼ **cup fresh raspberries**

❶ Line 7½" tart pan or 8" pie plate with parchment paper. In food processor, combine coconut, walnuts and apricots 30 sec. or until finely chopped, adding 1 tsp. water at a time if mixture seems dry; press into prepared pan.

❷ In clean food processor, mix coconut milk and next 4 ingredients 2 min. or until smooth. Spread mixture in tart shell, smoothing top. Chill 1 hr.

❸ Unmold tart and place on serving platter. Arrange strawberries and raspberries in center of tart.

Per serving: Cal. 487 Pro. 7g Carb. 24g Fiber 4g Sug. 12g Chol. 0mg Sod. 13mg Total fat: 44g Sat. 25g Trans. 0g

**IF YOU PURCHASED CERTAIN JOINT HEALTH DIETARY SUPPLEMENTS, YOU MAY BE PART OF A CLASS ACTION SETTLEMENT**

If you purchased certain joint health dietary supplements containing glucosamine that were manufactured or sold by Rexall Sundown, Inc. or NBTY, Inc. or their affiliates ("Rexall"), during certain periods of time and in certain geographic locations, you may be part of a class action settlement. As part of the settlement, you may be able to file a claim for cash. This notice is only a summary. For more complete information, and a list of all products covered by this settlement, please read the full notice by visiting the website **www.GlucosamineSettlement.com,** by writing to the address at the bottom of the notice, or by calling toll-free **(888) 972-6583.**

**WHAT ARE MY LEGAL RIGHTS?**

• **If you wish to remain a member of the settlement class,** you do not have to do anything. To receive money, you must file a claim. If the Court approves the proposed settlement, you will be bound by all of the Court's orders. This means you will not be able to make any claims against Rexall or its customers that are covered by the settlement.

• **If you wish to submit a claim,** visit **www.GlucosamineSettlement.com,** and follow the instructions, or call toll-free **(888) 972-6583** to obtain a claim form. All claims must be submitted or postmarked by **December 3, 2013.**

• **If you do not wish to be a member of the settlement class,** you must submit a letter to the Settlement Administrator at the address below postmarked by **August 1, 2013.** If your request to be excluded from the settlement class you cannot submit a claim form.

**GLUCOSAMINE SETTLEMENT C/O CLAIMS ADMINISTRATOR P.O. BOX 170 PHILADELPHIA, PA 19105-0170 (888) 972-6583**

First For Women

**Supp. A67**

## IF YOU PURCHASED CERTAIN JOINT HEALTH DIETARY SUPPLEMENTS, YOU MAY BE PART OF A CLASS ACTION SETTLEMENT

If you purchased certain joint health dietary supplements containing glucosamine that were manufactured or sold by Rexall Sundown, Inc. or NBTY, Inc. or their affiliates ("Rexall"), during certain periods of time and in certain geographic locations, you may be part of a class action settlement. As part of the settlement, you may be able to file a claim for cash. This notice is only a summary. For more complete information, and a list of all products covered by this settlement, please read the full notice by visiting the website www.GlucosamineSettlement.com, by writing to the address at the bottom of the notice, or by calling toll-free (888) 972-6583.

### WHAT ARE MY LEGAL RIGHTS?

• If you wish to remain a member of the settlement class, you do not have to do anything. To receive money, you must file a claim. If the Court approves the proposed settlement, you will be bound by all of the Court's orders. This means you will not be able to make any claims against Rexall or its customers that are covered by the settlement.

• If you wish to submit a claim, visit www.GlucosamineSettlement.com, and follow the instructions, or call toll-free (888) 972-6583 to obtain a claim form. All claims must be submitted or postmarked by December 3, 2013.

• If you do not wish to be a member of the settlement class, you must submit a letter to the Settlement Administrator at the address below postmarked by August 1, 2013. If your request to be excluded from the settlement class cannot submit a claim form.

### GLUCOSAMINE SETTLEMENT
C/O CLAIMS ADMINISTRATOR
P.O. BOX 170
PHILADELPHIA, PA 19105-0170
(888) 972-6583



THE VICTIM Lloyd (above), a friend of Hernandez's, played semipro football for the Boston Bandits.

TROUBLED YOUTH Despite scrapes with the law, Hernandez (at age 17) vowed to "make the right decisions" as a pro athlete.

The Patriots dumped the promising but troubled player, whose meteoric rise led him to the top ranks of the NFL and a $40 million contract. Meanwhile, disturbing questions continue to pile up around Hernandez: Was he, as police are now investigating, the one who shot two men dead last summer after a nightclub fight in Boston? Was Lloyd killed because he knew about the crime? Could it be, as laid out in a pending civil lawsuit, that Hernandez shot another friend in the face earlier this year? His attorney Michael Fee says the case against him is "at bottom, a circumstantial case." His mother, Terri, says her son will be cleared.

Hernandez grew up in the Hartford suburb where his mother still works in the office of South Side Elementary school. "He was a good friend and a kid people looked up to," said Tucker, who has known him since the fifth grade. But Hernandez's mother told USA Today in 2009 that the shock of his father's death led her son, only 16 at the time, to hang with the wrong crowd. "There was so much anger," she said. His reported association with gangs and guns followed him into the 2010 NFL draft and turned him from a first- to a fourth-round pick.

Fatherhood seemed to kick-start his self-awareness. After his high school sweetheart and fiancée Shayanna Jenkins, 24, gave birth to their daughter Avielle in November, Hernandez told an interviewer, "Now another one is looking up to me. I can't just be young and reckless Aaron anymore."

But Indianapolis Colts tight end Dwayne Allen thinks he never shed his reckless behavior. "One of our brothers is in trouble right now because he didn't want to be different," Allen told newbies at the NFL's rookie symposium the same day as Hernandez's arrest. "You're right, I'm different. I got a lot more money in my pocket and a lot more sense. That's the way you got to go about it." Now, denied bail and with his athletic promise cut short, Hernandez sits in a Dartmouth, Mass., jail with plenty of time to ponder what went wrong. "If the charges are true, not only is his career over, but he'll spend the rest of his life in prison," says Tucker. "Whatever happens, though, he's still my friend."

By Sandra Sobieraj Westfall. Reported by Juliet Pennington and Jeff Truesdell



THE FIANCEE Shayanna Jenkins (outside court on June 26).

People Magazine

**Supp. A68**

My friend since the seventh grade, Betty Gibson, gave me a gift subscription to GUIDEPOSTS just last year," says **Joanna Featherstone** (*One-Woman Show*, page 56). "She was also the one who suggested I enter my story into the 2012 Writers Workshop contest." Joanna entered—and won. She is especially grateful for the fellowship she shared with the magazine's editors and the other writers



**FEATHERSTONE**
Lifts up her voice

in attendance. On the last day of the workshop, Joanna received a call saying that another long-time friend was about to go into hospice care. She returned to the group and told them the sad news. "One of the writers said, 'Let us pray.' We all bowed our heads and afterwards I sang," says Joanna. "The song was one I came up with in the moment. It expressed my gratitude for my friend's life as well as my appreciation for the spiritual rewards and support I received during the workshop."

**B**eing *Pistol Pete* for one whole year was a dream come true for **Jason Hynson** (page 20), who graduated from Oklahoma State University with his bachelor's

### IF YOU PURCHASED CERTAIN JOINT HEALTH DIETARY SUPPLEMENTS, YOU MAY BE PART OF A CLASS ACTION SETTLEMENT

If you purchased certain joint health dietary supplements containing glucosamine that were manufactured or sold by Rexall Sundown, Inc. or NBTY, Inc. or their affiliates ("Rexall"), during certain periods of time and in certain geographic locations, you may be part of a class action settlement. As part of the settlement, you may be able to file a claim for cash. This notice is only a summary. For more complete information, and a list of all products covered by this settlement, please read the full notice by visiting the website www.GlucosamineSettlement.com, by writing to the address at the bottom of the notice, or by calling toll-free **(888) 972-6583**.

**WHAT ARE MY LEGAL RIGHTS?**

• **If you wish to remain a member of the settlement class**, you do not have to do anything. To receive money, you must file a claim. If the Court approves the proposed settlement, you will be bound by all of the Court's orders. This means you will not be able to make any claims against Rexall or its customers that are covered by the settlement.

• **If you wish to submit a claim**, visit www.GlucosamineSettlement.com, and follow the instructions, or call toll-free **(888) 972-6583** to obtain a claim form. All claims must be submitted or postmarked by **December 3, 2013.**

• **If you do not wish to be a member of the settlement class**, you must submit a letter to the Settlement Administrator at the address below postmarked by **August 1, 2013.** If you request to be excluded from the settlement class you cannot submit a claim form.

**GLUCOSAMINE SETTLEMENT
C/O CLAIMS ADMINISTRATOR
P.O. BOX 170
PHILADELPHIA, PA 19105-0170
(888) 972-6583**

Guideposts

**Supp. A69**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NICK PEARSON, FRANCISCO
PADILLA, CECILIA LINARES,
AUGUSTINA BLANCO, ABEL
GONZALEZ, and RICHARD
JENNINGS, On Behalf of Themselves
and All Others Similarly Situated,

          Plaintiffs,

          v.

NBTY, INC., a Delaware corporation;
and REXALL SUNDOWN, INC., a
Florida corporation; TARGET
CORPORATION, a Minnesota
Corporation,

          Defendants.

Case No.:   11 CV 07972

CLASS ACTION

Judge James B. Zagel

## DECLARATION OF DAN ROSS

I, Dan Ross, an employee at Costco Wholesale Corporation ("Costco"), have knowledge regarding the facts in this Declaration and declare that the following is true, correct and accurate to the best of my ability:

1.      I am membership and marketing manager at Costco, a membership warehouse club that offers or has offered a variety of products, including Costco's "Kirkland Signature" glucosamine products manufactured by a Rexall company ("Costco Glucosamine Products"), for retail sale. I am providing this Declaration in connection with the settlement of the above-referenced litigation.

1

2.      Because Costco is a membership warehouse club, only Costco members may purchase items at Costco's warehouses.  As a condition of their membership, Costco requires that members provide name and address information.  In addition, some but not all Costco members provide e-mail addresses.  Because Costco's memberships are renewed on an annual basis, members are provided the opportunity to update their contact information each year, although not all members do so.

3.      When a Costco member purchases an item, he or she is required to present their membership card when checking out, and Costco's computer systems record that member's purchases.  Thus, in the ordinary course of Costco's business, Costco saves member contact information, as well as member purchase history data for each Costco membership.

4.      Costco maintains a general corporate policy not to voluntarily produce member identification information, or their purchase histories, in civil litigation.  To provide direct notice to Settlement Class Members purchasing the Costco Glucosamine Products as part of the settlement reached in this case, however, Costco agreed that it would send notice of the settlement to Settlement Class Members purchasing the Costco Glucosamine Products by e-mail and direct mail.

5.      First, on June 17, 2013, Costco sent 1,565,405 e-mails to all Settlement Class Members with e-mail addresses stored in Costco's records.  A true and correct copy of the notice sent by email is attached as Exhibit A.  Of the 1,565,405 e-mails sent, 336,993 e-mails bounced back as undeliverable (the "E-mail Bouncebacks").

6.      Separately, Costco prepared and sent a notice postcard to all Settlement Class Members for whom Costco had a mailing address but not an email address on file.  Prior to sending this mailing, Costco included the 336,993 undeliverable e-mail records and updated its

2

address records utilizing information contained in the 48-month "National Change of Address"

("NCOA") database.  From July 2, 2013 to July 10, 2013, Costco sent 2,007,853 notice postcards

by U.S. Mail to those members utilizing this information.  A true and correct copy of the notice

postcards is attached as Exhibit B (the "First USPS Mailing").

       FURTHER DECLARANT SAYETH NOT.

Under penalty of perjury, I declare that the above is true and correct.

Dated: August 14, 2013

DAN ROSS
MANAGER, COSTCO WHOLESALE

3

**Supp. A72**

THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ALYSON HERFERT, et al.,

              Plaintiffs,

    v.

CRAYOLA, LLC,

              Defendant.

CASE NO. C11-1301-JCC

ORDER DENYING APPLICATION
OF CLAIMANT'S COUNSEL
DARRELL PALMER TO APPEAR
PRO HAC VICE

The application of Claimant's counsel, Darrell Palmer, to appear pro hac vice (Dkt. No. 59, as amended (Dkt. Nos. 72, 73)) is denied for failure to appear at a prior hearing and for material nondisclosures in his application. Mr. Palmer falsely declared under penalty of perjury that he had not been disbarred or formally censured by a court of record or by a state bar association. (Dkt. No. 59). In fact, Mr. Palmer was temporarily suspended from the Colorado Bar Association, the State Bar of Arizona, and the State Bar of California as a result of a Colorado felony conviction. Mr. Palmer has submitted a letter to the Court attributing his failure to disclose these suspensions to an oversight on the part of his assistant. Any professional should know better than to blame his assistant for such a serious misstatement in a document containing his own signature. The Court relies on an attorney's signature as his personal attestation that the information submitted is true and complete. It was Mr. Palmer's responsibility, and his alone, to ensure the accuracy of his application.

ORDER DENYING APPLICATION OF
CLAIMANT'S COUNSEL DARRELL PALMER
TO APPEAR PRO HAC VICE
PAGE - 1

**Supp. A73**

1    For the foregoing reasons, the application of Claimant's Counsel, Darrell Palmer, to

2    appear pro hac vice is DENIED, and the portion of the Court's August 10th order (Dkt. No. 71)

3    requiring Mr. Palmer to appear in person before the Court on August 21st is VACATED.

4    DATED this 17th day of August 2012.

5

6

7

8

9

10    _____

11    John C. Coughenour
     UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER DENYING APPLICATION OF
CLAIMANT'S COUNSEL DARRELL PALMER
TO APPEAR PRO HAC VICE
PAGE - 2

```
1              UNITED STATES DISTRICT COURT

2         WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3       _____

    MARK A. ARTHUR, CIRILO        )
4   MARTINEZ, PARI NAJAFI and     )
    HEATHER MCCUE on behalf of    )
5   themselves and all others     )   NO. C10-198JLR
    similarly situated,           )
6                                 )   SEATTLE, WASHINGTON
          Plaintiffs,             )   SEPTEMBER 14, 2012
7                                 )
    v.                            )
8                                 )
    SALLIE MAE, INC.,             )   MOTION HEARING
9                                 )
          Defendant.             )
10      _____

11           VERBATIM REPORT OF PROCEEDINGS
          BEFORE THE HONORABLE JAMES L. ROBART
12            UNITED STATES DISTRICT JUDGE
        _____
13   APPEARANCES:

14   For Plaintiffs:        MR. JONATHAN D. SELBIN
                            MS. BETH E. TERRELL
15                          MS. ALISON STOCKING
                            MR. MATTHEW R. WILSON
16

17   For Defendant:         MS. JULIA B. STRICKLAND
                            MS. LISA M. SIMONETTI
18                          MR. ERIC D. REICIN

19   For Intervenor         MR. DARRELL PALMER
     Judith Harper and      MR. BRIAN J. TRENZ
20   Objectors Sweeney
     and McBean:
21

22
     Reported by:          Kari McGrath, CCR, RMR, CRR
23                         Federal Court Reporter
                           206.370.8509
24                         kari_mcgrath@wawd.uscourts.gov

25
```

Case: 14-1198     Document: 53-2     Filed: 05/19/2014     Pages: 155
Case: 1:15-cv-07972 Document #: 113-15 Filed: 08/04/13 Page 3 of 32 PageID #:1702

2

PROCEEDINGS

1
2
---
3    THE COURT:  Please be seated.  The clerk will call
4  this matter.
5    THE CLERK:  Case C10-198, Mark Arthur versus Sallie
6  Mae.
7     Counsel, please make your appearances.
8    MR. SELBIN:  Good afternoon, Your Honor.  Jonathan
9  Selbin from Lieff Cabraser Heimann & Bernstein on behalf of
10  plaintiffs and the proposed class.
11    THE COURT:  Thank you.
12    MS. TERRELL:  Good afternoon.  Beth Terrell from
13  Marshall Daudt & Willie on behalf of plaintiffs and the
14  proposed class.
15    MS. STOCKING:  Good afternoon.  Alison Stockins,
16  Lieff Cabraser Heimann & Bernstein on behalf of the
17  plaintiffs and proposed class.
18    MR. WILSON:  Good afternoon, Your Honor.  Matt Wilson
19  from Meyer Wilson on behalf of plaintiffs and the proposed
20  class.
21    MS. STRICKLAND:  Good afternoon, Your Honor.  Julia
22  Strickland from Stroock & Stroock & Lavan on behalf of
23  defendant Sallie Mae.
24    THE COURT:  Thank you.
25    MS. SIMONETTI:  Good afternoon, Your Honor.  Lisa

Case: 14-1198    Document: 53-2    Filed: 05/19/2014    Pages: 155
Case: 1:13-cv-07972 Document #: 113-15 Filed: 08/04/13 Page 2 of 32 PageID #:1703

3

1  Simonetti, Stroock & Stroock & Lavan, on behalf of defendant
2  Sallie Mae.
3          MR. REICIN:  Good afternoon.  Eric Reicin, deputy
4  general counsel for Sallie Mae.
5          MR. PALMER:  Good afternoon, Your Honor.  Darrell
6  Palmer on behalf intervenor Judith Harper and objectors
7  Sweeney and McBean.
8          MR. TRENZ:  Good morning, Your Honor.  Brian Trenz on
9  behalf of intervenor Judith Harper.
10         THE COURT:  Counsel, there are four matters before me
11 today, and I'm going to take them in the order that makes
12 sense to me, which will be, first, to take up Docket 251,
13 which is the motion for revocation of court's order granting
14 admission pro hac vice to Darrell Palmer.  That will be
15 followed by Docket 232, motion for attorneys' fees filed by
16 intervenor Judith Harper.  Third will be Docket 219, motion
17 for final approval of amended class action settlement.  And
18 then last will be the motion for attorneys' fees and costs
19 and service awards in connection with the amended class
20 action settlement.
21     I will tell you that I will definitively rule on the
22 motion for revocation.  I will definitively rule on
23 Ms. Harper's motion for attorneys' fees.  I will give you my
24 oral indication of granting or denying the motion for final
25 approval of class action settlement, and the motion for

Case: 14-1198    Document: 53-2      Filed: 05/19/2014    Pages: 155
Case: 1:13-cv-07972 Document #: 113-11 Filed: 08/04/13 Page 5 of 32 PageID #:1704

4

1    attorneys' fees and costs.  Those will be confirmed by a

2    written order which will have further detail to it.  So that

3    will be our schedule for the day.

4        Mr. Palmer, why don't you go to the podium, since I would

5    like to hear from you.  Mr. Palmer, you filed in connection

6    with this matter a declaration of Darrell Palmer in support

7    of Ms. Harper's motion for award of attorneys' fees and

8    costs, and it's in the form of a declaration of some six

9    pages, signed under penalty of perjury.

10       Is there anything in that declaration that you want to

11   change before I rule on the motion?

12           MR. PALMER:  This is the declaration in connection

13   with the application for attorneys' fees, Your Honor?

14           THE COURT:  Yes.

15           MR. PALMER:  I don't have that in front of me.  I

16   couldn't answer that question at this time.

17           THE COURT:  Well, you signed it under penalty of

18   perjury.

19           MR. PALMER:  Yes.

20           THE COURT:  And you reviewed it before you signed it?

21           MR. PALMER:  Yes.

22           THE COURT:  You believed everything in it was true at

23   that time?

24           MR. PALMER:  I believe so.

25           THE COURT:  All right.  Well, this is my issue then:

Case: 14-1198     Document: 53-2     Filed: 05/19/2014     Pages: 155
Case: 1:15-cv-07972 Document #: 113-15 Filed: 08/04/13 Page 75 of 32 PageID #:1705

5

 1   Paragraph 5, quote, "I notified the court of the foregoing
 2   deficiencies during the December 17, 2010, conference call
 3   between the court and all counsel.  As a result, the court
 4   ordered that class and defense counsel look into the
 5   'missing' class members and report back to the court
 6   immediately.  The district court also extended all deadlines
 7   for the settlement."
 8       Do you have any reason to believe that that isn't your
 9   account of what happened?
10           MR. PALMER:  This was for December of 2010?
11           THE COURT:  December 17, 2010.
12           MR. PALMER:  I don't think I was -- I don't think I
13   participated in that call, Your Honor.
14           THE COURT:  I don't think you did either.  First off,
15   there was no call.
16           MR. PALMER:  Right.
17           THE COURT:  It was a court hearing.
18           MR. PALMER:  Right.
19           THE COURT:  You didn't show up.  You didn't speak.
20           MR. PALMER:  Correct.
21           THE COURT:  How can you tell me, "I notified the
22   court of the foregoing deficiencies during the December 17,
23   2010, conference call"?
24           MR. PALMER:  Well, I think it's either an error in
25   the date, or it's referring to the objections that we filed.

```
 1           THE COURT:  "I notified the court of the foregoing
 2   deficiencies during the December 17, 2010, conference call."
 3   That is a flat-out statement, sir.
 4           MR. PALMER:  Yes.
 5           THE COURT:  Is it true?
 6           MR. PALMER:  There was no call, that I recall.
 7           THE COURT:  In your declaration, you state, "I am the
 8   lead partner at the Law Offices of Darrell Palmer."  That
 9   could be good, since it's named after you.  And apparently
10   you have a Kira Rubel, senior associate, who is mentioned on
11   page 4 --
12           MR. PALMER:  Correct.
13           THE COURT:  -- as having worked 272 hours in this
14   matter.
15           MR. PALMER:  That's right.
16           THE COURT:  And in pleadings which she has filed with
17   this court, it lists her as having applied for and been
18   granted pro hac vice status.
19           MR. PALMER:  That would be incorrect.  She has not
20   yet applied for pro hac vice status in this court.
21           THE COURT:  Then why is she signing pleadings
22   submitted to this court?
23           MR. PALMER:  I think the one pleading that she
24   signed, as I recall, was done at a time when I was
25   unavailable to sign it.
```

1          THE COURT:  Is it a regular practice in your law firm

2     to have someone engage in unauthorized practice of law by

3     signing pleadings in courts where they are not admitted?

4          MR. PALMER:  No, sir.

5          THE COURT:  All right.  You may be seated.  Thank

6     you.

7       The ruling of this court will be as follows:  Plaintiffs

8     move the court to revoke Darrell Palmer's pro hac vice

9     admission on the grounds that he made a false statement in

10    his pro hac vice application.

11      My colleague, Judge Coughenour, on August 17, 2012, denied

12    Mr. Palmer's pro hac vice application for the reason of

13    containing the same false statement and, secondly, because,

14    in part, Mr. Palmer blamed his assistant for the error.

15    Those of us who know Judge Coughenour well know that that

16    would never be a good idea.

17      Mr. Palmer represents that it was an innocent mistake on

18    his part in connection with his application in this matter,

19    and has submitted an amended application that corrects the

20    false statement.  He also takes full responsibility for the

21    error, while stating, quote, "Mr. Palmer's office made an

22    inadvertent error."

23      It is undisputed that Mr. Palmer made a false statement in

24    his pro hac vice application.  He declared under penalty of

25    perjury that he had, quote, "not been disbarred or formally

Case: 14-1198    Document: 53-2    Filed: 05/19/2014    Pages: 155
Case: 12:12-cv-07972 Document #: 113-1 Filed: 08/04/13 Page 2 of 32 PageID #:1708

8

1    censured by a court of record or by a state bar association;

2    and there are no disciplinary proceedings against me," in the

3    record at Docket 97.

4        In fact, Mr. Palmer was temporarily suspended from the

5    Colorado Bar Association, the State Bar of Arizona, and the

6    State Bar of California as a result of a Colorado felony

7    conviction in the 1990s.

8        Pursuant to Western District of Washington Local

9    Rule 2(f)(3), an attorney may be subject to disciplinary

10   action for violation of the Standards of Professional

11   Conduct, including the Federal Rules of Civil Procedure.

12       Under Federal Rule of Civil Procedure 11, an attorney's

13   signature on a court filing certifies that to the best of the

14   person's knowledge, the facts presented in the documents have

15   evidentiary support, Federal Rule of Civil Procedure

16   11(b)(3).

17       Here, Mr. Palmer improperly certified and declared under

18   penalty of perjury that he did not have a disciplinary

19   history.  As such, he violated the Standards of Professional

20   Conduct set forth in the local rules and is subject to

21   disciplinary action.

22       Mr. Palmer attempts to mitigate his error by

23   distinguishing the cases cited by plaintiff, explaining that

24   he was temporarily disbarred for conduct unrelated to the

25   practice of law, asserting that he meets the standards for

1    pro hac vice application in this district, taking

2    responsibility for his error, contending that his work

3    substantially benefitted the class, and maintaining that

4    plaintiffs have bad motives for bringing this action.

5        I have not conducted an independent investigation into the

6    Colorado Bar Association action, or Colorado conviction, and

7    I don't know if it was a disbarment or a suspension.  But

8    everyone seems to describe it as either one or the other of

9    those.

10            MR. PALMER:  So the record is clear, it was a

11   suspension, Your Honor.

12            THE COURT:  Please don't interrupt me, sir.  You are

13   in enough trouble already.

14        This misses the point that it is a civil rule violation

15   under Rule 11, not Mr. Palmer's suspension, that is at issue

16   in this matter.  I really don't want to know about the facts

17   of the underlying proceeding.  We will assume, since

18   Mr. Palmer is an officer of the court, that it was an

19   inadvertent problem.

20        However, in this matter, the conduct is unacceptable.

21   Mr. Palmer was alerted to the problem when his pro hac vice

22   application in Judge Coughenour's case was challenged.  That

23   was on October 10, 2012 (sic).  Mr. Palmer did not

24   immediately raise and seek to correct the same mistake in

25   this case.  In fact, plaintiffs waited ten days before filing

Case: 14-1198    Document: 53-2    Filed: 05/19/2014    Pages: 155
Case: 1:11-cv-07972 Document #: 113-1 Filed: 07/04/13 Page 11 of 32 PageID #:1710

10

1    their motion to give Mr. Palmer time to raise and correct the

2    issue.

3        Mr. Palmer did not file an amended pro hac vice

4    application until August 27, 2012, a full 17 days after being

5    notified of the problem.  This does not demonstrate candor

6    with the court or that he took seriously the fact that he

7    made a false statement under oath.

8        Additionally, Mr. Palmer has apparently submitted false

9    pro hac vice applications in at least three other cases.  As

10   a final note, the false statement in the pro hac vice

11   application is not the only misrepresentation Mr. Palmer has

12   made to this court.  It is impossible to reconcile a

13   declaration submitted to this court under penalty of perjury,

14   dated May 17, 2012, with the court record.  And Mr. Palmer

15   has now acknowledged that it is incorrect.  That serves as

16   the basis for his fee application in this matter.

17       As will be further discussed today, Mr. Palmer made

18   several other misrepresentations in his motions for

19   attorneys' fees.  These misrepresentations confirm my

20   conclusion that the court sanction Mr. Palmer by revoking his

21   admission in this case.  Therefore, Docket 251 is granted,

22   and Mr. Palmer's pro hac vice is revoked.

23       Let me then take up next the question of the motion for

24   attorneys' fees by Judith Harper.

25       I'm not having argument, counsel.  I'm ruling from the

Case: 14-1198    Document: 53-2    Filed: 05/19/2014    Pages: 155
Case: 1:15-cv-07972 Document #: 113-16 Filed: 08/04/19 Page 32 of 32 PageID #:1731

31

```
 1                    C E R T I F I C A T E

 2

 3

 4            I, Kari McGrath, CCR, CRR, RMR, Official Court

 5    Reporter for the United States District Court in the Western

 6    District of Washington at Seattle, do hereby certify that I

 7    was present in court during the foregoing matter and reported

 8    said proceedings stenographically.

 9            I further certify that thereafter, I have caused

10    said stenographic notes to be transcribed under my direction

11    and that the foregoing pages are a true and accurate

12    transcription to the best of my ability.

13

14

15                         /S/  KARI McGRATH

16                         Kari McGrath, CCR, CRR, RMR

17                         Official Court Reporter

18

19

20

21

22

23

24

25
```

Case: 1:11-cv-07972 Document #: 113-20 Filed: 09/04/13 Page 2 of 31 PageID #:1811

## UNITED STATES DISTRICT COURT
## NORTERHN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| NICK PEARSON, FRANCISCO PADILLA, CECILIA LINARES, AUGUSTINA BLANCO, ABL GONZALEZ, and RICHARD JENNINGS, On Behalf of Themselves and All Others Similarly Situated, | \| | |
| | \| | Case No.: 11CV 07972 |
| Plaintiffs, | \| | |
| v. | \| | |
| NBTY, INC., a Delaware corporation; and REXALL SUNDOWN, INC., a Florida corporation; and TARGET CORPORATION, a Minnesota Corporation, | \| | |
| Defendants. | \| | |

## Report of Keith A. Reutter, Ph.D.,
## Regarding Settlement

I.    **Introduction**

1.    I am a Ph.D. economist and Principal in the Washington, D.C. office of the Berkeley Research Group ("BRG").  BRG is an economic and financial consulting firm with offices in major U.S. and foreign cities.  I have been associated with BRG since shortly after its founding in early 2010, and have been professionally employed as an economist for over 15 years.  I hold a Bachelor of Science and Master of Arts in economics from the University of Texas-Arlington, as well as a Doctor of Philosophy in economics from Auburn University.

2.    My professional experience includes the analysis of financial and economic data as it pertains to damages in complex litigation, as well as regulatory matters.  I have filed testimony in state and federal courts, as well as with the U.S. Federal Energy Regulatory Commission.  In addition to consulting work, I have taught economics and finance as an adjunct professor.  My curriculum vitae containing a description of my education, professional experience as an economist, publications, and affiliations is attached as Appendix A.  BRG is being compensated for my work in this matter at my standard hourly rate of $375.  My compensation is in no way dependent on the outcome of this litigation.  I have testified at trial or by deposition in the following matters in the last four years: *Liliana Cardenas, et al. Plaintiffs, v. NBTY, Inc., and Rexall Sundown, Inc., Defendants*, United States District Court Eastern District of California, Case No.: 2:11-CV-01615-LKK-CKD (2013); *Tara Holdings v. Stewart Lawn and Landscape*, In the Circuit Court for Anne Arundel County, Maryland, Case No. 02-C-11-156176 (2012 – 2013); *Backyard Power, Inc. v. Lawn Equipment Parts Co.*, In the United States District Court for the District of Maryland (2009).

II.    **Assignment and Summary of Conclusions**

3.      In January of 2013, I submitted an expert report on behalf of plaintiffs regarding the estimation of class-wide damages in the current matter. It is my understanding that the parties have agreed to settle the litigation, and I have reviewed the Settlement Agreement. The settlement provides two benefits to members of the proposed Class, a direct monetary benefit and a benefit derived from the proposed injunctive relief. I have been retained by plaintiffs' counsel and have been asked by the plaintiffs to provide an estimate of the minimum value of the monetary relief made available to members of the proposed Class, and to value the proposed injunctive relief created by the settlement. I estimate the value of the direct monetary relief being made available and the proposed injunctive relief with the understanding that branded (including but not limited to Osteo Bi-Flex) and private label glucosamine chondroitin products manufactured or sold by the Settling Defendants, many of which prominently display the "rebuilds cartilage" or a similar message, are subject to the proposed injunctive relief. In completing this assignment I, or those under my direct supervision, have reviewed Rexall Sundown, Inc. ("Rexall") documents produced in discovery, declarations from Rexall employees, as well as court filings and data available through public sources. A list of documents relied upon in forming the opinions contained herein is attached as Appendix B.

4.      Based on my review of Rexall's documents, and other material, it is my opinion that, to a reasonable degree of economic certainty, the monetary relief made available to members of the proposed Class is, at a minimum, $14.2 million. Further, the injunctive relief agreed to in this settlement will likely result in savings to consumers of at least $18.5 million annually and savings to members of the proposed Class, who are repeat purchasers of the covered products, of $8.7 million per year.

**III.    Background**

**Supp. A88**

5.


6.


---

[1] Cramer-Krasselt Study (REX0004055 – 4179) (attached here as Exhibit 1); ACNielsen Study (REX0002483 – 2590) (attached here as Exhibit 2).  Cramer-Krasselt is a Chicago-based advertising and public relations firm that reported over $1 billion in revenue in 2012.  See http://www.c-k.com/#/offices/.  Cramer-Krasselt's clients include luxury car maker Porsche, Corona beer, and Benjamin Moore Paints.  Founded in 1923, and headquartered in New York City, ACNielsen is a global market research firm.  ACNielsen's products and services include the collection and sale of retail pricing data derived from store scanners, as well as the analysis of consumer trends.  See http://www.nielsen.com/us/en.html.
[2] ACNielsen Study (Exhibit 2), at REX0002494.
[3] Cramer-Krasselt Study (Exhibit 1), at REX0004083-85.
[4] Cramer-Krasselt Study (Exhibit 1), at REX0004121-22.

4



7. 

---

[5] Cramer-Krasselt Study (Exhibit 1), at REX0004083 and 4164.
[6] MillwardBrown Study (attached here as Exhibit 3), at REX0002324.
[7] ACNielsen Study (Exhibit 2).
[8] ACNielsen Study (Exhibit 2), at REX0002486, 2492 and 2494.
[9] ACNielsen Study (Exhibit 2), at REX0002486.
[10] ACNielsen Study (Exhibit 2), REX0002547.

8.    Exhibit 6 represents the demand for and supply of Osteo Bi-Flex prior to and following the proposed restaging. Initially the market for Osteo Bi-Flex is in equilibrium at $E_0$, where the demand ($D_0$) for Osteo Bi-Flex intersects the supply ($S_0$) of the product. Based on the ACNielsen survey, the repositioning of the Osteo Bi-Flex product line, to emphasize the purported ability to rebuild cartilage, was expected to increase demand from $D_0$ to $D_1$ on Exhibit 6, thus, increasing both the price of Osteo Bi-Flex and the quantity sold, establishing a new equilibrium at $E_1$. If the injunctive relief is successful at de-emphasizing the rebuilds cartilage message, I would expect the demand for Osteo Bi-Flex to shift back toward and approach $D_0$, establishing a new lower price and reduced sales volume, both of which would benefit members of the proposed Class, as well as other future consumers.

## IV.    Valuation of Injunctive Relief

9.    The above studies, conducted on behalf of Rexall, suggest that restaging Osteo Bi-Flex, in compliance with the injunctive relief described in the settlement, will have a negative impact on product sales because consumers will no longer be influenced by this key message. In other words, a subset of consumers, who were previously enticed by the rebuilds cartilage message, will no longer be misled by those representations and hence will refrain from buying the covered products, resulting in a reduction in sales volume.



Thus, it is expected that as a result of the injunctive relief, *i.e.,* a prohibition against the rebuilding of cartilage claims, fewer consumers

6

will be misled, which will result in savings to consumers.

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

     **a.**    *Branded Osteo Bi-Flex*

    10.    It is my understanding that calendar year 2012 retail sales of Rexall's branded

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
███████████████████████████████████████[12]  Thus, future purchasers of these

products will likely include current members of the proposed Class. Based on the conclusions

contained in the foregoing surveys, it is my opinion that the injunctive relief will likely result in

annual savings to consumers who purchase branded Osteo Bi-Flex, of $14.8 million annually, or

$1.23 million per month.[13] ██████████████████████████████████████████

and carries over into the injunctive relief period, it is my opinion that the injunctive relief will

likely result in annual savings to current members of proposed Class, those who continue to

purchase branded Osteo Bi-Flex, of approximately $7.0 million, or $ 583,333 per month.[14]  If

defendants only comply with the injunctive relief regarding the rebuilding cartilage message on

branded Osteo Bi-Flex products for a 30-month period, the benefit to consumers provided for in

the settlement will be an estimated $37 million ($1.23 million per month × 30 months), and the

---

[11] Declaration of Michael Collins ("Collins Declaration"), at ¶ 7.
[12] Declaration of Jorge Granja ("Granja Declaration"), at ¶ 3.
[13] █████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████
[14] █████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████

7

benefit to current members of the proposed Class is an estimated $17.5 million ($583,333 per month × 30 months).

**b.    *Private Label Glucosamine Chondroitin***

11.    In addition to branded Osteo Bi-Flex, the Settling defendants manufacture and sell private label glucosamine chondroitin products (sold under retailers' private label), the wholesale sales of which ██████████████████[15]  Data to precisely estimate the extent to which private label sales will be impacted by the labeling change is not available.  However, because the private label products compete in the same market as Osteo-Bi-Flex, it is reasonable to assume that they will likely be impacted in a way similar to that described for branded Osteo Bi-Flex.  Thus, using the analysis outlined above, it is my opinion that the injunctive relief will likely result in annual savings to consumers who purchase the covered private label glucosamine chondroitin products of $3.7 million, or $308,333 per month.[16]  Further, it is my opinion that the injunctive relief will likely result in annual savings to current members of the proposed Class, who continue to purchase the covered products, of $1.7 million, or $141,667 per month.[17]  If, as above, the injunctive relief regarding the rebuilding cartilage message on private label glucosamine chondroitin products is adhered to for only a 30-month period, the benefit to consumers, resulting from the injunctive relief provided for in the settlement, will be an estimated $9.25 million ($308,333 per month × 30 months), and the benefit to members of the proposed Class an estimated $4.25 million ($141,667 per month × 30 months).

---

[15] Collins Declaration, at ¶ 8.
[16] ████████████████████████████████████████████
[17] ████████████████████████████████████████████

8

    *c.*       **Combined Benefit, Branded Osteo Bi-Flex and Private Label Glucosamine**

**Chondroitin**

    12.    Given the foregoing analysis, it is my opinion that the injunctive relief associated

with the removal of rebuilding cartilage representations will likely result in annual savings to

consumers who purchase the covered products of $18.5 million ($14.8 million + $3.7 million), or

$1.54 million per month, and to repeat purchaser members of the proposed Class of $8.7 million

($7.0 million + $1.7 million), or $725,000 per month.  If defendants only comply with the

injunctive relief regarding the rebuilding cartilage message for a 30-month period, the benefit to

consumers resulting from the injunctive relief provided for in the settlement is estimated to be

$46.2 million, and the estimated benefit to current members of the proposed Class is

approximately $21.7 million.[18]

**V.**    **Valuation of Direct Monetary Relief Made Available to Members of the Proposed**

**Class**

    13.    In addition to injunctive relief, the settlement provides that Rexall will pay, on an

uncapped basis, claims made by members of the proposed Class.  It is my understanding that the

settlement provides that, at a minimum, Rexall will remit to claimants $3.00 per bottle for each

undocumented purchase of covered products, up to a maximum of 4 bottles, or $12.[19]  Further, it

is my understanding that the Settling Defendants, or those acting on behalf of the Settling

Defendants, have conducted a notice program that is estimated to have reached over 76 percent

---

[18]

[19]

of the estimated 12 million members of the proposed Class, or 9.1 million people.[20]  It also is my understanding that at least 4,718,651 members of the proposed Class received direct notice (via email or postcard) of the settlement.[21]  Per the terms of the settlement, each member of the proposed Class has the right to file a claim for no less than $3.  Thus, assuming that each of the 9.1 million, or 76 percent of 12 million members of the proposed Class, who were estimated to have been exposed to the Class notice made only one undocumented claim of purchase, under the terms of the settlement, an upper range of the minimum value of the funds that the settling defendants have agreed to pay is $27.3 million (9.1 million times $3).  If the analysis is limited to those members of the proposed Class who received direct notice by email or postcard the resulting minimum value of the proposed settlement, on a value made available basis, is $14.2 million (4,718,651 × $3 = $14.2 million).

_____

Keith A. Reutter
August 30, 2013

---

[20] Affidavit of Mark D. Schey, ¶ 10.
[21] Affidavit of Michael E. Hamer, ¶¶ 10 – 13; Affidavit of Dan Ross, ¶¶ 5 and 6.

Case: 1:11-cv-07972 Document #: 113-20 Filed: 09/04/13 Page 12 of 31 PageID #:1821

# **Appendix A**



# Keith A. Reutter, Ph.D.

Berkeley Research Group, LLC
1919 M Street NW, Suite 800
Washington, DC 20036
Direct: 202.480.2645
Cell: 571.327.4103
kreutter@brg-expert.com

**BIO/SUMMARY**

Keith Reutter, Ph.D. is a Principal in the Berkeley Research Group's ("BRG") Washington, DC office.  Dr. Reutter specializes in providing economic and statistical analysis and expertise in regulatory and complex litigation matters, including: antitrust (*e.g.* price fixing, market definition, attempted monopolization, allegations involving the Sherman Act and Hatch-Waxman Act), intellectual property (*e.g.* patent and trademark infringement, 337 investigations before the U.S. International Trade Commission) labor and employment (*e.g.* wrongful termination, discrimination), class certification proceedings, and commercial litigation (*e.g.* breach of contract, false advertising).

Dr. Reutter has provided testimony before state and federal courts, the American Arbitration Association, and the Federal Energy Regulatory Commission.

Dr. Reutter's engagements have covered a wide range of industries, including natural gas, oil and diluent pipelines, basic chemicals, consumer products, pharmaceuticals, dairy products, basic food stuffs, high-tech industries and products (e.g. computer software and hardware) and real estate.

**EDUCATION**

Ph.D., Economics, Auburn University, Lowder School of Business, 1997
> Fields of Concentration: Industrial Organization/Regulation, Econometrics, History of Economic Thought
> Dissertation: From Franchise to State Commission: Regulation of the Electric Utility Industry, 1907 to 1932

M.A., Economics, the University of Texas-Arlington, 1992

B.S., Economics, the University of Texas-Arlington, 1988



**EXPERT RETENTIONS**

*Lorean Barrera, et al., Plaintiffs v. Pharmavite, LLC, Defendants*, United States District Court for the Central District of California, Case No.: CV-11-4153 (AGrx). Expert report regarding the estimation of damages.

*Rebecca Bohn, et al., Plaintiffs v. Pharmavite, LLC, Defendants*, United States District Court for the Central District of California, Case No.: 2:11-cv-10430-GHK-AGR (2013). Expert report regarding the estimation of damages and deposition testimony.

*Luis Lerma, et al., Plaintiffs, v. Schiff Nutrition International and Schiff Nutrition Group, Defendants*, United States District Court Southern District of California, Case No.: 11-CV-1056-JAH(MDD) (2013). Expert report regarding the estimation of damages.

*Liliana Cardenas, et al. Plaintiffs, v. NBTY, Inc., and Rexall Sundown, Inc., Defendants*, United States District Court Eastern District of California, Case No.: 2:11-CV-01615-LKK-CKD (2013). Expert report and deposition testimony regarding the estimation of damages.

*Tara Holdings v. Stewart Lawn and Landscape*, In the Circuit Court for Anne Arundel County, Maryland, Case No. 02-C-11-156176 (2012 - 2013). Expert report regarding damages. Deposition and trial testimony.

*Waypoint Aviation Services, Inc. et al. v. Lycoming Engines, et al.* In the Circuit Court of Cook County, Illinois, No. 06 CH 22950 (2012). Expert report regarding the estimation of damages.

*Backyard Power, Inc. v. Lawn Equipment Parts Co.*, In the United States District Court for the District of Maryland (2007 - 2009). Expert report regarding commercial damages. Deposition.

*Settlement Hearing Regarding Crompton's EPDM Damages*, before independent arbitrator (2005). Testimony before independent arbitrator regarding antitrust damages.

*The Townsend Group, Inc. v. the National Lumberman's Publishing Corp et al.*, before the American Arbitration Association (2002). Expert report regarding damages.

*inData Corporation v. Verdict Systems et al.*, In the Superior Court of the State of Arizona (2001) Case No. CV 1999-93390. Expert report regarding damages.

**Supp. A98**



**SELECTED CONSULTING**

*In the Matter of Certain Audiovisual Components and Products Containing Same,* Before the U.S. International Trade Commission, Investigation No. 337-TA-837 (2012 – 2013).

*In the Matter of Certain Video Displays and Products and Containing Same,* Before the U.S. International Trade Commission, Investigation No. 337-TA-828 (2012).

DTE/MichCon analysis regarding ANR Pipeline and Storage facilities (2012 – 2013).

*In the Matter of Certain Semiconductor Chips with Minimized Chip Package Size and products Containing Same,* Before the U.S. International Trade Commission, Investigation No. 337-TA-605 (Bond Forfeiture Proceeding) (2012).

*In the Matter of Certain Dynamic Random Access Memory and NAND Flash Memory Devices and Products Containing the Same,* Before the U.S. International Trade Commission, Investigation No. 337-TA-803 (2012).

*In the Matter of Enbridge Southern Lights Tolls, before the National Energy Board, RH-1-2011,* Canada (2011).

*In re Southeastern Milk Antitrust Litigation,* In the United States District Court for the Eastern District of Tennessee, at Greeneville (2007 – 2009).

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litigation,* In the United States District Court for the District of Connecticut (2004 – 2009).

*In re Wellbutrin Antitrust Litigation,* In the United States District Court for the Eastern District of Pennsylvania (2006 – 2008).

*Faye Vassilates et al., v. Del Monte et al.,* Superior Court State of California County of Alameda (2007 – 2008).

*Columbus Drywall et al., v Masco Corporation et al.,* In the United States District Court for the Northern District of Georgia, Atlanta Division (2006 – 2007).

*In re Carbon Black Antitrust Litigation,* In the United States District Court for the District of Massachusetts (2004 – 2006).



**SELECTED TESTIMONY BEFORE THE FEDERAL ENERGY REGULATORY COMMISSION**

Comments of C. Danner, H. Kahwaty, K. Reutter and C. Tyler re the NOI, "Analysis of Horizontal Market Power in Transactions Under the Federal Power Act," Docket No. RM11-14-000. May 2011.

Comments of K. Reutter re the NOI, "Analysis of Horizontal Market Power in Transactions Under the Federal Power Act," Docket No. RM11-14-000. May 2011.

Market Power Analysis re Pine Prairie Energy Center, LLC (update), FERC Docket No. CP04-379-002, February 2009.

Market Power Analysis re Michigan Consolidated Gas Company, FERC Docket No. PR09-10-000, December 2008.

Market Power Analysis re Southern Pines Energy Center (update), FERC Docket No. CP02-229-004, May 2008.

Market Power Analysis re Washington 10 Storage Corporation, FERC Docket No. PR08-26-000, May 2008.

Market Power Analysis (update) re Caledonia Natural Gas Storage Facility, FERC Docket No. CP08-52-000, January 2008.

Market Power Analysis re Leaf River Energy Center LLC, FERC Docket No. CP08-8-000, October 2007.

Market Power Analysis re Tres Palacios Storage LLC, FERC Docket No. CP07-90-000, February 2007.


**PUBLICATIONS/PRESENTATIONS**

"Recent Changes in Statute and Case Law: Effects on the Value of Intellectual Property Assets," with W.O. Kerr, prepared for and presented at the 2012 Annual Meeting of the Society for Mining, Metallurgy and Exploration.

"The First Step in Restructuring the US Electric Industry," with A. Barnett and H. Thompson, *Energy Economics*, Vol. 27, Issue 2, pp. 225-235 (Spring 2005).

"Electricity Substitution: Some local industrial evidence," with A. Barnett and H. Thompson, *Energy Economics*, Vol. 20, Issue 4, pp. 411-419 (Fall 1998).



"Power Pools vs. Bilateral Markets: A Survey," Auburn Policy Research Center monograph, summer 1996.


## PROFESSIONAL AFFILIATIONS

Energy Bar Association
American Economic Association


## ACADEMIC AND OTHER POSITIONS

Reutter Economics, LLC
        Principal: 2009 – 2012

Nathan Associates Inc.
        Principal Economist: 2007 – 2009
        Managing/Senior Economist: 2001 – 2007

InteCap/Micronomics, Inc.
        Senior Economist/Director: 1999 – 2001

The University of Southern Indiana
        Assistant Professor of Economics and Finance (Adjunct): 1998

American General Finance
        Senior Analyst – Risk Analysis: 1998 – 1999

Capital Economics
        Economist: 1997

Auburn Policy Research Center
        Research associate: 1993 – 1997

Case: 1:11-cv-07972 Document #: 113-20 Filed: 09/04/13 Page 18 of 31 PageID #:1827

# Appendix B

**Appendix B**
**Material Relied Upon by Keith A. Reutter, Ph.D.**

**Bates Numbered Documents**

Exhibit 1        Cramer-Krasselt Survey (REX0004055-4179)

Exhibit 2        ACNielsen Study (REX0002483-2590)

Exhibit 3        MillwardBrown Study (REX0002314-2356)

Exhibit 4        Food and Drug Pricing, Osteo Bi-Flex (Pricing Suggested by ACNielsen Study)

Exhibit 5        Mass Merchandiser Pricing, Osteo Bi-Flex (Pricing Suggested by ACNielsen Study)

Exhibit 6        Expected Changes in Demand for Osteo Bi-Flex, Given ACNielsen Study


**Court Documents**[1]

*Nick Pearson, et al., Plaintiffs, v. NBTY, Inc., et al., Defendants, Second Amended Class Action Complaint*, United States District Court, Northern District of Illinois, Eastern Division, Case No. 11 CV 07972 [D.E. 64] (Apr. 22, 2013)

Master Exhibit A        Affidavit of Mark D. Schey, dated August 30, 2013

Master Exhibit B        Affidavit of Michael E. Hamer, dated August 30, 2013

Master Exhibit C        Affidavit of Dan Ross, dated August 14, 2013

Master Exhibit J        Declaration of Michael Collins, dated August 30, 2013

Master Exhibit Z        Declaration of Jorge Granja, dated August 29, 2013


**Websites**

http://www.c-k.com/#/offices/

http://www.glucosaminesettlement.com/claim/

http://www.nielsen.com/us/en.html

---

[1] To reduce the size of this filing, attachments to Dr. Reutter's Report that are also on the *Pearson* docket or on the Parties' Master Exhibit list are not attached as exhibits hereto.

Case: 1:11-cv-07972 Document #: 113-20 Filed: 09/04/13 Page 30 of 31 PageID #:1839

# Exhibit 6

**Exhibit 6: Expected Changes in Demand for Osteo Bi-Flex, Given ACNielsen Study**



**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

**VISHVA DESAI and PHILIP J. CHARVAT,
on behalf of themselves and others similarly
situated,**

      **Plaintiffs,**

**v.**                                           **Case No. 1:11-cv-1925**

**ADT SECURITY SERVICES, INC.,**

      **Defendant.**

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION
<u>FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT</u>**

Dated: June 7, 2013

# TABLE OF CONTENTS

I.    Introduction ................................................................................................... 1

II.   Background ..................................................................................................... 2

   A.   Telemarketing calls to Plaintiffs and commencement of action. ....................... 2

   B.   Plaintiffs' discovery efforts............................................................................ 2

   C.   ADT's third-party complaint. ........................................................................ 4

   D.   Plaintiffs identify class members through the Dynamic call records. ................ 5

   E.   Legal uncertainty regarding "on behalf of" liability. ...................................... 6

   F.   The settlement negotiations. .......................................................................... 8

III.  The Proposed And Preliminarily-Approved Settlement. ..................................... 8

   A.   The settlement class. .................................................................................... 8

   B.   The settlement fund...................................................................................... 9

   C.   Additional class member relief. .................................................................... 10

   D.   Notice and settlement administration............................................................. 11

   E.   Opt-out and objection procedures................................................................. 14

   F.   Release. ...................................................................................................... 14

IV.   The Settlement Warrants Final Approval. ........................................................ 15

   A.   All factors favor final approval..................................................................... 16

      1.   The settlement provides significant benefits to the settlement class, particularly in
           light of the uncertainty of prevailing in the litigation. ............................... 16

      2.   This multi-year litigation has already involved complex and expensive discovery
           and the briefing of numerous critical legal issues...................................... 18

      3.   The lack of opposition to the settlement supports final approval. .................. 19

      4.   Class counsel believes the settlement is fair, reasonable, and adequate. .......... 20

      5.   The extensive discovery and advanced stage of the proceedings weigh in favor
           of settlement approval................................................................................ 20

B.    The notice scheme is consistent with due process and Rule 23.........................................21

V.    The Requested Attorney Fees Are Reasonable..................................................................22

VI.   The Incentive Awards To The Class Representatives Are Reasonable............................24

VII.  The Five *Pro Se* Objections Should Be Overruled............................................................26

VIII. Conclusion ............................................................................................................................27

## TABLE OF AUTHORITIES

**Cases**

*Am. Int'l Grp., Inc. et al., v. ACE INA Holdings, et al.,* Nos. 07-cv-2898, 09 C 2026,
   2012 WL 651727 (N.D. Ill. Feb. 28, 2012) ............................................................ 15

*Armstrong v. Bd. of Sch. Dirs. of the City of Milwaukee*, 616 F.2d 305 (7th Cir.1980)......... 15, 16

*Bryan v. Pittsburgh Plate Glass Co.,* 494 F.2d 799 (3d Cir. 1974).............................................. 19

*Bussie v. Allmerica Fin. Corp.*, 50 F. Supp. 59 (D. Mass. 1999) ............................................ 19

*Charvat v. Echostar Satellite, LLC*, 676 F. Supp. 2d 668 (S.D. Ohio 2009)................................. 7

*Charvat v. Echostar Satellite, LLC,* 630 F.3d 459 (6th Cir. 2010)................................................ 7

*City of Greenville v. Syngenta Crop Prot., Inc.*, --- F. Supp.2d ---, No. 3:10-cv-00188,   2012 WL
   5252304 (S.D. Ill Oct. 23, 2012) ............................................................................... 22

*Cook v. Niedert,* 142 F.3d 1004 (7th Cir. 1998) .................................................................. 24, 25

*Desai v. ADT Sec. Servs., Inc.,* No. 11-C-1925, 2012 WL 4482012 (N.D. Ill. 2012) ................... 4

*Desai v. ADT Sec. Servs., Inc.,*No. 11-C-1925, 2011 WL 2837435 (N.D. Ill. July 18, 2011) ... 2, 6

*Dish Network, LLC v. Fed. Comm. Comm'n*, No 13-1182 (D.C. Cir.) ......................................... 7

*Erie Forge and Steel, Inc. v. Cyprus Minerals Co.,* No. 94–404 (W.D. Pa. Dec. 23, 1996)........ 17

*Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998)....................................................................... 15

*Florin v. Nationsbank of Ga., N.A.,* 34 F.3d 560 (7th Cir. 1994) ................................................ 22

*Gaskill v. Gordon,* 942 F. Supp. 382 (N.D. Ill. 1996) ................................................................ 22

*Hammon v. Barry*, 752 F. Supp. 1087 (D.D.C. 1990) ................................................................ 19

*Heekin v. Anthem, Inc.*, No. 1:05-01908, 2012 WL 5878032 (S.D. Ind. Nov. 20, 2012)............. 25

*Hinman v. M&M Rentals, Inc.*, No. 06-1156 (N.D. Ill. Oct. 6, 2009)........................................ 23

*In re Domestic Air Tranp. Antitrust Litig.,* 148 F.R.D. 297 (N.D. Ga. 1993) ............................. 17

*In re Ky. Grilled Chicken Coupon Mktg. & Sales Practices Litig.*, 280 F.R.D. 364
   (N.D. Ill. 2011)................................................................................... 1, 16, 20, 21

*In re Newbridge Networks Sec. Litig.*, No. 94-1678, 998 WL 765724 (D.D.C. Oct. 23, 1998)... 17

*In re Ravisent Techs., Inc. Sec. Litig.*, No. 00-1014, 2005 WL 906361
(E.D. Pa. Apr. 18, 2005) ........................................................................ 17

*In re Synthroid Mktg. Litig.*, 264 F.3d 712 (7th Cir. 2001) ........................................ 24

*In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.,* 724 F. Supp. 160
(S.D.N.Y. 1989) ...................................................................................... 22

*In re Vivendi Universal, S.A.,* 242 F.R.D. 76, 107 S.D.N.Y. 2007)  ........................... 21

*Isby v. Bayh,* 75 F.3d 1191 (7th Cir. 1996) ................................................................ 16

*Laskey v. International Union (UAW),* 638 F.2d 954 (6th Cir.1981) ........................... 19

*Lazy Oil Co. v.* Witco, 95 F.Supp.2d 290 (W.D. Pa. 1997) ......................................... 17

*Lively v. Dynegy, In*c., No. 05-0063, 2008 WL 4657792 (S.D. Ill. Sept. 30, 2008).................... 25

*Matter of Cont'l Ill. Sec. Litig.*, 962 F.2d 566 (7th Cir. 1992)..................................... 22

*Mirfasihi v. Fleet Mortg. Corp.,* 356 F.3d 781(7th Cir. 2004...................................... 21

*Morlan v. Universal Guar. Life Ins*., No. 99-274, 2003 WL 22764868 (S.D. Ill. Nov. 20, 2003)25

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) ......................... 21

*Saf-T-Gard Int'l, Inc. v. Seiko Corp. of Am.*, No. 09 C 0776 (N.D. Ill. Jan. 14, 2011) ............... 23

*Schulte v. Fifth Third Bank,* 805 F. Supp. 2d 560 (N.D. Ill. 2011)......................... 17, 18

*Shurland v. Bacci Café & Pizzeria on Ogden, Inc.,* 271 F.R.D. at 146) ..................... 21

*Spicer v. Chicago Bd. Options Ex., Inc*., 844 F. Supp. 1226 (N.D. Ill. 1993) ............................ 25

*Sutton v. Bernard*, 504 F.3d 688 (7th Cir. 2007) ...................................................... 21

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.,* 463 F.3d 646 (7th Cir. 2006)......................... 16

*Thomas v. Taco Bell Corp.*, 879 F. Supp. 2d 1079 (C.D. Cal. 2012) ........................... 6

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.* 396 F.3 96 (2d Cir. 2005) ......................... 15

## Statutes

47 U.S.C. § 227.............................................................................................. *passim*

## Other Authority

*In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, --- FCC Rcd. ---
(F.C.C. May 9, 2013) ................................................................................ 7

# I.    INTRODUCTION

After nearly two years of hard-fought litigation, followed by four days of mediation and additional informal negotiations over a span of several months, the parties in this putative Telephone Consumer Protection Act class action reached a proposed settlement.  (*See* Ex. A, Settlement Agreement.)  The settlement establishes a $15 million fund that Plaintiffs expect will pay class members an estimated $47.27 per claim.  If approved, the settlement will bring to conclusion what has been, and likely would continue to be, contentious and costly litigation centered on the unsettled legal question of ADT's liability for the allegedly unlawful telemarketing practices of its dealers and others who market or sell ADT products and services.

By their motion, Plaintiffs seek final approval of this class action settlement.  This memorandum describes in detail the reasons why final approval is in the best interest of the class and is consistent with Rule 23. Class members appear to agree; over 132,000 have submitted claims for payment.

In evaluating the fairness of a class action settlement, the most important consideration is the strength of the plaintiff's case on the merits balanced against the amount offered in the settlement.  *In re Ky. Grilled Chicken Coupon Mktg. & Sales Practices Litig.*, 280 F.R.D. 364, 375 (N.D. Ill. 2011).  While the Plaintiffs believe they would secure class certification and prevail on the merits at trial, success is not assured.  At every turn, ADT has vigorously defended this case.  The relief provided here—payments from the settlement fund, coupled with ADT's agreement to take measures to assure future TCPA compliance—meets and exceeds the applicable standards of fairness.  Accordingly, the Court should approve the settlement so that class members may receive their settlement benefits.

## II.     BACKGROUND

**A.     Telemarketing calls to Plaintiffs and commencement of action.**

In February 2011, Plaintiff Vishva Desai received an unsolicited automated telemarketing call—or "robocall"—from a telemarketer promoting the sale and installation of ADT home-security systems.  On March 21, 2011, Ms. Desai, who resides in the Northern District, commenced this action.  She alleges the call she received was placed on behalf of ADT and for its benefit, and that ADT is liable for violating the TCPA's provisions banning robocall telemarketing unless the caller has received the recipient's prior express consent.  *See* 47 U.S.C. § 227(b).

Mr. Charvat, an Ohio resident, also received ADT-related robocalls and on January 28, 2011 commenced a similar action against ADT in Columbus, Ohio.  *See Charvat v. ADT Sec. Servs., Inc.,* No. 2:11cv0093 (S.D. Ohio).  After learning of Ms. Desai's lawsuit, Mr. Charvat voluntarily dismissed his case and, together with his counsel, joined forces with Ms. Desai and her attorney.  Mr. Charvat and Ms. Desai consolidated their claims in this Court by filing a First Amended Complaint (ECF No. 18) on April 18, 2011.

ADT responded to this filing with a motion to dismiss, and asserted its chief legal defense:  that because ADT did not make or otherwise initiate the telemarketing calls at issue, it could not be liable for the calls under the TCPA.  The parties submitted extensive briefing on this and other matters raised in ADT's motion, which the Court denied on July 18, 2011.  *See Desai v. ADT Sec. Servs., Inc.,* No. 11-C-1925, 2011 WL 2837435 (N.D. Ill. July 18, 2011) ("*Desai I*").

**B.     Plaintiffs' discovery efforts.**

During the pendency of the motion to dismiss, Plaintiffs commenced what ultimately

2

proved to be a massive and far-reaching discovery effort, including subpoenas directed to some

92 separate persons and entities.  Plaintiffs' discovery plan was threefold:  first, to identify the

entities behind the telemarketing calls to the Plaintiffs; second, to identify other companies that

also telemarketed ADT products and services; and third, to identify class members—those

persons who received allegedly unlawful calls from ADT-related telemarketers.

These expensive and time-consuming discovery efforts required diligence, persistence

and no small degree of knowledge of the telemarketing industry.  Determining who was behind

the Plaintiffs' telemarketing calls was complicated by the fact that the calls were "spoofed,"

meaning the telemarketers manipulated their telephone systems in order to cause false

information to display on the recipient's caller ID device.  Finding these callers required

Plaintiffs to issue dozens of subpoenas up the telemarketing chain to targets across the nation.

The subpoena trail began with Ms. Desai's and Mr. Charvat's own telephone companies, then

led to telephone management companies that leased phone lines to telemarketers, and then on to

the telemarketers, who in turn relied on separate telemarketing outfits using automated dialing

systems.

Plaintiffs' subpoena efforts often were met with resistance and noncompliance by the

recipients, which led to discovery battles waged in other federal district courts.  Plaintiffs hired

counsel in these remote jurisdictions to protect their interests, and eventually obtained the

subpoenaed information after prevailing on discovery motions.

While tracking the trail of the Charvat and Desai calls, Plaintiffs' counsel served written

discovery on ADT, which led to more discovery-motion practice after ADT objected to certain

aspects of Plaintiffs' requests.  Ultimately, the discovery directed at ADT led to a rolling

production of more than 175,000 pages of documents over the course of six months.

**Supp. A113**

When combined with the 35,000 pages of documents and hundreds of thousands of pages of call records obtained through Plaintiffs' third-party efforts, a complete picture of the case began to emerge.  Plaintiffs determined that one of the Charvat calls was placed by EMI, a California telemarketing and lead generation firm hired by an outfit called DirectSavings USA, which in turn was providing telemarketing leads to Eversafe Corporation, one of ADT's largest authorized dealers.  EMI also placed the Desai call after it was hired by a marketing company called Paramount Media Group, which in turn was hired by an ADT-authorized marketer called Saveology—an independent company that sells leads to ADT's authorized dealers.

**C.      ADT's third-party complaint.**

The complex discovery in the case began to shift from subpoenas to written discovery when, on August 25, 2011, ADT filed a third-party complaint (ECF No. 75) for indemnification and contribution against entities that Plaintiffs identified were potentially responsible for the Charvat and Desai calls, including Saveology, Eversafe, and EMI.  This pleading spawned a thick stack of third-party filings, including answers, cross-claims, default motions, and motions to dismiss.  *See, e.g.*, *Desai v. ADT Sec. Servs., Inc.,* No. 11-C-1925, 2012 WL 4482012 (N.D. Ill. 2012) ("*Desai II*").

The upshot of ADT's third-party complaint for Plaintiffs was the opportunity, utilized in November of 2011, to issue interrogatories and requests for production of documents to third-party defendants Eversafe, Saveology, Chris Long, EMI, Peter Tolman, Leads Direct Marketing, Voice Tel Corporation, Direct Savings, USA, Oscar Montenegro, City VIP, LLC and Paramount Media Group.  The parties also took the Rule 30(b)(6) deposition of Paramount Media Group.  As with the subpoenas, some of the written discovery was contested, which necessitated more

4

**Supp. A114**

motions to compel discovery, most of which were granted.  (ECF Nos. 184, 206.)  In response to this discovery, these third-party defendants produced another 10,000 pages of documents.

**D.      Plaintiffs identify class members through the Dynamic call records.**

Plaintiffs' efforts to obtain discovery from third-party defendants Christopher Long and EMI proved especially challenging—and fruitful.  Long and EMI initially refused to respond to Plaintiffs' discovery, and then unsuccessfully moved to quash Plaintiffs' subpoena in federal district court in California.  *Desai v. EMI, Inc.,* No. 2:11-cv-04026-GAF-AJW (C.D. Cal.).  Then, after Plaintiffs moved to compel production before this Court (ECF No. 143), Long and EMI commenced bankruptcy proceedings in California, in which Plaintiffs' counsel appeared and examined Long under oath.  Still, Long and EMI failed to respond to discovery, even after this Court granted the Plaintiffs' motion to compel.  Left with no alternative, Plaintiffs moved for contempt sanctions against Long and EMI, which finally drew their attention and they opposed the motion for sanctions.  The Court resolved the matter by ordering Long and EMI to produce the requested information.  (ECF No. 196.)

This production, combined with the bankruptcy-proceeding testimony from Long, proved critical to this litigation, as it identified a California company called Dynamic Interactive as the telecommunications provider for Long's and EMI's massive telemarketing campaign.  Dynamic provides voice broadcasting services that enable companies like EMI to transmit thousands of prerecorded phone messages simultaneously to consumers nation-wide.  Plaintiffs' follow-up subpoena to Dynamic yielded documents that revealed EMI as the dialer of the telemarketing call to Ms. Desai, and included recordings of the robocall messages placed by EMI.  The Dynamic production also included call logs showing approximately 50 million attempted

5

**Supp. A115**

telemarketing calls placed by EMI using Dynamic's voice broadcasting technology.  EMI placed

robocalls for clients in many industries, not only home security.  Most critically, the Dynamic

subpoena resulted in the production of a list of more than 1.4 million unique telephone numbers

to which EMI transmitted telemarketing robocalls that mentioned ADT and were completed (*i.e.*,

answered by a person or an answering machine).[1]  The consumers associated with these 1.4

million numbers are thus within the proposed class.  Through a "reverse-lookup" process of the

1.4 million phone numbers, Plaintiffs obtained information that allowed for the mailing of class

notice to more than 1.2 million households.  As for the other telemarketing calls attributed to

EMI, Plaintiffs lack sufficient information to determine whether the calls were made in efforts to

sell ADT products or security services.

**E.      Legal uncertainty regarding "on behalf of" liability.**

From the inception of the action, and throughout the period Plaintiffs and their counsel

invested their time and money prosecuting these claims, the parties have litigated in the shadow

of uncertainty regarding the central legal question presented by this case:  whether and under

what circumstances ADT, who did not place telemarketing calls to Plaintiffs or class members,

could be liable for TCPA violations committed by its authorized dealers and their agents.  Courts

have been sharply divided on this issue.  *Compare Desai I,* 2011 WL 287435, *3 (denying

ADT's motion to dismiss, and finding that TCPA liability does not require a party to make a call)

---

[1] After receiving the Dynamic call logs, Plaintiffs' counsel were able to identify the calls
that played a pre-recorded message mentioning ADT by having Dynamic investigate those logs
that Plaintiffs' counsel believed were associated with such pre-recorded messages.  Dynamic's
system allowed Dynamic to identify the prerecorded message that was played to the numbers
called in a particular log, and those files, produced in ".wav" format, did indeed mention ADT.

**Supp. A116**

*with Thomas v. Taco Bell Corp.*, 879 F. Supp. 2d 1079 (C.D. Cal. 2012) (absence of "on behalf of" language in 47 U.S.C. § 227(b)—unlike § 227(c)(5)— means the entity whose goods are advertised in a precorded message is not liable under the TCPA unless traditional vicarious liability principles are satisfied); *Charvat v. Echostar Satellite, LLC*, 676 F. Supp. 2d 668, 674-677 (S.D. Ohio 2009) (even under § 227(c)(5) an entity cannot be held liable for calls made on its behalf unless it had the right to control of the manner and means of the telemarketing), *remanded by Charvat v. Echostar Satellite, LLC*, 630 F.3d 459, 465 (6th Cir. 2010) (district court should have invoked the doctrine of primary jurisdiction and referred issue to the Federal Communications Commission).

Neither the Seventh Circuit nor any other Federal Court of Appeals has addressed this issue. Recently, the FCC issued its decision in *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, --- FCC Rcd. --- (F.C.C. May 9, 2013) (hereinafter "FCC Ruling 13-54") (clarifying that "a seller … may be vicariously liable under federal common law agency-related principles for violations of either section 227(b) or 227(c) committed by telemarketers that initiate calls to market its products or services."), *pet. for app. filed, Dish Network, LLC v. Fed. Comm. Comm'n*, No 13-1182 (D.C. Cir.).[2]  Although the FCC Ruling confirms the Plaintiff's view of the applicable law in this case, whether ADT is actually liable for the conduct of third party marketers remains a hotly contested issue.

---

[2] Mr. Charvat, one of the two class representatives in this case, also was the consumer who initiated suit against Dish Network that brought to the Sixth Circuit Court of Appeals the issue as to whether Dish was liable for the illegal telemarketing practices of its authorized dealers.  The Sixth Circuit in turn referred this question to the FCC under the doctrine of general jurisdiction, which ultimately resulted in the issuance of FCC Ruling 13-54.  *See Charvat, supra.*

**F.     The settlement negotiations.**

Against this unsettled background, the parties began to explore settlement.  Plaintiffs'

counsel first met with ADT's counsel in New York City on April 11, 2012.  Following this initial

meeting, the parties completed three daylong mediation sessions with mediator Professor Eric

Green, a co-founder of JAMS/Endispute who now mediates complex cases through his Boston

firm, Resolutions LLC.  These sessions took place in May and September 2012, with intermittent

settlement talks in between, some led by Prof. Green, and some directly between counsel.

Eventually, these discussions culminated in the settlement agreement which this Court approved

preliminarily on February 19, 2013.

## III.     THE PROPOSED AND PRELIMINARILY-APPROVED SETTLEMENT

This Court preliminarily approved the settlement in an order dated February 19, 2013.

(ECF No. 233.)

**A.     The settlement class.**

The final settlement would establish a settlement class defined as follows:

All persons or entities who, at any time from January 1, 2007 through the date of
the Settlement Agreement, received one or more Covered Calls.

"Covered Calls" means either (1) a telemarketing call utilizing a pre-recorded
message or (2) a telemarketing call to a cell phone that was made through the use
of automated dialing equipment, where the call described in (1) and/or (2) relates
in any way to ADT Security Services, Inc. Covered Calls include calls initiated or
made by ADT or by someone acting or purporting to act on behalf of ADT, or calls
initiated or made by someone seeking to sell products or services relating in any
way to ADT, including calls made by ADT's Authorized Dealers, ADT's
Authorized Telemarketers, ADT's Marketing Partners, or calls initiated or
made  by anyone seeking to sell leads relating to ADT,  or any calls initiated or
made by anyone seeking to sell leads relating to ADT to anyone else, where the
lead sought to be generated from the call ultimately could have been sold to ADT,
ADT's Authorized Dealers, ADT's Authorized Telemarketers, or ADT's
Marketing Partners, including but not limited to any calls made or caused to be

8

made by Christopher Long (or any entity associated with Christopher Long), Oscar
Montenegro (or any entity associated with Oscar Montenegro), EMI, Inc. (also
known as European Marketing International and European Media International and
Nationwide Media, Inc.) (collectively "EMI") (or anyone acting by, through, or
with EMI), Direct Savings USA, LLC (or anyone acting by, through, or with
Direct Savings USA, LLC), Direct Savings USA, Inc. (or anyone acting by,
through, or with Direct Savings USA, Inc.), Paramount Media Group (or anyone
acting by, through or with Paramount Media Group), Dynamic Interactive Corp.
(or anyone acting by, through or with Dynamic Interactive Corp.), Pete Tolman,
Leads Direct Marketing (or anyone acting by, through, or with Leads Direct
Marketing), Voice Tel Corp. (or anyone acting by, through, or with Voice Tel
Corp.), TM Caller ID (or anyone acting by, through, or with TM Caller ID), City
VIP (or anyone acting by, through, or with City VIP), and JMB Enterprises (or
anyone acting by, through, or with JMB Enterprises). Covered Calls included any
such calls whether or not authorized by, approved by, or known by ADT.

(*See* Ex. A, Settlement Agreement ¶¶ 2.13, 2.26.)

**B.     The settlement fund.**

The proposed settlement would establish a $15 million fund that has been used to pay

notice and administration costs (currently estimated to be approximately $3.4 million), and will

be used to pay Court-approved attorneys' fees (33 1/3 % of the $15 million fund), reimbursement

of costs and expenses, Court-approved service payments to both Plaintiffs (up to $30,000 each),

and payments to class members. Authorized claimants are entitled to equal shares of the

remainder of the settlement fund after these payments.

Based on the **136,440** claims received in response to the notice program developed with

the assistance of the proposed settlement administrator, AB Data, Plaintiffs anticipate a payout of

$47.33 per class member claim. Any funds that remain after class members are paid will be

distributed as *cy pres* to a charitable institution proposed by the parties and approved by the

Court. The parties propose the Electronic Privacy Information Center ("EPIC"), in Washington,

D.C., as the *cy pres* recipient. (*Id.* § 4.3.) EPIC is a public interest research center established in

**Supp. A119**

1994 to focus public attention on emerging civil liberties issues and to protect privacy, the First

Amendment, and constitutional values. *See* Electronic Privacy Information Center,

www.epic.org, last visited June 4, 2013. However, due to the large number of claimants, there

will not be any *cy pres* distribution unless settlement members who already filed a claim fail to

tender their settlement check.

### C.    Additional class member relief.

As an additional benefit to all settlement class members, ADT has agreed that for a

period of at least two years from the effective settlement date, ADT will continue in place its

policy of not making telemarketing calls promoting ADT services using pre-recorded messages.

(Ex. A, Settlement Agreement § 4.6.) Additionally, ADT shall, for a period of at least two years

from the effective date, include in all new contracts with ADT's Authorized Marketers a

provision, and amend its telemarketing guidelines for all of ADT's Authorized Dealers, to

prohibit Authorized Marketers and Authorized Dealers from making telemarketing calls

promoting ADT's services using pre-recorded messages or purchasing leads that were generated

through telemarketing using pre-recorded messages.

These restrictions on use of pre-recorded messages will include any call using an

artificial or prerecorded voice to deliver a message with or without consent, that is made for the

purpose of marketing ADT services. The restrictions do not apply to calls (i) made for non-

solicitation purposes, including, but not limited to, calls for appointment scheduling and

confirmation, calls regarding service issues or advisories, calls regarding account payment and

administration, customer satisfaction survey calls, and calls associated with provision of

monitoring services or (ii) made by an Authorized Marketer or Authorized Dealer to market

10

**Supp. A120**

products and services that do not relate to ADT.  The prohibition also does not apply to any pre-recorded messages made to comply with the Telemarketing Sales Rule's and Telephone Consumer Protection Act's call abandonment rules.  This benefit is a significant one for class members, as many telemarketing entities will purport to use lawful lead generation activities employing the use of pre-recorded messages, when, in fact, the telemarketing is in violation of state or federal law.

**D.**     **Notice and settlement administration.**

AB Data, Ltd. was retained to perform the duties of claims administrator, including, *inter alia*, giving notice, maintaining the settlement website, fielding inquiries about the settlement, and processing claims.   An affidavit is attached from an account executive with AB Data, Ltd. setting forth the various publication efforts undertaken, and the responses received.  (Ex. B, Peters-Stasiewicz Aff.)  A comparison of this affidavit with the Court's preliminary approval order (ECF No. 233) demonstrates that notice and settlement administration was conducted in accordance with that order.

The Plaintiffs could not identify all class members because the calls were placed by third parties and, aside from EMI, the identity of those third-party callers is unknown.  Therefore, for purposes of notice, the settlement class is comprised of two categories of members: (1) "Direct Notice Consumers" who received ADT-related telemarketing robocalls from EMI/Dynamic and whose names and addresses can be obtained through "reverse-lookup" procedures; and, (2) "Publication Notice Consumers" who received ADT-related telemarketing calls but for whom Plaintiffs do not have specific identifying information, and have no way of determining their identities in order to send them direct notice.  (*See* Ex. C.)

The **1,280,221** Direct Notice Consumers were mailed the Court approved first-class mailed notice on March 12, 2013. (Ex. B, Peters-Stasiewicz Aff. ¶¶ 7-9.) The **358,972** Class members whose mailed notice was returned as undeliverable were run once through the U.S. Post Office's National Change of Address system by the Settlement Administrator and forwarding addresses were found for **1,180** class members. (*Id.* ¶ 11.) A total of **922,429** Class Members were successfully mailed notice. (*Id.* ¶ 12.)

Publication Notice Consumers received publication notice through the extensive notice plan developed by AB Data. Under this plan, notices ran in the following major publications:

| PUBLICATION | CIRCULATION | NOTICE SIZE | INSERTS | ON SALE DATE |
|---|---|---|---|---|
| Parade | 33,000,000 | 2/5 page | 2 | 04/21/2013; 04/28/2013 |
| USA Weekend | 22,250,000 | 2/5 page | 1 | 04/21/2013 |
| Reader's Digest | 5,577,717 | Full page | 1 | 04/15/2013 |
| Good Housekeeping | 4,346,757 | 1/3 page | 1 | 04/15/2013 |
| People | 3,563,035 | 1/3 page | 1 | 03/29/2013 |
| TV Guide | 3,276,822 | 1/3 page | 1 | 04/18/2013 |
| Sports Illustrated | 3,204,945 | 1/3 page | 1 | 03/27/2013 |
| Time | 2,010,879 | 1/3 page | 1 | 03/22/2013 |
| USA Today | 1,981,016 | 1/6 page | 1 | 03/22/2013 |
| TOTAL | 79,211,171 | | | |

(*Id.*, Ex. B) The publication notice reached an estimated 79,211,171 households nationwide. The total number of persons exposed to the notice program, or "gross impressions," are

12

**Supp. A122**

estimated to be 158,422,342, or 67% of all adults in the United States.  (*See* Ex. B)  **2,639**

potential Class Members requested and were mailed Publication Claim Forms.  (Ex. B, Peters-

Stasiewicz Aff. ¶ 15.)

In addition, the notice plan established a settlement website,

http://robocallsettlement.com, with downloadable case documents and claim forms, including the

publication claim form and option to submit a claim online.  (*Id.* ¶ 20.)  The website includes a

list of anticipated "frequently asked questions" with responses, and other pertinent case

information.  The Publication Claim Form was downloaded **20,023** times. (*Id.*)

Finally, notice was disseminated via internet banners on popular websites, a method

believed to have generated 2.2 million views (or "impressions") of the banners over a 45-day

period.  Potential class members could click on the banner, which linked to the settlement

website.  The websites that carried the banners include the following:

| WEBSITE | POSITIONING | IMPRESSIONS |
|---|---|---|
| Yahoo! | Inside Pages on Yahoo!/Run of Network | 3,426,220 |
| Microsoft/MSN | Inside Pages on MSN/Run of Network | 562,960 |
| NYTimes.com | Inside Pages/Run of Site | 1,052,632 |
|  | TOTAL | 5,041,812 |

The outcome of this thorough notice procedure was the receipt of **136,440** timely claim

forms.  (*Id.* ¶ 25.)  This response rate—over 14% of direct notice recipients—is relatively high

compared to other similar class actions, which yielded claims rates of approximately 5%.  (*Id.*

¶ 26.).

13

**Supp. A123**

1  GIRARDI | KEESE
   THOMAS V. GIRARDI, SBN 36603
2  tgirardi@girardikeese.com
   GRAHAM B. LIPPSMITH, SBN 221984
3  glippsmith@girardikeese.com
   1126 Wilshire Boulevard
4  Los Angeles, California 90017
   Tel:   (213) 977-0211
5  Fax:   (213) 481-1554

6  ENGSTROM, LIPSCOMB & LACK
   WALTER J. LACK, SBN 57550
7  wlack@ellaw.com
   DANIEL G. WHALEN, SBN 126487
8  dwhalen@ellaw.com
   10100 Santa Monica Blvd, 12th Floor
9  Los Angeles, California 90067
   Tel:   (310) 552-3800
10 Fax:   (310) 552-9434

11 Attorneys for Plaintiff Benjamin Fogel and the Class

12            SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                 FOR THE COUNTY OF LOS ANGELES

14
   BENJAMIN FOGEL, on behalf of himself and the     CASE NO. BC300142
15 Class,

16           Plaintiff,                             JUDGMENT, FINAL ORDER AND
                                                    DECREE
17      v.

18 FARMERS GROUP, INC.; FIRE
   UNDERWRITERS ASOCIATION; TRUCK
19 UNDERWRITERS ASSOCIATION; ZURICH                 Date:    December 21, 2011
   FINANCIAL SERVICES; and Does 2 through           Time:    1:30 p.m.
20 100,                                             Dept:    CCW 307

21           Defendants.

22

23 R.C. HEUBLEIN and STATE OF MONTANA
   COMMISSIONER OF SECURITIES AND
24 INSURANCE,

25           Intervenors.

26

27

28

                                        ORIGINAL FILED

                                        DEC 21 2011

                                        LOS ANGELES
                                        SUPERIOR COURT

                                        1
   JUDGMENT, FINAL ORDER AND DECREE

                        Supp. A124

1
## JUDGMENT, FINAL ORDER AND DECREE

2      WHEREAS Plaintiff Benjamin Fogel, on behalf of the Class (as defined below), and Defendants

3 Farmers Group, Inc., Fire Underwriters Association, Truck Underwriters Association, and Zurich Financial

4 Services Ltd. (collectively, "Defendants") have applied to the Court pursuant to Rule 3.769 of the

5 California Rules of Court (the "C.R.C.") for an Order (*i*) approving the proposed settlement of this class

6 action (the "Action") in accordance with the Stipulation of Settlement (including its exhibits and its

7 Addendum dated March 2, 2011) (the "Settlement Agreement"), which sets forth the terms and conditions

8 for a proposed settlement of the Action (the "Settlement") and (*ii*) dismissing the Action with prejudice and

9 upon the terms and conditions in the Settlement Agreement; and

10      WHEREAS, on February 3, 2011, the Court granted permissive intervention to R.C. Heublein

11 ("Intervenor"), a member of the Class; and

12      WHEREAS, on March 2, 2011, the Court entered an Order (the "Preliminary Approval Order")

13 preliminarily approving the proposed Settlement, provisionally certifying the Class for settlement purposes,

14 directing notice to be sent and published to potential Class Members, and scheduling a hearing (the

15 "Fairness Hearing") to consider whether to grant final approval of the proposed Settlement, the proposed

16 Plan of Allocation, and Plaintiff's Counsel's motion for an award of attorneys' fees, expenses, and

17 incentive award; and

18      WHEREAS, on October 31, 2011, the Court granted permissive intervention to the State of

19 Montana Commissioner of Securities and Insurance ("Montana CSI") (collectively with Heublein,

20 "Intervenors"), for the limited purpose of enabling Montana CSI to pursue its objections to the proposed

21 Settlement; and

22      WHEREAS the Court reviewed the written objections that various Class Members and others

23 (including Intervenors) have filed to the proposed Settlement; and

24      WHEREAS the Court held the Fairness Hearing on November 9, 2011, to determine, among other

25 things, (*i*) whether the terms and conditions of the proposed Settlement are fair, reasonable, and adequate

26 and should therefore be approved; (*ii*) whether the Class should be finally certified for settlement purposes;

27 (*iii*) whether notice to the Class was implemented pursuant to the Preliminary Approval Order and

28 constituted due and adequate notice to the Class; (*iv*) whether to approve the proposed Plan of Allocation;

Supp. A125

1   (v) whether to enter judgment dismissing the Action on the merits and with prejudice as to Defendants and

2   against all Class Members; (vi) whether to enter the requested permanent injunction and Complete Bar

3   Order as provided in the Settlement Agreement; and (vii) whether and in what amount to award attorneys'

4   fees and expenses to Plaintiff's Counsel and an incentive award to Plaintiff; and

5       WHEREAS the Court heard argument at the Fairness Hearing from counsel for Plaintiff and

6   Defendants (collectively, the "Settling Parties"), non-parties Farmers Insurance Exchange, Fire Insurance

7   Exchange, and Truck Insurance Exchange (collectively, the "Exchanges"), the Intervenors, and various

8   other objectors (including certain Class Members); and

9       WHEREAS, at the Fairness Hearing on November 9, 2011, the Court (i) requested updated

10  information on Class Members' claims for settlement relief and certain additional information on Plaintiff's

11  Counsel's request for an award of attorneys' fees and expenses, (ii) asked the Settling Parties and the

12  Exchanges to amend the Settlement Agreement to clarify an exclusion discussed at the Fairness Hearing

13  concerning the claims in the case styled *Geter v. Farmers Group, Inc.*, and (iii) scheduled another hearing

14  for December 20, 2011 to consider Plaintiff's Counsel's request for attorneys' fees and expenses and to

15  enter a final order and judgment approving the proposed Settlement; and

16      WHEREAS the requested additional information has been provided to the Court; and

17      WHEREAS the Court heard further argument on Plaintiff's Counsel's request for attorneys' fees

18  and expenses on December 20, 2011;

19      NOW, THEREFORE, based on the written submissions of the Settling Parties, the Exchanges,

20  Intervenors, and other objectors (including Class Members), and on the arguments of counsel at the

21  Fairness Hearing, it is hereby ORDERED, ADJUDGED, AND DECREED as follows:[1]

22      1.   **Incorporation of Settlement Documents.** This Judgment, Final Order, and Decree (the

23  "Judgment") incorporates and makes a part hereof the December 12, 2010 Settlement Agreement

24  (including its Addenda dated March 2, 2011 and December 2, 2011).

25      2.   **Jurisdiction.** The Court has personal jurisdiction over the parties and all other Class

26  Members (as defined below) and has subject-matter jurisdiction over the Action, including, without

27

28  [1]    Terms not defined in this Order shall have the definitions ascribed to them in the Settlement
    Agreement.

3

JUDGMENT, FINAL ORDER AND DECREE

1  limitation, jurisdiction to approve the proposed Settlement and Plan of Allocation, grant final certification

2  of the Class, and dismiss the Action on the merits and with prejudice.

3        3.    **Final Class Certification.** The Court finds that, for settlement purposes, the prerequisites

4  for certification of a class under California law (including Cal. Code Civ. Proc. § 382 and C.R.C. 3.769)

5  have been satisfied, in that:

6              (a)    The Class is ascertainable from records kept by Defendants and/or the Exchanges

7  and from objective criteria;

8              (b)    The Class is so numerous that joinder of all members would be impractical, in that

9  the Class consists of approximately 12,547,196 Class Members;

10             (c)    Plaintiff Benjamin Fogel has alleged one or more questions of fact and law that are

11  common to all members of the Class;

12             (d)    Based on Plaintiff's allegations that Defendants engaged in uniform conduct

13  affecting all members of the Class, Plaintiff's claims are typical of those of the other Class Members;

14             (e)    Plaintiff and Plaintiff's Counsel have fairly and adequately represented and protected

15  the interests of the members of the Class, in that (*i*) Plaintiff's interests are and have been consistent with

16  those of the other Class Members; (*ii*) Plaintiff's Counsel are able and qualified to represent the Class; and

17  (*iii*) Plaintiff and his attorneys have fairly and adequately represented the Class Members in prosecuting

18  this Action and in negotiating and entering into the Settlement; and

19             (f)    For settlement purposes, questions of law and/or fact common to members of the

20  Class predominate over any such questions affecting only individual Class Members, and a class action is

21  superior to all other available methods for the fair and efficient resolution of the Action.  In making these

22  findings for settlement purposes, the Court considered, among other things, (*i*) the Class Members' interests

23  in individually controlling the prosecution of separate actions, (*ii*) the impracticability or inefficiency of

24  prosecuting separate actions, (*iii*) the extent and nature of any litigation concerning these claims already

25  commenced, and (*iv*) the desirability of concentrating the litigation of the claims in a particular forum.

26        4.    Pursuant to Cal. Code Civ. Proc. § 382 and C.R.C. 3.769, the Court hereby finally certifies

27  this Action as a class action, for settlement purposes only, on behalf of a Class consisting of:

28             All persons and entities who were subscribers to one or more of Farmers

Supp. A127

1    Insurance Exchange, Truck Insurance Exchange, or Fire Insurance Exchange

2    at any time during the period from January 1, 1999 through December 31,

3    2010, inclusive (the "Class Period"), or were named insureds on any

4    Exchange insurance or reinsurance policy issued or in effect at any time

5    during the Class Period. Excluded from the Class are:

6        a.    any persons or entities who submitted valid and timely requests for

7    exclusion from the Class;

8        b.    any persons or entities who, while represented by counsel, settled an

9    actual or threatened lawsuit or other proceeding against the Releasees and

10   released the Releasees from any Released Plaintiff's Claims;

11       c.    such persons or entities who are or were a Defendant or an officer or

12   director of any Defendant;

13       d.    any person or entity that is presently a party in a bankruptcy

14   proceeding or has had his, her, or its claims in this Action extinguished

15   through a discharge in bankruptcy; and

16       e.    the Exchanges and their respective past or present parents,

17   predecessors, successors, Affiliates, divisions, business units, and

18   subsidiaries, and any entities in which any Exchange has, or the Exchanges

19   collectively have, a Controlling Interest or that has a Controlling interest in it

20   or them.

21      5.    The Court confirms its appointment of Plaintiff as the Class representative and of Plaintiff's

22 Counsel as Class counsel.

23      6.    **Notice.** The Court finds that the distribution of the Individual Notice (including the Proof of

24 Claim), the publication of the Summary Notice, the distribution of the reminder postcard, and the notice

25 methodology as set forth in the Notice Program previously approved by the Court all were implemented

26 in accordance with the Court's Preliminary Approval Order (and/or as amended or modified by

27 subsequent order of the Court).

28

5

JUDGMENT, FINAL ORDER AND DECREE

Supp. A128

7.    The Court further finds and confirms that the Individual Notice (including the Proof of Claim), the Summary Notice, the reminder postcard, and the notice methodology:

    (a)    constituted the best practicable notice;

    (b)    constituted notice that was reasonably calculated under the circumstances to apprise potential Class Members, and fully and accurately informed them, of the pendency of the Action, the effect of the Settlement Agreement (including the release of claims), the nature and material terms of the proposed Settlement (including the proposed Plan of Allocation and Plaintiff's Counsel's request for an award of attorneys' fees, expenses, and incentive award), their right to object to the proposed Settlement (including the proposed Plan of Allocation and Plaintiff's Counsel's request for an award of attorneys' fees, expenses, and incentive award), their right to exclude themselves from the Class, and their right to appear at the Fairness Hearing;

    (c)    were reasonable and constituted due, adequate, and sufficient notice to all persons or entities entitled to receive notice; and

    (d)    met all applicable requirements of California law (including C.R.C. 3.766 and 3.769(f)), the United States Constitution (including the Due Process Clause), the Rules of the Court, and any other applicable law.

8.    **Final Settlement Approval.** The Court finds that the proposed Settlement resulted from serious, informed, non-collusive negotiations conducted at arm's length by the parties and was entered into in good faith. The terms of the Settlement Agreement do not have any material deficiencies and do not improperly grant preferential treatment to any individual Class Member. Accordingly, the proposed Settlement as set forth in the Settlement Agreement is hereby fully and finally approved as fair, reasonable, and adequate, consistent and in full compliance with all applicable requirements of California law (including Cal. Code Civ. Proc. § 382 and C.R.C. 3.769), the United States Constitution (including the Due Process Clause), and the Rules of the Court, and in the best interests of each of the Settling Parties, the Class Members, and the Exchanges.

9.    In making these findings, the Court considered, among other factors, (*i*) the nature of the claims asserted and the strength of Plaintiff's claims and Defendants' defenses, (*ii*) the risk, expense, complexity, and likely duration of further litigation, (*iii*) the prospects of Plaintiff's obtaining certification

JUDGMENT, FINAL ORDER AND DECREEE

1    of a litigation class and of maintaining such certification through trial, (iv) the amount and kinds of

2    benefits to be offered in the proposed Settlement, including both the monetary and the nonmonetary

3    relief, (v) the allocation of the settlement funds among the Class Members and the Exchanges, (vi) the

4    stage of the proceedings at which the proposed Settlement was reached, (vii) the information available to

5    the Settling Parties, the Exchanges, the Class, and the Court, (viii) the experience and views of the

6    Settling Parties' and the Exchanges' counsel, (ix) the extensive involvement of a respected Mediator, who

7    is a retired Judge of the California Superior Court, (x) the potential Class Members' reactions to the

8    proposed Settlement, including the number of objections and exclusion requests submitted by actual or

9    potential members of the Class, which consists of approximately 12.5 million members, (xi) the

10    submissions and arguments made throughout these proceedings by Intervenors and their counsel, (xii) the

11    objections raised by certain Class Members and others, and (xiii) the submissions made in connection

12    with the Fairness Hearing (including its continuance on December 20, 2011).

13        10.    Before the Fairness Hearing began on November 9, 2011, the Court invited the Settling

14    Parties, the Exchanges, the Intervenors, and the objectors to compare the risk profile of the "typical"

15    proposed class-action settlement with the risk profile of the proposed settlement of this case. The Court

16    posted two graphs (Figures A and B, attached as Appendix II) illustrating the Court's views of those

17    different risk profiles. Figure A represents the course of the typical class-action settlement presented for

18    a determination of fairness and adequacy. Figure B illustrates the Court's perception of this case's risk

19    profile. Listed above Figure A are the principal risk factors that apply – in varying degrees of seriousness

20    – to a proposed class-action settlement. Listed above Figure B are the principal objections that have been

21    raised to the proposed Settlement in this case.

22        11.    The typical class action usually leads to a variety of outcomes, some of which might be

23    really good for the plaintiff, and some of which might be really good for the defendant. But the more

24    common outcome often lands in the middle, as Figure A illustrates. Even if the plaintiff wins, he or she

25    might not win a lot of money – and he or she will incur delays and expenses in obtaining that so-called

26    "victory" in any event. The ultimate "victory" thus might not be so great for the plaintiff, and the loss

27    might not be so large for the defendant.

28

1    12.    This case, however, presents a remarkably different profile – one illustrated by an almost

2    perfectly inverted bell curve of risk-reward relationship, as shown in Figure B.  Both sides enjoyed

3    victories in early phases of the litigation, but, as the case evolved, both sides faced legal and factual

4    complications that threatened to produce results at the nadir of the bell curve, rather than at the peak.

5    Instead of leading to the typical valuation of outcomes in the middle of the bell curve, this case posed the

6    real possibility of an all-or-nothing outcome for both sides, without any bunching of mid-range results.

7    The transcript of the November 9th hearing provides further explanation of the Court's views on these

8    issues.

9    13.    In evaluating the principal objections to the proposed Settlement (as discussed below) –

10   including the allegedly small recovery per claimant (rather than in the aggregate), the amount of

11   attorneys' fees to be paid to Class Counsel (separately from the Settlement Amount), and the payment of

12   any residual settlement funds to the Exchanges to which the Class Members had subscribed – the Court

13   considered how the legal and factual uncertainties – as well as the expenses and delays inherent in further

14   litigation – should shape its response to the objectors as well as its assessment of the proposed

15   Settlement's fairness and adequacy.

16   14.    **Objections to the Settlement.**  The Court has considered the approximately 228 timely

17   objections made by Class Members and Intervenors Heublein and Montana CSI. Those objections –

18   which came from approximately 0.0018% of the Class – fall into the following twelve general categories:

19   (*i*) Class Members' individual settlements amount are too small; (*ii*) Class Counsel's attorneys'-fee

20   request is too high; (*iii*) Class Counsel have a conflict of interest; (*iv*) Class Members should not be

21   forced to arbitrate disputes; (*v*) the Class should not have been certified; (*vi*) the Settling Parties should

22   not be able to modify the Settlement after final judgment; (*vii*) the Defendants should be free to charge

23   whatever AIF fee they want to charge; (*viii*) the Settlement will lead to increased premiums; (*ix*) the Class

24   Representative Incentive Award is inappropriate; (*x*) the Notice and Claims Program is defective; (*xi*) the

25   allocation of any residual settlement funds to the Exchanges is unfair; and (*xii*) the Release is overbroad.

26   The Court overrules these objections for the following reasons and for the other reasons expressed in the

27   record throughout the course of this action.

28

15. **The Individual Class Members' Settlement Amounts Are Fair and Reasonable.** The competing analyses by the Parties' retained experts show that the value of the settlement fund ranges from 25% to 75% of the amount that Plaintiff and the Class could hope to recover if they succeeded at a trial of this action. In light of the costs and uncertainties of litigating this case – including the substantial possibility that Plaintiff and the Class would not succeed on the merits and would recover nothing at all, as well as the expense and delays inherent in continued litigation – the settlement amount is reasonable. So is the allocation of the settlement fund among Class Members, as the amounts paid are proportionate to the amount of premium paid by each Class Member. Few – if any – objectors objected that the total amount of the proposed Settlement ($455 million) was too small. While several objectors did object that their individual award was too small in comparison to the premiums they had paid, this case did not seek to recover premium payments. Rather, the case sought to recover some portion of AIF fees, which were only a small percentage of the premium. The Court also believes that the proposed Settlement's nonmonetary terms provide a substantial benefit to the Class by reminding Class Members of both (*i*) the nature of the relationship between subscribers and the Exchanges and (*ii*) the amount of premium that can be used to pay the Farmers Defendants' AIF fee.

16. **Class Counsel's Request for Attorneys' Fees Is Reasonable.** The Court has set forth its reasons for the attorneys' fees award it has made in Paragraphs 44-55, *infra*.

17. **No Showing Has Been Made That Class Counsel Have or Had a Conflict of Interest.** This objection is based on the fact that one of the attorneys and one of the law firms representing the Class (Mr. Girardi and his firm Girardi Keese) were represented by the firm Skadden, Arps, Slate, Meagher & Flom LLP, counsel for the Farmers Defendants in this action. Skadden, Arps is a large firm, comprising nearly 2,000 lawyers. The lawyers who represented Mr. Girardi are not the same as the ones who represent the Farmers Defendants in this action, and the two actions were entirely unrelated to each other. Nor does any other evidence suggest that Mr. Girardi's and his firm's representation of the Class was in any way affected by Skadden, Arps' representation of Mr. Girardi and his firm in the unrelated action. In addition, the Class has been represented by five other law firms that were not represented by Skadden, Arps. This issue was identified for the Court before Notice was sent to Class Members, and the notice materials were revised to provide proper and adequate notice of this matter. The Court has

9

JUDGMENT, FINAL ORDER AND DECREEE

satisfied itself that this issue does not constitute a matter of concern regarding the representation of the Class by the Girardi Keese law firm. Moreover, to the extent that some objectors suggest that the zealous representation of the Class was adversely affected, the history of this case establishes that the Class received zealous representation, as did Defendants.

18.  **The Arbitration Clause Is Appropriate.**  The arbitration process in the proposed Settlement applies only to disputes about how much settlement money a Class Member is to receive from the settlement fund. Arbitration of any such claims is paid for by Defendants, not by Class Members, and it is a fair and efficient means to resolve disputes, especially those involving amounts that would not be cost-effective or feasible to litigate. No Class Member is being "forced" to arbitrate, because anyone who did not want to submit to arbitration of any dispute involving his or her settlement claim was entitled to opt out of the proposed settlement. Moreover, the arbitration provision does not apply to the underlying claims asserted in this action. Those claims were vigorously litigated in this Court and are now being settled. They will not be presented to the Arbitrator.

19.  **The Settlement Class Was Properly Certified.**  The bases articulated by the Court for its provisional certification of the Class for settlement purposes support the final certification of the settlement Class, particularly because any issues of manageability of a trial of the action are no longer a concern. No objector has identified any intraclass conflicts that require the creation of subclasses for settlement purposes, as some objectors have proposed.

20.  **The Provision Allowing Certain Modifications After Final Judgment Does Not Render the Settlement Unfair or Unreasonable.**  The Settlement restricts any such post-judgment modifications to those that are "not materially inconsistent with the Court's Final Judgment and do not materially limit the rights of Class Members or the Exchanges under [the] Settlement Agreement." Stipulation of Settlement § XII.A. Accordingly, no post-judgment modifications that would materially compromise Class Members' rights are permitted.

21.  **The Issue of Whether Defendants Should Be Free To Charge What They Want Does Not Militate in Favor of Disapproving this Settlement.**  This so-called "objection" is more of a comment on the litigation than a comment on the proposed Settlement. The Defendants have elected to compromise this dispute based on their view that doing so is in their best interests and those of their

1  shareholders. The Court's job in reviewing the proposed Settlement is to protect the Class, not the

2  Defendants. Moreover, to the extent the objection asserts that Plaintiff's claims lack merit, the objection

3  supports the proposed Settlement's fairness – if not generousness – to the Class.

4     22.  **Any Questions About Future Premiums Are Not a Reason to Disapprove the**

5  **Settlement.** There is no evidence that the proposed settlement – if approved – would lead to increased

6  premiums. In California, premium rates set by the Exchanges are governed by strict formulae imposed

7  by the Department of Insurance and the Insurance Code. Most other states have their own comprehensive

8  regulations governing the rate-making process to ensure that insurance rates are fair. In addition, the

9  Exchanges' receipt of any residual settlement funds could, if anything, have an ameliorative effect on

10  premiums rates. Moreover, the proposed Settlement does not purport to govern Defendants' future

11  conduct except to the extent expressly specified in the Settlement Agreement.

12     23.  **The Class Representative's Incentive Award Is Reasonable.** The amount of the Court's

13  incentive award to Plaintiff ($30,000) is reasonable, based on his contribution of his time and effort over

14  a period of eight years. The amount is well within the range of incentive awards typically granted, taking

15  into account the success and the size of the Settlement.

16     24.  **The Notice and Claim Program Were Appropriate.** The Court, after significant analysis,

17  and after taking into account all concerns raised by Intervenor Heublein, approved the Settlement

18  Agreement's "hybrid claims-made" process, which required Class Members to return Proofs of Claim

19  that had been personalized for each Class Member using the information in the Farmers Defendants'

20  database and that allowed Class Members to add any other information they believed relevant to their

21  award of settlement relief. The Court, cognizant of generalized concerns involving claims-made

22  settlements, was satisfied that legitimate reasons existed for using a claims-made process in this case and

23  that the claims-made process was not merely a subterfuge to decrease participation by Class Members.

24  Requiring Class Members to submit Proofs of Claim was fair and reasonable for a number of reasons,

25  including:

26          (a)    To help ensure that the settlement payments would go to the persons actually entitled

27  to the settlement money;

28          (b)    To increase the likelihood that Class Members would obtain payment for all policies

1  eligible for settlement relief (not just for the policies recorded on the personalized Proofs of Claim);

2              (c)    To increase the likelihood that all settlement checks would reach the Class Members;

3              (d)    To reduce the escheat risk that might have resulted if Defendants had mailed out

4  checks without first receiving Proofs of Claim; and

5              (e)    To help protect Defendants from duplicative claims in situations where a particular

6  policy had or has more than one named insured (as many or most of the policies at issue apparently had or

7  have).

8      25.    The Court is not aware of any evidence suggesting that Defendants have used or intended to

9  use the claim-filing process to discourage Class Members from filing Proofs of Claim for settlement

10  relief. Rather, the evidence suggests that the Settling Parties have tried to facilitate the claim-filing

11  process, and Defendants agreed to pay for a separate mailing of postcard reminders to Class Members

12  who had not sent in Proofs of Claim or any other submissions by early August 2011. Defendants also

13  agreed to pay for the mailing of full notice and postcard reminders to another group of potential Class

14  Members who had been inadvertently omitted from the original notice pool even though individual notice

15  to those relatively few potential Class Members might not have been required in light of the extensive

16  publication notice, and even though the Court did not direct the parties to mail the postcard reminders to

17  that group. Moreover, inasmuch as Defendants are paying out $455 million without any reversion of

18  unclaimed funds (see Paragraph 28, infra), the Court finds no merit to objections to the use of a claims-

19  made process.

20      26.    In addition, the results of the claims process show that the use of Proofs of Claim does not

21  appear to have deterred Class Members from seeking settlement relief. As of the time the claims process

22  closed on December 6, 2011, more than 35% of the settlement fund (approximately $159,798,397) had

23  been claimed by approximately 21.6% of the Class (approximately 2,717,681 Class Members). This

24  claims rate was significantly higher than the Court had anticipated and than is customary in other

25  settlements of consumer class actions.

26      27.    **The Allocation of the Residual Is Fair and Reasonable.** The Court approves the

27  Settlement Agreement's allocation of any residual settlement funds to the Exchanges and finds that this

28  allocation of the residual settlement money (if any) is fair and reasonable.

12

---

JUDGMENT, FINAL ORDER AND DECREEE

**Supp. A135**

28. Because of the separateness between the Exchanges and the Farmers Defendants, the Court finds that the Settlement is not a reversionary settlement (although California law does not prohibit reversionary settlements in any event).

29. The Court further finds that California's *cy près* statute (Cal. Code Civ. Proc. § 384) and *cy près* principles in general are not applicable, because the Settlement specifies how any residual funds should be allocated

30. Allocation of the residual funds to the Exchanges also is fair and reasonable because:

(a)    The Exchanges are owned by their subscribers (including Class Members), so Class Members who are current subscribers to the Exchanges will benefit from the Exchanges' enhanced surplus;

(b)    The Exchanges directly paid the allegedly excessive AIF fees to the Farmers Defendants, so the Exchanges should be able to recover any funds that Class Members do not claim for themselves, and

(c)    The Exchanges are releasing Defendants from the Released Exchanges' Claims, and the payment of any residual funds to the Exchanges represents consideration for that release.

31. Allocation of any residual settlement funds to the Exchanges is not unfair to Class Members who are no longer insured by the Exchanges, because:

(a)    The primary form of settlement relief is a cash payment, which is equally available to all Class Members, whether they are former or current insureds of the Exchanges;

(b)    The Exchanges' former insureds have or could have pending or potential claims under previously issued insurance policies, so they also would benefit from the Exchanges' strengthened surplus; and

(c)    Former subscribers/insureds might choose to return to the Exchanges and would therefore benefit from the Exchanges' increased surplus.

32. **The Release Is Not Overbroad.** The Court approves the scope of the Release as fair and reasonable in light of the claims at issue in the Action and the settlement amount being paid. The final form of the Release and its relevant defined terms reflect (*i*) changes that the Court proposed and that the Settling Parties and the Exchanges accepted before the Court preliminarily approved the proposed Settlement and (*ii*) a formal confirmation of oral statements that Defendants' counsel made at the

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

| | | |
|---|---|---|
| BRENDA WATSON, et al., On Behalf of Themselves and All Others Similarly Situated, | ) ) ) ) | No. C-05-5200-RBL |
| | ) | CLASS ACTION |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| DELL INC., et al., | ) ) | |
| Defendants. | ) ) | |

**DECLARATION OF DAVID C. HOLLAND**
**CONCERNING NOTIFICATION**

STATE OF MINNESOTA      )
                                               )
COUNTY OF HENNEPIN   )

I, David C. Holland, declare as follows:

1.      I am a Principal of Rust Consulting, Inc. ("Rust Consulting"), which serves as the

Claims Administrator for the above-captioned action.  I am responsible for supervising the

services provided by Rust Consulting for this matter.  My business address is 625 Marquette

Avenue, Suite 880, Minneapolis, MN  55402.  I am over the age of 21 and am otherwise

competent to make this declaration.  I have personal knowledge of the facts contained in this

declaration, and they are true and correct.

2.      Rust Consulting has extensive experience in class action matters, having provided

services in class action cases ranging in size from 100 to 100 million class members involving

employment discrimination, antitrust, securities fraud, property damage, product liability,

insurance and consumer issues.  We have provided notification and/or claims administration

services in more than seven hundred (700) class action cases including: *In re Compact Disc*

*Minimum Advertised Price Antitrust*, MDL No. 982 (U.S. Dist. Ct. W.D. Penn.), music products

price-fixing settlement; *Wolens v. American Airlines, Inc.*, No. 88CH 7554 (Cir. Ct. Cook Cty,

Ill., Cty. Dept. Law Div.), breach of contract frequent flyer plan settlements; *McNeil v. American*

*General Life & Accident Co.*, Case No. 3-99-1157 (U.S. Dist. Ct. M.D. Tenn. Nashville Div.),

industrial life insurance settlement; *Naef v. Masonite Corp.*, No. 94-4033 (Ala. Cir. Ct., Mobile

Co.), hardboard siding defective product settlement; *In re Metropolitan Life Ins. Co.*, Misc.

Docket No. 96-179 MDL No. 1091 (U.S. Dist. W. D. Penn.), life insurance market conduct

settlement; *Baird v. Thomson Consumer Electronics, Inc.*, Case No. 00-L-000761 (Cir. Ct. Third

Jud. Cir. Madison Cty. Ill.), television set defective product settlement; *Benacquisto v. American*

*Express Financial Corp.*, No.00-1980 DSD, No. 96-18477, No. 97-4742, No. 98-15681 (U.S.

Dist. Ct., 4th Dist. Minn.), annuity and life insurance and market conduct settlements; *Schwartz*

*v. Dallas Cowboys Football Club*, Civ. Action No. 07 CV 5184 (U.S. Dist. Ct. E.D. Penn.), NFL

Sunday Ticket Direct TV antitrust settlement; *Carlson v. Abbott Laboratories*, No. 94-CV-2608

(Wis. Cir. Ct. Milw. Co.), one of many infant formula price-fixing cases on behalf of third-party

consumer classes in sixteen states; *Cox v. Shell Oil Co.*, No. 18,844 (Tenn. Ch. Ct. Obion Co.

Div.) (Polybutylene pipe defective product cases); *In re Motorsports Merchandise Antitrust*

*Litigation*, MDL Docket No. 1212, NASCAR on-track merchandise price-fixing case; *Fogie v.*

*Thorn Americas*, Civ. File No. 3-94-359 (U.S. Dist. Ct., 3rd Dist. Minn.), consumer "furniture

rental" usury case; *Ridgeway v. Denny's, Inc.*, C93-20202 JW(PT), racial discrimination case

concerning restaurant customers; *Stender v. Lucky Stores, Inc.*, No. 88-1467 (U.S. Dist. Ct. N.D.

Cal.), gender discrimination cases; *Forbush v. J.C. Penney Co.*, Nos. 3-90-2719-X, 3-92-0109-X

(U.S. Dist. Ct. N.D. Tex.), pension fund settlement; *Garza v. Sporting Goods Properties, Inc.*,
No. SA 93-CA-1082 (U.S. Dist. Ct. W.D. Tex.), defective shotgun product case; and numerous
other cases.

       3.     Rust Consulting was engaged by Dell Inc. ("Dell") to provide claims
administration for the above-captioned action. Duties included : a) printing and First Class
mailing of the Notice and Claim Form ("Notice Package"); b) receipt of undeliverable Notice
Packages; c) tracing undeliverable mail for updated addresses; d) remailing of traced
undeliverable mail and forward mail; and e) establishment of a website to provide information
and forms to potential Class Members.

       4.     Rust Consulting obtained the mailing address (P.O. Box 1360, Minneapolis, MN
55440-9901) to receive undeliverable Notice Packages, completed Claim Forms, requests for
exclusion, changes of address, and other correspondence.

       5.     Rust Consulting received text for the Notice Package from Dell, as preliminarily
approved by the Court. A draft of the printed Notice Package was prepared by Rust Consulting
and approved by Dell, attached hereto as **Exhibit A**. On May 2, 2006, Dell provided Rust
Consulting with data files ("Class List") containing Class Member names and last known
addresses.

       6.     The class member addresses contained in the Class List were verified and updated
utilizing the National Change of Address Database ("NCOA") maintained by the U. S. Postal
Service. The NCOA contains all requested changes of address which have been filed with the
U. S. Postal Service and are currently in effect. In the event that any settlement class member
had filed a U. S. Postal Service change of address request, the address listed with the NCOA
would be utilized in connection with the mailing of the Notice to that class member.

3

**Supp. A139**

7.      On August 10, 2006, Rust Consulting caused 933,576 Notice Packages to be mailed by United States First Class postage paid.

8.      As of October 9, 2006, Rust has received 48,767 undeliverable Notice Packages. In addition, 4,259 Notice Packages were returned to Rust Consulting with a U.S. Postal Service label detailing a forwarding address and were re-mailed.

9.      As of October 9, 2006, Rust performed address traces on 35,043 undeliverable Notice Packages that were received on or before August 30, 2006 (within the 20 day period).  Of the traces performed, 21,127 updated addresses were obtained and Notice Packages were re-mailed via United States First Class Mail.  Rust provided Dell a report of all the undeliverable records on or before August 30, 2006 (within the 20 day period), totaling 13,916.

10.     A website address was included in the Notice Package mailing for the purpose of allowing potential Class Members to receive information regarding the Settlement, including downloadable Notices and claim forms. The website has received a total of 3,719 visits as of October 9, 2006.  The website address included in the Notice Package was www.watsonsettlement.com.

11.     As of October 9, 2006, Rust Consulting has received 85,017 completed Claim Forms from potential Class Members via United States Mail.

12.     A fax number was included in the Notice Package mailing to allow Class Members to submit their Claim Form.  As of October 9, 2006, Rust Consulting has received 2,840 fax filings.

13.     As of October 9, 2006, 490 potential Class Members have excluded themselves from participation in the class, attached as **Exhibit B**.  Rust Consulting has received no objections to the Settlement terms.

4

I certify under penalty of perjury and under the laws of the State of Minnesota, that the

preceding is true and correct to the best of my knowledge.  Executed this 13ᵗʰ day of October

2006 at Minneapolis, Minnesota.

_____
David C. Holland, Principal


Sworn and subscribed to before
me this 13th day of October, 2006.


**Notary Public**

REBECCA A. BLAKE
NOTARY PUBLIC-MINNESOTA
My Commission Expires Jan. 31, 2010

5

**Supp. A141**

Case: 1:11-cv-07972 Document #: 137-1 Filed: 11/06/13 Page 2 of 11 PageID #:2828

**UNITED STATES DISTRICT COURT**
**NORTERHN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| NICK PEARSON, FRANCISCO PADILLA, CECILIA LINARES, AUGUSTINA BLANCO, ABL GONZALEZ, and RICHARD JENNINGS, On Behalf of Themselves and All Others Similarly Situated, | |
| Plaintiffs, | Case No.: 11CV 07972 |
| v. | |
| NBTY, INC., a Delaware corporation; and REXALL SUNDOWN, INC., a Florida corporation; and TARGET CORPORATION, a Minnesota Corporation, | |
| Defendants. | |

**Supplemental Report of Keith A. Reutter, Ph.D.,**

## I.    Introduction, Assignment and Summary of Conclusions

1.    I am a Ph.D. economist and Principal in the Washington, D.C. office of the Berkeley Research Group ("BRG"). BRG is an economic and financial consulting firm with offices in major U.S. and foreign cities. I have been associated with BRG since shortly after its founding in early 2010, and have been professionally employed as an Economist for over 15 years. I hold a Bachelor of Science and Master of Arts in Economics from the University of Texas-Arlington, as well as a Doctor of Philosophy in Economics from Auburn University.

2.    On September 4, 2013, I submitted a report in the above captioned matter wherein I estimated the expected benefit that will accrue to consumers, including members of the proposed Class, as a result of the injunctive relief agreed to by the settling parties.[1] In that report, I relied on defendant Rexall's internal documents to provide a reasonable estimate of the likely economic impact of the proposed labeling changes. That estimate was based on the information available to me at the time and predicted a lower price, a decline in sales volume, or both, as a result of the proposed labeling changes.[2] Using historical dollar sales data for Osteo Bi-Flex as a proxy I estimated the lower prices, all other things equal, that might reasonably result due to the labeling changes and then used that as one measure of the economic impact of those labeling changes. I also predicted an expected drop in the sales volume of Osteo Bi-Flex. The predicted decline in sales volume was based on the expectation that some consumers will stop purchasing Osteo Bi-Flex when the "renews and rebuilds" cartilage representations are removed from the label. The expected decline in sales volume was based on Rexall's internal documents that indicate that a high percentage of Osteo Bi-Flex purchasers responded that the "renews and rebuilds" cartilage representations are important to their purchasing decisions.

---

[1] Report of Keith A. Reutter Regarding Settlement, dated August 30, 2013, hereinafter "Reutter Report."
[2] Reutter Report, ¶ 8.

3.      I understand that the Court has raised the question of whether it is possible to empirically measure the value of the labeling changes, required by the Settlement Agreement, by analyzing defendants' sales and pricing data for products before and after the labeling changes are implemented, in order to assign a specific monetary value to the relief afforded to the Class and consumers brought about by the labeling changes.  It is my opinion that such a computation, relying on defendant's data alone, would not measure the actual economic impact of the labeling changes, and thus would not answer the question.  This is because, like any retail product, there are other confounding economic factors, in addition to the proposed labeling changes, at work that continuously influence the price and sales of the covered products.  These additional factors would have to be taken into consideration in order to measure the actual economic impact of the labeling changes in terms of prices and volume of sales.  For example, a reduction in competition from companies selling comparable products or an increase in advertising by defendants may result in an increase in the price or volume sold of the covered products following the labeling changes.  In such a situation, an observed increase (or decrease) in the price or volume sold of the covered products would mean little viewed in isolation, and would not value the effect of the labeling changes.  A regression analysis would have to be performed to take into consideration these, and possibly other, additional factors, to isolate the actual monetary value of the labeling changes.[3]

---

[3] Regression analysis is a widely accepted statistical technique that is used to measure or determine the impact that one or more independent, or explanatory, variables has on a dependent variable.  For instance, regression analysis can be used to determine the impact that an alleged price fixing cartel has on the price of a good.  For a discussion of the use of regression analysis in determining impact in a legal context, see: William H. Page, editor, *Proving Antitrust Damages: Legal and Economic Issues* (American Bar Association, 1996); Daniel L. Rubinfeld, "Reference Guide on Multiple Regression", in *Reference Manual on Scientific Evidence: 2nd Edition* (St. Paul: West Group, 2000).  For a general discussion of regression analysis, see: Damodar N. Gujarati, *Basic Econometrics: 4th Edition* (Boston: McGraw-Hill, 2003).

4.      In this regard I have reached the following conclusions: (1) a regression analysis, using defendant's data alone, would not be able to estimate the monetary value of the labeling changes; (2) a regression analysis of the impact of the proposed labeling changes would require a substantial amount of data that is not currently available to plaintiffs, or defendants; and (3) assuming these data issues could be overcome, which in my opinion is unlikely, such a study could not commence for at least two years following the labeling changes, which I understand will not take place until 6 months following final approval of the settlement.  Such a regression analysis would likely cost in excess of $500,000.  This cost estimate is based on my experience having conducted at least two dozen such studies, where the data was readily available, over the last 15 years of my professional career.

## II.    Inadequacy of Defendant Data

5.      As described in the Reutter Report, the expected impact of the proposed labeling changes is to reduce the demand for Rexall's Osteo Bi-Flex products, resulting in a decrease in both the price and quantity sold, all other things equal.  Others in the industry, or Rexall itself, may be able to partially or completely mask the impact of the labeling changes by, among other things, increasing the amount of money spent advertising glucosamine/chondroitin products thereby increasing overall demand and price.

6.      The only sales data that plaintiffs can obtain directly from defendants is Rexall's sales transactions.  As the manufacturer of Osteo Bi-Flex, Rexall's sales transactions reflect the price and quantity at which sales are made to wholesalers, distributors and others.  Rexall's transaction data does not include the price at which Osteo Bi-Flex is sold to consumers at retail. Further, defendant's data does not include the retail prices at which the covered private label

glucosamine/chondroitin products, manufactured by defendants, are sold.    Thus, Rexall's transaction data alone is inadequate to address the impact the labeling changes will have on the prices paid by consumers.

7.    It may be possible to overcome the inadequacy of defendant's transaction data by purchasing retail sales data from a third party vendor, such as ACNielsen.  ACNielsen collects retail sales data from the store checkout scanners of participating retail establishments across the U.S.[4]  However, Osteo Bi-Flex is only one of many glucosamine/chondroitin products marketed to consumers.    Hence, the actions taken by other glucosamine/chondroitin supplement manufacturers would have to be taken into account since they would likely have an impact on the sales volume and price of Osteo Bi-Flex.  Because the sale of Osteo Bi-Flex is likely impacted by exogenous factors, i.e. events beyond the direct control of Rexall, a proper analysis of the impact of the labeling changes would require the purchase of retail sales data for all glucosamine/chondroitin products marketed by Rexall, as well as retail sales data for all of the many other glucosamine/chondroitin products marketed by competitors.  The purchase price of this retail sales data would likely cost in excess of $100,000 given recent estimates I have received for similar data in unrelated matters.

a.    **Increased Marketing Spending by Rexall**

8.    As noted above, the expected impact of the labeling changes is to reduce the demand for Osteo Bi-Flex, resulting in a lower price and a lower quantity sold.  In order to counter the expected impact of the labeling changes, Rexall could unilaterally increase the amount of advertising and marketing directed at the consuming public.  By increasing the

---

[4] www.nielsen.com

amount of marketing directed at the consuming public, Rexall could effectively shift the demand curve for Osteo Bi-Flex to mask the actual impact caused by the labeling changes. If Rexall were to undertake such an action the price and quantity sold of Osteo Bi-Flex may very well exceed that which was observed prior to the labeling changes. But this would not mean that the labeling changes had no impact, but rather that these unilateral actions by Rexall masked the impact. Thus, the impact of the labeling changes cannot be determined by merely observing the retail, or wholesale, prices of Osteo Bi-Flex. It would also have to take into account Rexall's advertising and marketing directed at the consuming public.

**b.    Increased Marketing Spending by Other Manufacturers**

9.    Because Rexall is not alone in the manufacturing and marketing of glucosamine/chondroitin supplements, the actions of others in the marketplace will necessarily impact the quantity and price of Osteo Bi-Flex sold. If, for example, after the labeling changes Rexall does nothing, but the other manufacturers in the industry either decrease or increase the amount of advertising and marketing directed at consumers, then the price and quantity sold of Osteo Bi-Flex likely will be affected. In the case of a decrease in advertising or marketing by competitors, Rexall may be able to take advantage and either maintain or increase the price of Osteo Bi-Flex, again masking the actual impact of the labeling changes. Further, in the case of an increase in advertising or marketing by competitors, Rexall might be able to maintain or even increase the price and quantity of Osteo Bi-Flex due to what is known as a spillover effect, whereby an increase in advertising of a competing glucosamine/chondroitin product results in higher sales for Rexall. All of this is out of Rexall's control, i.e. is exogenous to Rexall, but must be taken into consideration to properly analyze the impact of the labeling changes. Absent

their voluntary production of this proprietary information, it is highly unlikely that the advertising or marketing budgets of other competitors could be obtained.

### c.    Increased Marketing Spending by Retail Outlets

10.    Similar to the actions taken by other manufacturers of glucosamine/chondroitin, if following the labeling changes, retailers of Osteo Bi-Flex increase the amount of advertising directed at the glucosamine/chondroitin consuming public, then retailers may be able to increase demand and hence affect the price and quantity of Osteo Bi-Flex despite the labeling changes. Again, the data necessary to determine the impact, if any, that retailers might have on the demand for Osteo Bi-Flex is exogenous to Rexall. Absent the voluntary production of this proprietary information, it is highly unlikely that the advertising or marketing budgets of retailers could be obtained. This confounding factor is further compounded by the fact that there are a far greater number of retailers in the marketplace than competitors.

### d.    Demographic Changes

11.    Another factor that would likely impact the price and quantity sold of Osteo Bi-Flex is the demographic makeup of the country. An aging and active population may result in an increase in the demand for glucosamine/chondroitin products, all else equal. While the demographic data necessary to measure the impact of an aging population on the price and volume sold of covered products is likely available from organizations such as the U.S. Census, an analysis would need to be undertaken to determine what demographic information is most relevant.

12.     The foregoing are just some of the confounding economic factors, or variables, that would have to be taken into account in order to perform an appropriate regression analysis to determine the true economic impact of the proposed labeling changes.

## III.     An Economic Analysis of Proposed Labeling Changes

13.     As noted, attempting to determine the actual economic impact of the proposed labeling changes will require a considerable amount of data, most of which is not available from Rexall.  First, retail pricing data for glucosamine/chondroitin products will be needed for a period of time preceding and following the proposed labeling changes.  Best economic practices suggest a minimum of two years, or 24 months, worth of data on either side of the labeling changes for a total of 48 months of data.[5]  Second, it will be necessary to know the amount of advertising that Rexall spent on a monthly basis for the same 48 month period, broken down by product.  Third, it will be necessary to know the amount of advertising dollars spent by manufacturers of competing glucosamine/chondroitin products, over the same 48 months.  Fourth, the amount of money spent by retailers to advertise glucosamine/chondroitin products, on a product-by-product basis, will be needed for the 24 months preceding and following the labeling changes.  Lastly, age-based demographic information will need to be collected.

14.     Given the data described above, to determine the impact of the proposed labeling changes, a regression equation in the following form must be performed:

$$P_{OBF} = \beta_0 + \beta_1(\text{Rexall Advertising}) + \beta_2(\text{Other Manufacturer's Advertising}) + \beta_3(\text{Retail Advertising}) + \beta_4(\text{Demographic Information}) + \beta_5(\text{Labeling Changes});$$

---

[5] A minimum of 48 months of data is necessary to guarantee the degrees of freedom necessary to yield statistical significance.

where, $P_{OBF}$ is the price of Osteo Bi-Flex and $\beta_5$ is a binary, or indicator, variable that takes on the value "0" before the proposed labeling changes and the value "1" following the labeling changes. As noted, it is necessary that two years of monthly data, on either side of the labeling changes, be collected in order to yield sufficient statistical results. Some of the data would necessarily have to be provided by direct competitors. Using the above equation, the coefficient $\beta_5$ represents the impact of the labeling changes. If this value is negative, and statistically significant, it would mean that the impact of the labeling changes was to lower the price of Osteo Bi-Flex.

15.     If it is possible to overcome the data issues described above, e.g. determining the level of advertising undertaken by manufacturers and marketers of competing glucosamine/chondroitin products, which is highly unlikely, the study as described would likely cost in excess of $500,000, which would include the value of my time, the time for my support staff, as well as the cost of acquiring the necessary data. Such a study could not be completed for two to three years following the implementation of the labeling changes.

## IV.     Conclusion

16.     I have been asked to determine the feasibility of undertaking a study to determine the actual economic impact of the proposed labeling changes agreed to by the settling parties. As described above, the actual value of the labeling changes cannot be gleaned from an analysis of defendant Rexall's data alone. That is, defendant's wholesale sales transaction data alone will not provide a measure of the actual impact of the labeling changes on consumers. In order to estimate the economic impact of the proposed labeling changes will require the purchase of retail sales data from a vendor such as ACNielsen, and will require knowledge of the advertising

budgets of competing manufacturers and retail outlets.    It is unlikely that competing

manufacturers or retail outlets would willingly and unilaterally produce the sensitive,

confidential and proprietary business information needed.   Further, a time period of two years

following the effective date of the labeling changes would be required in order give the market

sufficient time to adjust to the new labeling.


Keith A Reutter
November 4, 2013

**Proof of Service**

I hereby certify that on May 19, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants and counsel of record in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

 /s/ Kara L. McCall
Kara L. McCall
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853−7000

*Counsel for Defendants-Appellees
NBTY, Inc., Rexall Sundown, Inc., and
Target Corporation*