Nos. 14-1198, 14-1227, 14-1244, 14-1245, 14-1247, and 14-1389

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

NICK PEARSON, *et al.*, and RICHARD JENNINGS,
Plaintiffs-Appellees, Cross-Appellants,

v.

NBTY, INC., a Delaware corporation, *et al.*,
Defendants-Appellees.

APPEALS OF: THEODORE H. FRANK,
SIMONE THOMAS, PEGGY THOMAS, KATHLEEN MCNEAL, and ALISON PAUL
Objectors-Appellants, Cross-Appellees.

On Appeal from the United States District Court
for the Northern District of Illinois, No. 1:11-cv-07972,
Judge James B. Zagel

Response and Reply Brief of Appellants/Cross-Appellees
Theodore H. Frank, Kathleen McNeal, and Alison Paul

CENTER FOR CLASS ACTION FAIRNESS
Theodore H. Frank
1718 M Street NW, No. 236
Washington, D.C. 20036
(703) 203-3848
*In pro per* (14-1198)

LAW OFFICES OF DARRELL PALMER PC
Joseph Darrell Palmer
603 North Highway 101, Suite A
Solara Beach, CA 92075
(858) 792-5600
*Attorneys for Appellants Kathleen McNeal and
Alison Paul* (14-1389)

# Table of Contents

Table of Contents..................................................................................................... i

Table of Authorities ............................................................................................. iii

Jurisdictional Statement ........................................................................................1

Counter-Statement of Cross-Appeal Issues ........................................................5

Counter-Statement of Facts ..................................................................................6

Introduction ........................................................................................................10

I.　The settlement approval cannot stand because class counsel negotiated $4.5 million for themselves for a settlement where the class would receive less than $900,000. ......................................................................................14

　　A.　Disproportionate allocation violates Rule 23(e) even without a showing of actual collusion. ...............................................................................18

　　B.　The actual recovery matters. ........................................................................19

　　　　1.　Appellees' after-the-fact claims of surprise by low claims rate, however, is irrelevant even in the unlikely event that it is true. ............................22

　　　　2.　The $1.5 million paid to third parties for notice is not a class benefit....27

　　C.　The district court correctly concluded that plaintiffs failed to prove the injunctive relief compensated the certified class for their injury. ..............28

　　　　1.　When there is a single settlement class alleging past injury, class counsel's fiduciary duty is to maximize recovery for that class, rather than split settlement benefit with an uncertified class of future purchasers. ...............................................................................................31

　　　　2.　The expert report is inadmissible. ...........................................................35

　　　　3.　There was not even evidence that the labeling change was a net benefit to the class. ................................................................................................39

　　D.　In the alternative, the settlement is unfair because the claims process precluded the distribution of over $12 million to the class. .......................40

　　E.　A low number of objections does not imply fairness..................................41

II.　The reversion of over $2.5 million in a segregated fund to defendants because of an excessive fee request makes this settlement *per se* unfair..................42

III.   The district court's approval of a settlement that favored *cy pres* over class compensation was reversible error. ........................................................43

IV.   In the alternative, if the settlement approval is affirmed, the district court's refusal to grant the full $4.5 million fee request is not an abuse of discretion. ......46

Conclusion ........................................................................................................49

Certificate of Compliance  with Fed. R. App. 32(a)(7)(C) ...................................51

Proof of Service.................................................................................................52

# Table of Authorities

<u>Cases</u>

*Amcast Indus. Corp. v. Detrex Corp.,*
  2 F.3d 746 (7th Cir. 1993) ........................................................................44

*Amchem Prods. Inc. v. Windsor,*
  521 U.S. 591 (1997) ..................................................................................32

*Americana Art China Co., v. Foxfire Printing & Packaging, Inc.,*
  743 F.3d 243 (7th Cir. 2014) ...................................................5-6, 15-16, 19-20, 48-49

*In re Aqua Dots Prod. Liab. Litig.,*
  654 F.3d 748 (7th Cir. 2011) ...................................................................27

*Armstrong v. Bd. of Sch. Dirs. of the City of Milwaukee,*
  616 F.2d 305 (7th Cir. 1980) ................................................................11-12

*Amcast Indus. Corp. v. Detrex Corp.,*
  2 F.3d 746 (7th Cir. 1993) ........................................................................

*In re Baby Products Antitrust Litig.,*
  708 F.3d 163 (3d Cir. 2013)...................................................20-22, 24, 26, 43, 45, 47

*Bailey v. Int'l Brotherhood of Boilermakers,*
  175 F.3d 526 (7th Cir. 1999) ................................................................43-44

*Baltimore Orioles v. Major League Baseball Players Ass'n,*
  805 F.2d 663 (7th Cir. 1986) .....................................................................5

*Baxter Int'l, Inc. v. Abbott Labs.,*
  297 F.3d 544 (7th Cir. 2002) ...................................................................36

*Bew v. City of Chicago,*
  252 F.3d 891 (7th Cir. 2001) ...................................................................40

*In re Bluetooth Headset Prod. Liab. Litig.,*
  654 F.3d 935 (9th Cir. 2011) .........................................................15, 18-19, 28-29, 42

*Boeing v. Van Gemert*,
    444 U.S. 472 (1980) ..........................................................................................20-21

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209, 242 (1993)...........................................................................................38

*Budinich v. Becton Dickinson & Co.*,
    486 U.S. 196 (1988) ...................................................................................................4

*In re Classmates.com*,
    2012 U.S. Dist. LEXIS 83480 (W.D. Wash. Jun. 15, 2012) ........................................27

*Crawford v. Equifax Payment Services, Inc.*,
    201 F.3d 877 (7th Cir. 2000) ................................................................................14-15

*Daubert v. Merrell Dow Pharmaceuticals*,
    509 U.S. 579 (1993) ........................................................................................35, 37-38

*Devlin v. Scardeletti*,
    536 U.S. 1 (2002) .......................................................................................................2

*Dixon v. ATI Ladish LLC*,
    667 F.3d 891 (7th Cir. 2012) ...............................................................................40, 42

*In re Dry Max Pampers Litig.*,
    724 F.3d 713 (6th Cir. 2013) ......................................10-12, 15, 20, 28, 30, 41

*Dupuy v. Samuels*,
    423 F.3d 714 (7th Cir. 2005) .......................................................................................3

*Eubank v. Pella Corp.*,  __ F.3d __,
    2014 U.S. App. LEXIS 10332 (7th Cir. Jun. 2, 2014)
    .............................................................. 12-13, 14-16, 18-19, 22, 23, 26, 35, 41, 42, 47

*First Health Group Corp. v. BCE Emergis Corp.*,
    269 F.3d 800 (7th Cir. 2001) .......................................................................................3

*FTC v. OT Inc.*,
    512 F.3d 858 (7th Cir. 2008) .....................................................................................33

*FTC v. Trudeau*,
    606 F.3d 382 (7th Cir. 2010) .......................................................................................4

*Gautreaux v. Chicago Hous. Auth.*,
    491 F.3d 649 (7th Cir. 2007) .......................................................................3

*General Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) ....................................................................................37

*Glasser v. Volkswagen of Am.*,
    645 F.3d 1084 (9th Cir. 2011) ....................................................................4

*In re GMC Engine Interchange Litig.*,
    594 F.2d 1106 (7th Cir. 1979)...................................................................28

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
    55 F.3d 768 (3d Cir. 1995).................................................................. 4, 41

*Gwin v. Am. River Transp. Co.*,
    482 F.3d 969 (7th Cir. 2007) .......................................................................6

*Hughes v. Kore of Ind. Enter., Inc.*,
    731 F.3d 672 (7th Cir. 2013) ..................................................... 16-17, 44, 47

*In re Hydroxycut Mktg. and Sales Practices Litig.*,
    2013 U.S. Dist. LEXIS 165225 (S.D. Cal. 2013).........................................23

*Ira Holtzman, CPA & Assoc. v. Turza*,
    728 F.3d 682 (7th Cir. 2013) .............................................................. 17, 44

*JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*,
    190 F.3d 775 (7th Cir. 1999) .......................................................................3

*In re Kentucky Grilled Chicken*,
    280 F.R.D. 364 (N.D. Ill. 2011) ........................................................... 27, 48

*Klier v. Elf Atochem N. Am., Inc.*,
    658 F.3d 468 (5th Cir. 2011) .......................................................... 32, 43, 45

*Kumho Tire v. Carmichael*,
    526 U.S. 137 (1999).................................................................................37-38

*Lagarde v. Support.com, Inc.*,
    2013 U.S. Dist. LEXIS 42725 (N.D. Cal. Mar. 25, 2013)............................19

*Mars Steel v. Continental Ill. Nat. Bank & Trust,*
    834 F.2d 677 (7th Cir. 1987) ................................................................................21-22

*Marseilles Hydro Power, LLC v. Marseilles Land & Water Co.,*
    518 F.3d 459 (7th Cir. 2008) ................................................................................5, 35

*McCutcheon v. FEC,*
    134 S. Ct. 1434 (2014)............................................................................................44

*In re Mercury Interactive Sec. Litig.,*
    618 F.3d 988 (9th Cir. 2010) ...................................................................................38

*Moore v. Mote,*
    368 F.3d 754 (7th Cir. 2004) .....................................................................................3

*Moore v. Verizon Comm'ns, Inc.,*
    2013 U.S. Dist. LEXIS 122901 (N.D. Cal. Aug. 28, 2013) .........................................19

*Murray v. GMAC Mortg.,*
    434 F.3d 948 (7th Cir. 2006) ...................................................................................23

*People Who Care v. Rockford Bd. of Educ.,*
    272 F.3d 936 (7th Cir. 2001) .....................................................................................3

*Piambino v. Bailey,*
    757 F.2d 1112 (11th Cir. 1985)................................................................................49

*Rexall Sundown, Inc. v. Perrigo Co.,*
    651 F. Supp. 2d 9 (E.D.N.Y. 2009) ............................................................................8

*Reynolds v. Beneficial Nat'l Bank,*
    288 F.3d 277 (7th Cir. 2002) ...................................................................................19

*Matter of Rhone-Poulenc Rorer Inc.,*
    51 F.3d 1293 (7th Cir. 1995) ...................................................................................35

*Robert F. Booth Trust v. Crowley,*
    687 F.3d 314 (7th Cir. 2012) ...................................................................................34

*Robinson v. Alter Barge Line, Inc.,*
    513 F.3d 668 (7th Cir. 2008) ...................................................................................44

*Robinson v. McNeil Consumer Healthcare,*
  615 F.3d 861 (7th Cir. 2010) ...................................................29

*Shady Grove Orthopedic Associates v. Allstate Ins.,*
  130 S. Ct. 1431 (2010)...........................................................33

*Silverman v. Motorola, Inc.,*
  739 F.3d 956 (7th Cir. 2013) ............................................. 4, 16

*In re Skechers Toning Shoe Prods. Liab. Litig.,*
  No. 3:11-MD-2308-TBR, 2013 WL 2010702 (W.D. Ky. May 13, 2013) ...................24

*Stone Container v. Hartford Steam Boiler Inspection & Ins. Co.,*
  165 F.3d 1157 (7th Cir. 1999)....................................................3

*Strong v. Bellsouth Tel. Inc.,*
  137 F.3d 844 (5th Cir. 1998) ...................................................21

*Synfuel Technologies v. DHL Express (USA),*
  463 F.3d 646 (7th Cir. 2006) ...............................................30-31, 34, 39-40

*Szabo v. Bridgeport Machines, Inc.,*
  249 F.3d 672 (2001) ............................................................32

*Thorogood v. Sears, Roebuck & Co.,*
  627 F.3d 289 (7th Cir. 2010) (denying rehearing *en banc*),
  *underlying opinion vacated on other grounds,*
  131 S.Ct. 3060 (2011)...................................................... 15, 35

*In re Troutt,*
  460 F.3d 887 (7th Cir. 2006) ...................................................4

*Union Oil Co. v. Leavell,*
  220 F.3d 562 (7th Cir. 2000) ..................................................36

*Weinberger v. Great Northern Nekoosa Corp.,*
  925 F. 2d 518 (1st Cir. 1991). .................................................42

*Wilson v. Airborne, Inc.,*
  No. EDCV 07-770 VAP, 2008 WL 3854963, at *7 (C.D. Cal. Aug. 13, 2008)...........24

Rules and Statutes

15 U.S.C. § 1693m(a)(2)(B)(ii) ........................................................47

28 U.S.C. § 1291 ....................................................................... 2-5

28 U.S.C. § 1332(d)(2) ................................................................1

28 U.S.C. § 1711 note § 2(a)(3) ....................................................47

Fed. R. App. Proc. 4(a)(1)(A) .................................................... 1-2

Fed. R. App. Proc. 28(a)(5)...........................................................3

Fed. R. App. Proc. 28(a)(9)...........................................................3

Fed. R. Civ. Proc. 23 .................................................................13

Fed. R. Civ. Proc. 23(a)...........................................................32-33

Fed. R. Civ. Proc. 23(a)(4) ............................................... 15, 32, 40

Fed. R. Civ. Proc. 23(b)(2) .........................................................34

Fed. R. Civ. Proc. 23(e) ............................... 3, 4, 16-18, 20, 32-33

Fed. R. Civ. Proc. 23(g)..............................................................26

Fed. R. Civ. Proc. 23(h)........................2, 4, 5, 16, 20-21, 32-33, 46-48

Fed. R. Civ. Proc. 23(h)(1) .............................................. 30, 35, 38

Fed. R. Civ. Proc. 58 ..................................................................1

U.S. Const., Art. III .............................................................16, 33

Other Authorities

AMERICAN LAW INSTITUTE,
    PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION §3.05(c) (2010) ........................28

AMERICAN LAW INSTITUTE,
    PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION §3.07 (2010) ........................43-45

AMERICAN LAW INSTITUTE,
> PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION §3.13, *Illustration 2*
> (2010).................................................................................................28

BRICKMAN, LESTER,
> LAWYER BARONS (2011) ...................................................................42

David, Larry,
> "The Non-Fat Yogurt," *Seinfeld* (NBC, Nov. 4, 1993)...............................31

Fisher, Daniel,
> *Odds Of A Payoff In Consumer Class Action? Less Than A Straight Flush*,
> Forbes.com (May 8, 2014).....................................................23-24

Frank, Ted, "Nutella class action settlement far worse than being reported,"
> PointOfLaw.com blog (May 14, 2012), available at
> http://www.pointoflaw.com/archives/2012/05/nutella-class-action-
> settlement-far-worse-than-being-reported.php
> (last accessed June 26, 2014)..................................................34

Frankel, Alison, *A smoking gun in debate over consumer class actions?*,
> Reuters.com (May 9, 2014) ....................................................23-24

Issacharoff, Samuel,
> *Class Action Conflicts*, 30 U.C. DAVIS L. REV. 805 (1997) ...........................13

Janowicz, Tiffaney, *et al.*,
> *Settlement Administration: Impacting Claims Filing Rates* (Feb. 18, 2014),
> available at http://media.straffordpub.com/products/crafting-class-
> settlement-notice-programs-due-process-reach-claims-rates-and-more-
> 2014-02-18/presentation.pdf (last accessed June 25, 2014).........................24

Leslie, Christopher R., *The Significance of Silence: Collective Action Problems and
> Class Action Settlements*, 59 FLA. L. REV. 71 (2007)....................................41

Notes of Advisory Committee on 2003 Amendments to Rule 23 ................................29, 38

Notice of Settlement in *Desai v. ADT*, available at
> http://robocallsettlement.com/FileDownload.aspx?FileID=2089 (last
> accessed June 27, 2014) .......................................................24

Sale, Hillary A.,
   *Judges Who Settle*, 89 Wash. U. L. Rev. 377 (2011).....................................................13

## Jurisdictional Statement

Cross-appellants' jurisdictional statement is not complete and correct.

The district court has jurisdiction under 28 U.S.C. § 1332(d)(2) because this is a class action where the amount in controversy exceeds $5,000,000 exclusive of interest and costs; many of the millions of class members in the nationwide class are citizens of states other than a defendant's state of citizenship; and no exception to the Class Action Fairness Act applies. Dkt. 64 at 4.[1] For example, named plaintiff Nick Pearson is an individual and citizen of Illinois, while defendant Target Corporation is a citizen of Minnesota because it is a corporation incorporated under the laws of Minnesota, where its headquarters are located. *See id.* at 4-7.

The district court issued final judgment under Fed. R. Civ. Proc. 58 on January 22, 2014. A22. Appellant Theodore H. Frank is a class member who objected to the settlement, filed a claim, and appeared at the fairness hearing through counsel (A107-A148; A151); he filed a notice of appeal with the district court on January 29, 2014. Dkt. 145. Appellants Kathleen McNeal and Alison Paul are class members that filed objections to the settlement (Dkt. 104); they filed a notice of appeal on February 21, 2014. Dkt. 175. These notices of appeal are both timely. Fed. R. App. Proc. 4(a)(1)(A).

---

[1] "Axyz" refers to page xyz of the objectors' Appendix; "SAxyz" refers to page xyz of the appellees' Supplemental Appendix; "R" to the Record on appeal. "Dkt." refers to docket entries in Case No. 11-cv-07972 (N.D. Ill.) below. "OB" refers to Frank's opening brief; "PB" to the plaintiffs' corrected opening brief (No. 14-1198 Dkt. 59); and "DB" to defendants' brief.

The United States Court of Appeals for the Seventh Circuit has jurisdiction of the main appeal under 28 U.S.C. § 1291. Appellants, as class members who objected to settlement approval below, have standing to appeal a final approval of a class action settlement without the need to intervene formally in the case. *Devlin v. Scardelletti*, 536 U.S. 1 (2002).

Named plaintiffs Nick Pearson, *et al.*, filed a notice of appeal on February 3, 2014, and named plaintiff Richard Jennings filed a notice of appeal on February 4, 2014. Dkt. 148, 152. These cross-appeals would be timely under Fed. R. App. Proc. 4(a)(1)(A). But plaintiffs (collectively "Pearson") are not appealing from a final judgment, so this Court does not have jurisdiction of the cross-appeal under 28 U.S.C. § 1291.

The district court made an interim award of $2.1 million under Fed. R. Civ. Proc. 23(h), and invited plaintiffs to submit additional evidence on the alleged value of the settlement's injunctive relief at a later date:

> "At this time, we are neither able nor willing to award the plaintiffs' attorneys fees based on inconsistent conjecture as to what may happen in the future regarding labeling changes—especially, when the court may wait and, possibly, base such an award on accurate data. [Citation omitted.] Accordingly, whether Plaintiffs' counsel can prove the value of the labeling changes that it secured on behalf of the Class is an issue that it may be able to raise after the passage of time." [A21]

While plaintiffs' notice of appeal referred to the final judgment approving the settlement, their actual appellate brief asks only for reversal of the interim Rule 23(h) award ruling, complaining that the district court should have awarded all of their sought fees at once. PB39. But finality requires that the district court dissociate itself

from the case. *Moore v. Mote*, 368 F.3d 754, 755 (7th Cir. 2004) (no finality when district court order "explicitly contemplates the court's continuing involvement in the case"). With limited exceptions not applicable here, interim awards of attorneys' fees are not appealable. *Compare Dupuy v. Samuels*, 423 F.3d 714, 717-18 (7th Cir. 2005), *and People Who Care v. Rockford Bd. of Educ.*, 272 F.3d 936, 937 (7th Cir. 2001), *with Gautreaux v. Chicago Hous. Auth.*, 491 F.3d 649, 654 (7th Cir. 2007). There is thus no jurisdiction over the cross-appeal until the district court issues a final order on fees. Any other decision would give plaintiffs two bites at the apple, because they never waived their right to return to the district court with additional evidence. *Cf. First Health Group Corp. v. BCE Emergis Corp.*, 269 F.3d 800, 802 (7th Cir. 2001); *JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775, 776-77 (7th Cir. 1999).

Plaintiffs may argue that to the extent the cross-appeal is meant to bolster the lower court's Rule 23(e) ruling and avoid law of the case on any remand, there would arguably be appellate jurisdiction over questions raised by plaintiffs. But a "cross-appeal is necessary and proper only when the appellee wants the appellate court to alter the judgment (the bottom line, not the grounds or reasoning) of the district court." *Stone Container v. Hartford Steam Boiler Inspection & Ins. Co.*, 165 F.3d 1157, 1159 (7th Cir. 1999). To complicate matters further, to the extent a cross-appeal was required to preserve the Rule 23(e) argument, plaintiffs may have waived those arguments under Fed. R. App. Proc. 28(a)(5) and 28(a)(9) because their cross-appeal brief challenges only the interim fee ruling, and not the holding that the injunctive relief cannot support settlement approval, even though their notices of appeal do include reference to the final judgment and order granting settlement approval. PB3-4; PB39; *but see* PB25.

Of course, that the district court has not made a final order on fees does not affect the § 1291 jurisdiction over Frank's appeal from the final judgment approving the settlement. *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 202-03 (1988).

If the Court nevertheless decides that there is jurisdiction over the cross-appeal, Frank notes that, because he is not directly affected by the question of whether NBTY pays plaintiffs $4.5 million or $2.1 million in attorneys' fees, there might be some question as to his standing to oppose the cross-appeal. *Cf. Silverman v. Motorola, Solutions, Inc.*,  739 F.3d 956, 957 (7th Cir. 2013); *Glasser v. Volkswagen of Am.*, 645 F.3d 1084 (9th Cir. 2011). But because Frank is also challenging the Rule 23(e) fairness of the settlement, he has an interest in the disposition of the cross-appeal on the Rule 23(h) issue, and his briefing on the two questions overlaps. As *In re GMC Pick-Up Trucks Prods. Liab. Litig.* noted in analogous circumstances, "class counsel's argument that objectors have no standing to contest the fee arrangement is patently meritless: the fee agreement clearly does impact their interests, as it is, for practical purposes, a constructive common fund." 55 F.3d 768, 820 (3d Cir. 1995). (Similarly, however, this may cure any waiver by plaintiffs in their cross-appeal's statement of issues and conclusion.)

In the alternative, because the directly interested party, Rexall, is contractually forbidden from disputing plaintiffs' fee award (OB18-19), Frank's cross-appeal opposition can serve the role of *amicus*; this Court will often appoint *amicus* to brief and argue an undefended district court decision. *E.g., FTC v. Trudeau*, 606 F.3d 382, 385 (7th Cir. 2010); *In re Troutt*, 460 F.3d 887, 892 (7th Cir. 2006).

## Counter-Statement of Cross-Appeal Issues

1.     Is there 28 U.S.C. § 1291 appellate jurisdiction of an interim order awarding attorneys' fees when the district court invited class counsel to present supplemental evidence of class benefit at a later date and reapply for fees?

**Standard of Review:** This Court has the duty to determine *sua sponte* whether appellate jurisdiction exists. *Baltimore Orioles v. Major League Baseball Players Ass'n*, 805 F.2d 663, 666 (7th Cir. 1986).

2.     Did the district court abuse its discretion when it held that plaintiffs had failed to demonstrate that prospective minor labeling changes required by a settlement created class benefit?

**Standard of Review:** Questions of valuation are ones of fact, reviewed for clear error. *Marseilles Hydro Power, LLC v. Marseilles Land & Water Co.*, 518 F.3d 459, 465-67 (7th Cir. 2008).

3.     Did the district court abuse its discretion when it refused to grant the entire $4.5 million Rule 23(h) request for a settlement that provided class members less than a fifth of that monetary relief in the absence of persuasive evidence that the settlement's minor changes to product labels created class benefit?

**Standard of Review:** "We review a district court's fee determination for an abuse of discretion. We will not upset the district court's decision unless it reaches an erroneous conclusion of law, fails to explain a reduction or reaches a conclusion that no evidence in the record supports as rational. As a part of our analysis, we will also review *de novo* the district court's methodology to determine whether it reflects procedure approved for calculating awards." *Americana Art China v. Foxfire Printing &*

*Packaging, Inc.*, 743 F.3d 243, 246 (7th Cir. 2014) (internal quotations and citations omitted).

4.    Does a defendant's agreement to provide "clear sailing" to fees in a class-action settlement—a provision this and other courts have criticized as abusive to the class—require a district court to rubber-stamp a fee request consistent with that agreement?

**Standard of Review:** Questions of law relating to the Federal Rules are reviewed *de novo. Gwin v. Am. River Transp. Co.*, 482 F.3d 969, 974 (7th Cir. 2007).

## Counter-Statement of Facts

Plaintiffs' cross-appeal makes new factual assertions not anticipated in Frank's original Statement of the Case (in part because sealed materials were not disclosed to Frank until after his opening brief was filed), so Frank supplements.

Plaintiffs' complaints alleged Rexall committed consumer fraud in multiple ways. Dkt. 64 (R387). The settlement provided that Rexall would make small changes to the label for some, but not all, of the challenged propositions, as summarized in the following chart. Settlement ¶ 8 and Exh. B (A51-A52; A88).

| Label described by complaint | Post-settlement labeling safe harbor |
|---|---|
| "renews cartilage"<br><br>"repairs cartilage"<br><br>"rebuilds cartilage" | "Contains a key building block of cartilage"<br><br>"works by providing the nourishment your body needs to support cartilage, lubricate, and strengthen your joints"<br><br>"helps protect [or support] cartilage and helps with annoying flare-ups"<br><br>"supporting healthy connective tissue [or healthy cartilage]"<br><br>"Just 'one' Osteo Bi-Flex ONE PER DAY caplet is all you need to help protect cartilage and help ease occasional joint stress" |
| "help maintain the structural integrity of joints" | No change. |
| "maintain healthy connective tissue" | No change. |
| "lubricate joints" | No change. |
| "maintain joint comfort" | No change. |
| "support mobility" | No change. |
| "support flexibility" | No change. |
| "improvements to joint comfort in seven days" | No change. |
| "These statements have not been evaluated by the Food & Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease." | "These statements have not been evaluated by the Food & Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease. … Individual results may vary." |

*Compare* Dkt. 64 at ¶¶ 2, 30 (R387, R394-95), *and* 21 C.F.R. § 101.93(c), *with* Settlement ¶ 8 and Exh. B (A51-A52; A88). At least one Rexall product already had the "individual results may vary" language on the label. Dkt. 64 at ¶ 30 (R395).

Class members released all labeling-related consumer claims (including future labeling-related claims for labels that conformed to the Settlement language) against Rexall and others in the chain of distribution. Settlement ¶¶ 11-14 (A54-A58). Rexall was not required to pull already distributed bottles with the old labeling, Settlement ¶ 8.e (A52), but class members waived any claims as to those bottles as well. Settlement ¶ 11 (A54-A55). This release included not just the complained-about labeling, but any other labeling of Covered Products that might be grounds for suit. *Id.*; *cf. generally Rexall Sundown, Inc. v. Perrigo Co.*, No. 07-CV-3397 (E.D.N.Y.) (Rexall loses jury trial over Lanham Act counterclaim over glucosamine representations), *and* 651 F. Supp. 2d 9 (E.D.N.Y. 2009) (pre-trial summary judgment ruling).

Plaintiffs' expert report of Keith Reutter was based on 2002 marketing studies done for the defendant predicting the potential price and sales effects of a new marketing strategy. SA88-SA89. Reutter's report did not consider any post-2002 data on whether the 2002 study's predictions of economic impact were accurate. His report did not consider whether the new labeling was consistent or inconsistent with the proposed marketing strategy, nor did it compare the post-settlement label with the 2002-era label. While the report relied upon data that "a high percentage of Osteo Bi-Flex purchasers responded that the 'renews and rebuilds' cartilage representations are important to their purchasing decisions" (SA143), the expert did not consider the effect of the settlement's labeling change (or even the post-2002-study labeling change) on

8

purchasing decisions; did not consider any A/B testing for different phrasings of the same principle such as that permitted by the settlement's safe-harbor; did not consider any evidence whether the phrase "individual results may vary" would be material to consumers when added to existing disclosures; did not consider any evidence whether the verb "strengthen" and the nouns "building block" and "nourishment" would be less persuasive to consumers than the verbs "rebuild" or "renew"; and made no computation of the costs, if any, to consumers of the language challenged in the complaint as untrue but allowed to remain on the label. The report simply took the 2002 marketing study, assumed that its predictions were correct, assumed that the labeling change had the effect of entirely reversing the results predicted by the 2002 marketing study, and assumed that the resulting estimated revenue loss to Rexall equated to benefit to consumers. SA90-91. The report similarly assumed a 100% claims rate in calculating benefit to the class. SA94-95.

There was no evidence in the record that the challenged but unchanged language protected by the settlement was true. There was no evidence in the record that future consumers would not be (or would be) injured by the protected language. There was no evidence in the record comparing the magnitude of the alleged injury prevented with the magnitude of the alleged injury caused by statements protected by the injunctive relief. There was no evidence in the record that the new labels left consumers better informed (or even less misinformed) than the pre-settlement labels.

Thus, at the fairness hearing, the district court expressed skepticism that the injunctive relief was "significant." A173-A174; A181-A183. This ultimately led to a

finding that plaintiffs failed to provide a "defensible determination" of the injunctive relief's value. A20-A21.

The settling parties presented no evidence in the lower court as to what they expected the claims rate to be when they settled; rather, their briefing responding to objections took the position that the actual claims rate was irrelevant. Dkt. 113 at 8 (R1456).

## Introduction

Frank's appeal complains that this is a settlement that paid the class under $900,000 while the attorneys sought $4.5 million for themselves.

Rexall sputters "There is no reason, and Objector Frank provides none, why Frank's challenge to class counsel's fee award should call into question the adequacy of the settlement to the class members." DB15-16. But Frank did provide reason: a settlement must not just be adequate with respect to the class members, but consist of a fair *allocation* between the class counsel and the class members. OB10-19.

Thus, when the appellees cite to OB11 and claim that Frank has "no objection to the amount of compensation the class is receiving" (DB19) or does not "challenge money to individual class members" (PB11), they both misstate Frank's argument and ignore the central problem with the settlement. *In re Dry Max Pampers Litig.*, 724 F.3d 713 (6th Cir. 2013), relied on in Frank's opening brief, is directly on point. There was no dispute that the underlying *Pampers* litigation was inherently meritless. *Id*. at 723 (Cole, J., dissenting). Nevertheless, a settlement that provided the class nothing but

handsomely compensated the class counsel represented an unfair allocation of settlement proceeds—even if the class might not be entitled to anything. Perhaps the class here was only entitled to a single peppercorn, and Rexall overpaid by putting $6.5 million on the table. OB14-15. Such a settlement may be adequate, but it is still unfair and unreasonable when the allocation provides only a tiny fraction of that to the class and reserves the remainder for the attorneys and third parties.

The alternative would create a perverse incentive to bring meritless class actions. If class counsel can win for itself a disproportionate allocation simply by arguing that the class's claims were weak and that the class was not entitled to any more than the few hundred thousand dollars it received, it becomes more profitable to bring weak class actions than meritorious class actions where the ultimate settlement allocation would receive greater scrutiny because of the risk of class members losing valuable claims. Instead, any hypothetical overpayment of settlement value relative to alleged nuisance litigation value must be proportionately shared between the class and class counsel to avoid the perverse incentives created by the appellees' proposed rule of decision.

Rexall's reliance (DB17) on *Armstrong v. Bd. of Sch. Dirs. of the City of Milwaukee*, 616 F.2d 305, 315 (7th Cir. 1980), is thus misplaced. *Armstrong* stands for the proposition that one shouldn't second-guess the total amount of a settlement reached at arm's length. But Frank isn't challenging that total amount: if plaintiffs didn't think they could do better than a $6.5 million nuisance value in cash on the barrelhead (a tiny fraction of Rexall's revenues from allegedly fraudulent sales (SA92-SA93)), so be it. OB11-12. But as Frank noted, the "adversarial process … extends only to the amount the defendant

11

will pay, not the manner in which that amount is allocated between the class representatives, class counsel, and unnamed class members." *Dry Max Pampers*, 724 F.3d at 717.

Both appellees pretend that *Dry Max Pampers* does not exist; neither cited it once, much less argued it was wrong or did not apply here. This is an unfortunate omission for them, because the Seventh Circuit recently effectively endorsed Frank's proposed approach. *Eubank v. Pella Corp.,* __ F.3d __, 2014 U.S. App. LEXIS 10332 (7th Cir. Jun. 2, 2014). *Eubank* reversed a settlement approval over a number of "red flags," many of which Frank identified in this case: the problem of disproportionate one-sided recovery; the district court's decision to value the settlement using illusory measures of maximum possible redemptions rather than actual benefit to the class; and the "questionable" settlement provision that reversion of excess fee demands accrue to the defendant rather than the class. *Id.* at *27, *33 (calling ratio of $8.5 million actual recovery to $11 million in fees "one-sided[]"); *id.* at *27 (rejecting calculation of settlement value based on possible maximum claims rate); *id.* at *17 (referring to fee segregation as "questionable" provision). *Eubank* by itself requires reversal, because the district court failed to consider the one-sided nature of the settlement in approving it—and the 2.2-to-1 fee-to-recovery ratio in this settlement (not to mention the 5.1-to-1 ratio plaintiffs seek on cross-appeal and in the original fee request) is even more disproportionate than the 1.3-to-1 ratio condemned by *Eubank* as too "one-sided" to be approved.

Frank noted that appellees' proposed methodology for settlement approval leads to absurd results. OB28-30; OB32-33. Neither appellee denies this (or even addresses the hypotheticals), and each simply asks this Court, citing district-court precedent, to apply

the absurd rule. Yes, appellees can point to several (though not a unanimous number of) district courts that, when faced with an *ex parte* presentation of a settlement proposal and an opportunity to clear a complex class action off of their docket, ignore sound public policy and agree with appellees' position in this case about settlement valuation, deference to clear-sailing provisions, the "questionable" provision of reversion settlements, and approving settlements where the attorneys are the primary beneficiaries. *Cf. Eubank*, 2014 U.S. LEXIS App. 10332 at *8 (noting problem when judges are required to scrutinize settlements without assistance of adversary proceeding); Samuel Issacharoff, *Class Action Conflicts*, 30 U.C. DAVIS L. REV. 805, 829 (1997); Hillary A. Sale, *Judges Who Settle*, 89 WASH. U. L. REV. 377, 411-12 (2011). But courts of appeals dictate to district courts, not the other way around. Simply put, these other district courts' decisions are also wrong to the extent they contradict Frank's arguments on appeal. A review of the precedent shows their reasoning to be conclusory or otherwise unpersuasive for failing to address the arguments Frank makes and precedents Frank cites here. That the district court's legal errors in this case are repeated by several other district courts does not mean they are not legal errors. Rather, it emphasizes the need for a comprehensive opinion in this case to resolve the conflict.

The district court correctly found that plaintiffs failed to prove that the trivial injunctive relief of tweaks to the label had any benefit to the class—and could not be compensation to the class for prior injury. A19. The expert report relied upon by plaintiffs (and which Frank did not have access to until appeal, and then only in part) is junk economics. It is not even clear that the injunctive relief was a net positive to the class given the waivers it entails. Plaintiffs' attempt to save the settlement approval—

and their remarkable cross-appeal seeking a doubling of already disproportionate fees—by relying on the injunctive relief is thus doomed.

Reversal and remand is required because the lower court applied the wrong legal standards on several independent issues, but this Court should go further and require rejection of the red-flag-laden and one-sided settlement. This would moot the cross-appeal, but in the event that settlement approval is affirmed (or remanded for further proceedings), the cross-appeal should be rejected.

**I.     The settlement approval cannot stand because class counsel negotiated $4.5 million for themselves for a settlement where the class would receive less than $900,000.**

Frank's appeal poses the question "Does Rule 23 permit class counsel to exploit the class-action settlement process so that the attorneys are the primary beneficiary of a settlement at the expense of their clients?" OB2; OB10. The appellees answer yes, but provide only their *ipse dixit*, DB15-16, and misread precedents.

Rexall nitpicks at some of the cases Frank cites, noting distinctions between the settlements the Seventh Circuit has previously stricken and this case. DB20-21. But Frank's string-cite (OB15-16) fully acknowledged that he was asking this Court for an application of the *principles* cited in those cases. Yes, this settlement is better than *Crawford v. Equifax Payment Services, Inc.*, 201 F.3d 877 (7th Cir. 2000), where class members received no cash—though this settlement is not *that* much better given that 11.97 million out of 12 million class members receive no compensation. And this settlement is also worse than the one this Court rejected in *Eubank*.

*Eubank* held that a settlement that (among other problems) paid the class at most $8.5 million, but the attorneys $11 million, was evidence of unacceptable "one-sidedness." 2014 U.S. App. LEXIS 10332 at *27, *33. Such criticism of a settlement where the attorneys received "56 percent of the total settlement" (*id.* at *27) reinforces Frank's position that the Seventh Circuit should make its previous implicit criticisms explicit, and establish a bright-line rule against settlements that "treat the class action lawyers better than the class." OB10-19.

Now, certainly, as with *Crawford* and Frank's other citations, appellees can distinguish *Eubank*. But while this case may not have *Eubank*'s Rule 23(a)(4) problems, *Eubank* espouses broader principles: "multiple grounds" for settlement disapproval. 2014 U.S. App. LEXIS 10332 at *18. *Crawford, Thorogood, Bluetooth, Pampers,* and *Eubank,* like most judicial opinions, create precedential rules of general applicability. They are not merely one-off rejections of specific settlements with no precedential value for other cases where the settlement does not match on all fours. They certainly do not stand for the proposition that a settlement need only hop over the low bar of "better than *Crawford*" to pass muster.

Appellees simply refuse to directly contest or address the law that a settlement may not provide a "one-sided" or "disproportionate" allocation between class counsel and class members. *Eubank,* 2014 U.S. App. LEXIS 10332 at *27, *33; *Dry Max Pampers,* 724 F.3d 713; *cf. also In re Bluetooth Headset Prods. Liab. Litig.,* 654 F.3d 935, 947 (9th Cir. 2011). *Dry Max Pampers* and *Bluetooth* go unmentioned by both appellee briefs.

While otherwise ignoring its lessons in their cross-appeal, plaintiffs rely upon *Americana Art China* for the proposition that one-sided settlements are acceptable. PB15.

This is a poor reading of the case. In *American Art China*, class counsel appealed *ex parte* from a district court's Rule 23(h) award, seeking augmentation. 743 F.3d at 245. No class members objected on appeal to the attorney award, much less Rule 23(e) settlement approval; because of a clear-sailing clause, there was not even an appellee in *Americana Art China*. *Id.* This Court simply held that class counsel was lucky to get as much as they got. *Id.* at 247 (criticizing appeal); *id.* at 245-46 (noting appellant tried to dismiss appeal after oral argument).[2] *Americana Art China* never suggested that the unchallenged abusive and disproportionate settlement in that case with its "meager final payout" created a benchmark of minimum fairness that no future objector could challenge (much less that every class counsel was entitled to a 1.5 multiplier (PB35)). *Id.* at 245. It simply says nothing about Frank's Rule 23(e) challenge.

Plaintiffs also heavily rely upon *Hughes v. Kore of Ind. Enter., Inc.*, 731 F.3d 672 (7th Cir. 2013), but that decision is simply inapposite. In *Kore*, there was a class of 2800 ATM users whose identities were unascertainable, and the only remedy permitted by the federal statute in a class action was statutory damages capped at $3.57/class member. *Id.* at 674, 676. In the unique circumstances of that case (compounded by *ex parte* presentation because defendants chose "to file nothing"), *Kore* held that, when it

---

[2] Plaintiffs claim "While there were no objections to the fee award in *Americana Art China*, if the award there required reduction due to the small amount of actual claims, it would have been incumbent upon this Court, pursuant to Rule 23(h), to so order." PB15. Article III's case or controversy requirement says otherwise. This Court ordinarily does not reach out to reduce fees based on arguments not appropriately before it, even when such an issue that would benefit the class points out district-court error. *Silverman*, 739 F.3d at 957.

would be impossible to actually distribute money to a class, it would be permissible and desirable to structure and certify a class action to be solely for *cy pres* relief to effectuate the intent of a federal statute. Frank disagrees with *Kore* for reasons stated in his opening brief (OB42-OB43 & n.20), but the Court need not reach that issue. *Kore* does not stand for the proposition that *cy pres*- and injunction-only settlements where class members collect nothing are *always* appropriate. Indeed, this Court explicitly rejected that idea in *Turza*, when it held that distribution to class members, when feasible, must come first. *Ira Holtzman, C.P.A. & Assoc. v. Turza*, 728 F.3d 682, 689 (7th Cir. 2013). Here, no one is claiming that it is impossible to identify class members, because there was individualized notice given to 4.7 million of them. *Kore* on its own terms applies *only* when "distribution of damages to the class members would provide no meaningful relief." 731 F.3d at 675. Plaintiffs cannot claim that is true here, because *they filed a complaint seeking damages for class members*. That plaintiffs eventually settled it for a tiny fraction of the over $100 million of damages claimed[3] does not absolve them of their responsibility to allocate the resulting millions of dollars proportionately.

This settlement is considerably more one-sided than *Eubank*. It was intended to provide $4.5 million to the attorneys, while actually paying the class less than $900,000. Even if one includes *cy pres* as a settlement benefit, class counsel would have received over two thirds of the total benefit. This fails Fed. R. Civ. Proc. 23(e) as a matter of law, and requires reversal.

---

[3] Plaintiffs' expert argued that consumers were overcharged $18.5 million a year; the class period is over eight years long. SA94; A86-A87.

In the alternative, remand is required because the district court applied the wrong standard of law on several issues.

## A. Disproportionate allocation violates Rule 23(e) even without a showing of actual collusion.

The appellees repeatedly characterize Frank's argument as one of "collusion." DB9; DB15; PB9; PB11. But nothing in Frank's argument requires a finding of "collusion" in terms of explicit intent by the defendants to benefit class attorneys at the expense of the class. The sort of disproportionate allocation in this case violates Rule 23(e) even if it only results from defendants' indifference to the recipient of the settlement proceeds. OB17-OB19; *Eubank*, 2014 U.S. App. LEXIS 10332 at *7.[4] Plaintiffs' offense at the non-existent allegation of "conspir[acy]" (PB11) is thus misplaced. *Bluetooth* does use the word "collusion." This is an unfortunate ambiguity. *Bluetooth* uses "collusion" to broadly mean the tacit collusion of a defendant acquiescing to class counsel's self-dealing when given the option. *Bluetooth*, 654 F.3d at 947 (instructing courts to "be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations"). *See also Eubank*, 2014 U.S. App. LEXIS 10332 at *7 ("The defendant cares only about the size of the settlement, not how it is divided between attorneys' fees and compensation for the class."); *Bluetooth*, 654 F.3d at 949 (same). But then settling parties in this case and others use these precedents and

---

[4] That indifference saturates Rexall's appellate brief in this case, which baldly and incorrectly argues that allocation is irrelevant to settlement fairness. DB15-16.

equivocate to argue to district courts that *Bluetooth* only criticizes smoke-filled-room "collusion" solved by arms-length negotiation—and as a result, district courts like the one here ask the wrong question, and look solely at the more narrow view of collusion. *E.g.*, A8-A10; *Moore v. Verizon Comm'ns, Inc.*, 2013 U.S. Dist. LEXIS 122901, at *20-*21 (N.D. Cal. Aug. 28, 2013); *Lagarde v. Support.com, Inc.*, No. C12-0609, 2013 U.S. Dist. LEXIS 42725, at *21-*22 (N.D. Cal. Mar. 25, 2013).

Arm's-length negotiations are necessary, to be sure, but hardly sufficient. For example, *Reynolds v. Beneficial Nat'l Bank* expressly concedes that "there is no proof that the settlement was actually collusive," but rejected it as objectively unreasonable. 288 F. 3d 277, 283 (7th Cir. 2002). And the opinion in *Eubank*, while highly critical of a "scandalous" settlement, never once refers to "collusion." The question here is one of the objective terms of the settlement, not of the subjective motivations of the settling parties. And this settlement does not pass objective muster.

We hope the Court here will resolve that confusion in its opinion by reiterating that the problem of class-action settlement conflicts of interest does not just consist of "collusion," but one of self-dealing in the allocation of settlement proceeds. The district court committed an error of law in ending its inquiry once it found there was no conspiracy. A8-A10.

## B.     The actual recovery matters.

Plaintiffs, citing *Americana Art China*, argue that a fee award calculation must be made *ex ante*, without the 20/20 hindsight of the amount of actual claims, and that therefore the actual claims rate is irrelevant. PB15. The characterization is frivolous and

exactly the opposite of *Americana Art China*'s holding. "To our knowledge, we have never forbidden district courts from considering the outcome when engaging in a simulated *ex ante* analysis." 743 F.3d at 247. Plaintiffs' argument that they should not be "penalized" for the low claims rate (PB35) thus ignores their own cited case, as well as the simple facts that paying clients acting *ex ante* would want to incentivize class counsel not to make the claims process too burdensome.

Appellees repeatedly refer to this as an "uncapped" settlement, and argue that the hypothetical millions made available to the class demonstrates Rule 23(e) settlement fairness, even if the settlement is structured so those millions are not actually collected by anyone and never leave the defendant's coffers.

Appellees suggest no limiting principle for this methodology. If there were only a single $3 claim made, would the settlement be fair and justify a $4.5 million Rule 23(h) award? As Frank demonstrated in his opening brief, appellees' proposed methodology not only yields absurd results, but creates perverse incentives for class counsel to create illusory relief in lieu of actual class recovery. OB28-OB30. Appellees do not dispute either argument.

Nor do they address the underlying law that hypothetical benefits are not actual class benefits and that a settlement should be valued for what it actually delivers to the class. OB23-OB24. Neither set of appellees mentions, much less distinguishes, *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163 (3d Cir. 2013) or *Dry Max Pampers*, much less the literature cited by Frank.

Plaintiffs would have this Court extend *Boeing v. Van Gemert*, 444 U.S. 472 (1980), to situations involving constructive common-funds and disputed settlement approvals.

PB12-PB14. They fail to acknowledge the change in the law of Rule 23(h), the difference between a fee award and a fairness determination, or the absurd results created by their proposed stretch of *Boeing*. OB24-OB27. Plaintiffs attempt to claim *Strong v. Bellsouth Tel. Inc.*, 137 F.3d 844 (5th Cir. 1998), does not apply because the *Strong* "settlement provided Class members with coupons or certificates." PB14. That is a wild misreading of *Strong*, where the settlement was structured exactly like that here: a claims process where class members could receive refunds. 137 F.3d at 847. (Indeed, *Strong*'s settlement was superior to the one here, because a claim would result in a direct credit, rather than requiring the intermediate step of making a trip to the bank to deposit a $3 or $9 check.) *Strong* noted that a claims-made settlement where the defendant was not liable for any claims not made was *like* "coupons or certificates," in that the relief was similarly illusory, but nothing in its reasoning turned on it being a coupon settlement. 137 F.3d at 852. *Strong* is directly on point, and *Boeing* does not apply here. OB27-28.[5]

---

[5] Plaintiffs mysteriously rely upon *Mars Steel v. Continental Ill. Nat'l Bank & Trust*, 834 F.2d 677 (7th Cir. 1987), to argue that *Boeing* applies. PB13. *Mars Steel* (where the fees were $305,000) does not mention *Boeing* once and actually supports Frank's argument. Competing class counsel in *Mars Steel* objected and appealed, improbably claiming that settling class counsel sold out the class in litigation worth in the billion-dollar range at trial, and that a reverse auction resulted in an inferior settlement. *Id.* at 682. This Court noted that the underlying litigation's chances of success were "very dim" because of the lack of any evidence of violations of law. *Id.* at 682-83. *Mars Steel* emphasized its valuation was a rough estimate for purposes of disposing of the appeal; because "the record does not contain the necessary data for estimating the *actual value* to the class of either settlement," it could not say that one proposed competing class action settlement was superior to another. *Id.* at 680 (emphasis added); *id.* at 682 (noting that actual settlement value might be more than $11.5 million). Nothing turned on the specifics of *Mars Steel's* back-of-the-envelope estimate, and *Mars Steel* neither held that

The Seventh Circuit now explicitly agrees that actual value matters more to the fairness determination than hypothetical maximum redemption value. In *Eubank*, the parties estimated, complete with an expert report, that it would be possible for class members to make $90 million in claims, and the district court adopted that finding in computing the settlement value and holding the settlement fair. 2014 U.S. App. LEXIS 10332 at *15-*16. This Court reversed. There were only twelve thousand claims *actually* made on the defendant, and those claims were not likely to collect more than $8.5 million given the limitations on the claims process. *Id.* at *25-*27. It is that latter number that led *Eubank* to determine the settlement one-sided relative to the substantial attorneys' fees. The disproportion is even worse here.[6]

1.      **Appellees' after-the-fact claims of surprise by low claims rate, however, is irrelevant even in the unlikely event that it is true.**

Long before appellees grudgingly disclosed the number of claims, Frank objected that the claims rate was doomed to be low. Appellees assert for the first time on appeal that they were surprised by the low claims rate, and that they thought that millions would be collected. DB22; PB15-16; PB22-23. There is no evidence in the record for this proposition, but even if they had not waived this factual dispute, such self-serving subjective crocodile tears should not be credited.

---

actual value did not matter nor that one must use the maximum possible value in calculating settlement benefit. Frank's allocation argument simply wasn't at issue.

[6] *Eubank* also refutes plaintiffs' argument (PB29) that one cannot consider actual value outside of a coupon settlement. *See also Baby Prods.*, 708 F.3d 163.

The objectors correctly predicted that the claims rate would be low. A14; A126-A128; A163. Federal courts, including the district court here and this Court, have long recognized that claims rates in small-sums claims-made cases are low. A14 (citing cases); A11 (citing study); *Eubank*, 2014 U.S. App. LEXIS 10332 at *24-*25; *Murray v. GMAC Mortg.*, 434 F.3d 948, 952 (7th Cir. 2006). Class counsel here, Elaine Ryan and Patricia Syverson, have been involved in at least one settlement where the claims rates were similarly low, and likely more. *E.g.*, *In re Hydroxycut Mktg. and Sales Practices Litig.*, 2013 U.S. Dist. LEXIS 165225 at *64 (S.D. Cal. 2013) (48,000 claims after notice sent to millions). (Alas, courts rarely make class counsel disclose claims rates, in part because class counsels systematically schedule fairness hearings so that the claims rate is not yet known. OB30. We strongly suspect that the final claims rate in several other settlements of these class counsel is similarly sub-1%.) Experienced settlement administrators would have been happy to explain that it was substantially more likely than not that the claims rate in a claims-made settlement would be under 1%. Daniel Fisher, *Odds Of A Payoff In Consumer Class Action? Less Than A Straight Flush*, Forbes.com (May 8, 2014) (citing class-action settlement administrator declaration that median response rate in claims-made consumer class action settlements is 0.023%).[7]

---

[7] That declaration was filed in a similar claims-made settlement, except the class counsel there argues that a sub-1% claims rate is a spectacular result for the class. It was the first time that the plaintiffs' bar opened the kimono on this issue, having previously denied that claims-made settlements regularly failed to compensate class members. As noted, most district courts fail to inquire into actual claims rates, and courts have only recently begun to become aware of the abuses this creates in claims-made settlements. *Cf.* Alison Frankel, *A smoking gun in debate over consumer class actions?*, Reuters.com

Rexall's counterexamples of high claims rates in claims-made settlements (DB22-DB23) are inapposite. For example, *Skechers* involved expensive shoes that class members would remember purchasing and made $80/pair available to class members; the *Desai v. ADT* notice offered up to $500 to class members (reduced *pro rata* to $47.27);[8] and *Airborne* claims averaged over $50. Such settlements are not analogous to purchases of generic supplements over an eight-year class period where the settlement offers a base sum of $3 before augmentation. Larger settlement offers mean larger claims rates. Tiffaney Janowicz *et al.*, *Settlement Administration: Impacting Claims Filing Rates* 24 (Feb. 18, 2014) (claims rates much lower for low-value settlements). Further, this settlement precluded media statements, further depressing claims compared to, say, the widely publicized *Skechers*. A73. The claims process in *Fogel v. Farmers* could not be more different than this one. *Fogel*'s settlement notice provided pre-filled-out "personalized Proofs of Claim" to class members, and then provided a second (and sometimes third) round of notice through postcard reminders, and the average claim was for over $58; *Dell* sent an individualized "Notice Package" that included a claim form. SA134-SA135; SA139; *cf.* Janowicz, *supra* ("pre-populated claim forms" with address, account, and proposed award information substantially increase claims rates). Here, most class members were not given personalized notice, much less "personalized Proofs of Claim"

---

(May 9, 2014); *e.g.*, *Baby Prods.*, 708 F.3d at 174-75 (holding reversible error such failure by district court) ($35M settlement fund, less than $3M claimed by class).

[8] *See* http://robocallsettlement.com/FileDownload.aspx?FileID=2089 (last accessed June 27, 2014). There were 136,440 claims for "50 million attempted telemarketing calls"—the same under-0.3% claims rate as here. SA115-SA116; SA122.

or second reminders. Those who did get individualized notice got a postcard that (a) merely stated they "may be part of a class action settlement" rather than that the parties knew that the recipient purchased a Covered Product from Vitamin World; (b) told them nothing about the size of potential claims or what proof they would need to make the claim; and (c) led them to an intimidating website claims form that would have deterred claims from anyone not experienced in class-action notice vagaries or obsessive-compulsive about retaining years-old Vitamin World receipts. SA31; SA14-15; A143; DB6-7.[9] Appellees' assertions that "There is nothing to distinguish the structure of this settlement from other cases resulting in claim rates in the 5% to 15% range" (DB22) and that the process was "designed to achieve the highest legitimate claims rate possible" (PB16) is naïve at best, and expressly contradicted by the claim process in *Fogel*—the unreported state-court case appellees self-selected for their supplemental appendix.

One notes that the appellees were not so surprised by the claims rate that they bothered to tell the Court that the claims rate was unexpectedly low; nor did they ask for additional attempts to distribute money to the class; nor were they so unaware of the possibility that they did not negotiate a contingency *cy pres* provision. Settlement ¶ 17.d (A60-A61). The record shows that, rather, appellees argued that the claims rate

---

[9] Rexall asserts that Frank waived this argument (DB39), but it's right there in his district-court declaration; Frank's counsel also protested at the fairness hearing and in briefing that the claims process delivered less money than it could have, and that claims would be low. A143; A163; A126-A128. Rexall cannot contract for a burdensome objection process that requires a "signed declaration" to object (A65) and then complain that factual argument was included in the required declaration.

did not matter (Dkt. 113 at 8 (R1456)), a position they continue to take on appeal. PB12-PB15; DB22-DB23. Moreover, the appellees did their best to hide the actual claims rate from the district court by originally arranging the scheduling the fairness hearing before the end of the claims process. A188; A196; *cf. Eubank*, 2014 U.S. App. LEXIS 10332 at *17. These are not the actions of settling parties who anticipate having a claims rate to be proud of. Given that the settling parties take the position that it is legally irrelevant whether class members actually collect anything from a settlement, it is hardly unexpected that the settling parties negotiated a settlement where class members did not actually collect very much.

Too, if class counsel was really surprised by the claims rate after agreeing to the intimidating claims process here, especially after their prior experience with low claims rates in claims-made settlements, it calls into question their Rule 23(g) adequacy.

In any event, class members cannot cash good intentions, even if class counsel's newly-stated protestations of surprise and undue optimism are true. In dozens of class-action settlement objections, we have yet to see class counsel mistakenly publicly underestimate class recovery in a claims-made settlement. Class counsel has a "responsibility to seek an award that prioritizes direct benefit to the class." *Baby Prods.*, 708 F.3d at 178. Courts will have no way of determining whether surprise is genuine; class counsel will have no incentive not to exaggerate their optimism. If class counsel can escape their responsibility to the class simply by feigning surprise at the poor results of their negotiations, class counsel will have little incentive to structure a settlement the right way in the first place. But when courts reject or threaten to reject settlements that have only illusory claims-made relief, settling parties magically

discover settlement structures that actually deliver money to class members. OB42 (citing cases); *see also In re Classmates.com*, 2012 U.S. Dist. LEXIS 83480 at *4, *13 (W.D. Wash. Jun. 15, 2012) (going from claims-made settlement that would have paid "less than $60,000" to over $2.5 million in actual payments to class).

Appellees have waived the implausible factual argument that they did not expect low claims rates, but such an argument should be legally irrelevant in any event. Any reasonable attorney would expect a low claims rate in this claims-made settlement. Frank's objection did not just make a lucky guess.

### 2. The $1.5 million paid to third parties for notice is not a class benefit.

Frank argued that crediting notice as a class benefit skews incentives and creates absurd results. OB31-OB33. For example, if notice were a class benefit, settling parties concerned about a possibly disproportionate settlement structure could "cure" the settlement by purchasing Super Bowl advertising or hiring a Kardashian to be a celebrity spokesperson.

Plaintiffs respond in a footnote by asserting that there is "well established case law" supporting their position, but provide no rebuttal to Frank's public-policy argument, or alternative public policy grounds to support their position. Frank stands by his argument and his reading of *In re Aqua Dots Prods. Liab. Litig.*, 654 F.3d 748 (7th Cir. 2011).

For that matter, Plaintiffs' single cite (PB30 n.12), *In re Kentucky Grilled Chicken*, 280 F.R.D. 364 (N.D. Ill. 2011), is not even a precedential opinion, but a brief filed by a party, and was pulled from the published West reporter. To the extent plaintiffs are

seeking to incorporate in a footnote another party's brief to exceed their word limits, this should be forbidden. But even addressing plaintiffs' implicit argument that notice and administration costs are a benefit because they are a necessary prerequisite to class recovery, that argument results in double-counting. If notice is efficacious, then the class will recover more, and the settlement will be worth more. There will be no incentive to underspend on notice and administration, as opposed to the incentive to overspend if class counsel receives an effective commission on the proceeds.

It is error to attribute benefit to notice expenses.

## C. The district court correctly concluded that plaintiffs failed to prove the injunctive relief compensated the certified class for their injury.

Let us start with the truism that an injunction for an injunction's sake is not enough to support a settlement or attorney's fees. If any old injunction would do, class counsel could settle class litigation by requiring a defendant's CEO to write "I will not defraud the class" on a chalkboard 100 times and present a bill for lodestar with multiplier. Before one credits an injunction with being a settlement benefit, one must prove that the injunction is actually *beneficial*. That burden of demonstrating settlement fairness rests with the moving parties. *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1126 n.30 (7th Cir. 1979); *Dry Max Pampers*, 724 F.3d at 718-19 (compiling cases and authorities); AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 3.05(c) (2010) ("*ALI Principles*"). Thus, for example, an injunction that merely has the defendant continue an existing practice is not a class benefit. *E.g., ALI Principles* § 3.13 Illustration 2 (2010); *Dry Max Pampers*, 724 F.3d at 719-21. An injunction

that does not provide "actual value to the class" is not a benefit. *Bluetooth*, 654 F.3d at 944 (citing Fed. R. Civ. P. 23(h), 2003 Advisory Comm. Notes and cases).

On the record below, the injunction plaintiffs trumpet is as illusory as the supposed $14.2 million "available" to the class.

The settlement included an injunction that required Rexall to tweak its label in minor ways. Rexall had to add "Individual results may vary" to existing legally-required disclaimers on bottles that did not already have that language. *Compare* Dkt. 64 at ¶ 30 (R395), *with* A88. Rexall could no longer use the challenged verbs "renew" or "rebuild" or "repair." A88. But the injunction gave Rexall a safe harbor for immaterially different verbs such as "support" and "protect" and verb-nouns like "nourishment." *Id.* Moreover, Rexall could continue to use phrases like "help maintain the structural integrity of joints," "maintain healthy connective tissue," "maintain joint comfort," and "support mobility" that plaintiffs had challenged as misleading. *Compare* Dkt. 64 at ¶ 2 (R387), *with* A88.

Plaintiffs presented no evidence that these changes were material to consumers. They presented no evidence that the removed language was more scientifically "untrue" than the retained language. They presented no evidence that consumers were more harmed (or even harmed at all) by one set of language over another. They presented no evidence that the required additional disclaimer (to the extent it was actually additional) made a whit of difference, much less a positive difference, on what was already a wordy label. *Cf. Robinson v. McNeil Consumer Healthcare,* 615 F.3d 861, 869-70 (7th Cir. 2010) (additional labeling can be counterproductive; citing literature). The district court was thus skeptical that the injunctive relief was "significant." A181.

Plaintiffs instead rely upon an economist's expert report (SA86-SA105) that relies on faulty premises and reasoning and was, until this appeal (when only the text, but not the sealed exhibits, were sent to Frank), undisclosed to unnamed class members by virtue of it being kept under seal. OB10. Because it was not made available to the class, it would have violated Rule 23(h)(1)'s notice requirements for the district court to rely upon the sealed reasoning. But even on its face, the expert report does not legitimately support the claims made by plaintiffs. Because settling parties have the burden of proving settlement value, and plaintiffs did not meet their burden, the district court did not err in finding no value to the settlement's injunctive relief.

This is not just true as a matter of fact, but also true as a matter of law. Prospective injunctive relief for future sales is not benefit to a class defined as those allegedly injured by past sales. *Synfuel Techs. v. DHL Express (USA)*, 463 F.3d 646, 654 (7th Cir. 2006); *Dry Max Pampers*, 724 F.3d at 720.

The district court did not err in refusing to attribute value to the injunctive relief in the absence of better evidence; it would have been reversible error to do otherwise. As the district court's comments in the fairness hearing showed, the district court was generous in denying plaintiffs' motion without prejudice and permitting them to submit new evidence down the line, rather than simply holding that they had not proved any value to the injunctive relief. A173-A174; A181-A183. This is an opportunity that plaintiffs have not yet waived, and which thus deprives their cross-appeal of jurisdiction.

1.    **When there is a single settlement class alleging past injury, class counsel's fiduciary duty is to maximize recovery for that class, rather than split settlement benefit with an uncertified class of future purchasers.**

"The fairness of the settlement must be evaluated primarily based on how it compensates class members for these past injuries." *Synfuel*, 463 F.3d at 654. As the district court correctly found, prospective injunctive relief does not compensate class members for past injuries.

Two hypothetical settlements demonstrate the problem with attributing prospective injunctive relief in a misrepresentation case to be a benefit to the class. Imagine the hypothetical consumer-fraud class action *Seinfeld v. Kramer* where a class sues a shop selling "non-fat yogurt" that turns out to be full of fat. *Cf.* Larry David, "The Non-Fat Yogurt," *Seinfeld* (NBC, Nov. 4, 1993). If the parties settled for injunctive relief where the defendant agreed to correctly label their full-fat yogurt in the future, that would be of no benefit to the class for their *previous* injuries—even if, as here, there happened to be some overlap between the class members and the set of people who purchased non-fat yogurt in the future. The class members only benefit to the extent they make additional purchases from the defendant, but that benefit is offset by the market price they pay for those new purchases. Any reduction in price reflects the fact that consumers have less demand for the relabeled product, and is not necessarily a gain in consumer surplus.

Another example: imagine the hypothetical consumer fraud class action *Gatsby v. West Egg*, where the class sues West Egg for selling packages of a dozen eggs that only have ten eggs in them. If the parties settled with injunctive relief that required West Egg

to include at least fifteen eggs in every "dozen eggs" package, that again provides no benefit to the class for their *previous* injuries, even if, once again, there happened to be some overlap between the class members and the set of people who purchased West Eggs in the future. The lack of benefit becomes even more apparent if West raises its price for a "dozen" eggs from $1.20 to $1.80. Future purchasers are not getting free eggs.

"Relief" granted to a set of future consumers is inherently incapable of compensating for injuries suffered by the putative clients—the class that allegedly suffered past injury. Under Rule 23(a)(4), private class counsel are to represent a *class*, and put their clients' interests first, not to act as *parens patriae* for the public to restructure future economic transactions affecting non-class-members in their view of the public interest. *Cf. Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468 (5th Cir. 2011) (*cy pres* in public interest impermissible where settlement money can be distributed to class members with unsatisfied claims). A decision of class counsel to negotiate prospective relief that will affect only an indeterminate subset of the class at the expense of retrospective relief for the entire class arguably creates an intra-class conflict that requires separate representation under Rule 23(a)(4). *Cf. Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-27 (1997).

Plaintiffs argue that state laws permitting class actions to disregard class interests and pursue injunctive relief for future consumers at the expense of recovery for past consumers overrides that fiduciary duty to the class. PB25-PB27. Even if that were universally true under all fifty states' laws (Frank is not a citizen of the states cited by plaintiffs, and *cf. also Szabo v. Bridgeport Mach., Inc.*, 249 F.3d 672 (2001)), *Erie* federalism principles do not save their position. Federal courts are required to follow Fed. R. Civ.

Proc. 23(a), (e), and (h), regardless of whether the application of federal procedural rules has the effect of expanding or contracting the rights of class members and defendants bargained for by state legislators. *Shady Grove Orthopedic Associates v. Allstate Ins.*, 130 S. Ct. 1431 (2010).

Plaintiffs argue that "requiring truth" is a sufficient benefit. PB21; PB30. As discussed in Section I.C.3 below, plaintiffs have not shown that they vindicated that principle with this settlement. And nothing Frank argues contradicts plaintiffs' cited case, *FTC v. OT Inc.*, 512 F.3d 858 (7th Cir. 2008). As the case's caption indicates, it is not a class action, but a government enforcement action. The government is acting *parens patriae*, and does not have a fiduciary responsibility to a class with its own selfish interests that may not coincide with the general public. If private class-action attorneys were actually authorized to act as private attorneys general in the public interest with disregard to their putative class-member clients, there would be no need for class representatives to meet Rule 23(a) standards or even Article III standing requirements. As the Supreme Court has repeatedly made clear, the procedural tail of the class action device cannot be made to wave the substantive dog: at the end of the day, class actions are about joinder, and one cannot simply ignore the clients' interests to pursue the attorney's preferred regulatory agenda.

Plaintiffs trumpet the fact that Rexall had an incentive to maintain labeling changes beyond the thirty-month minimum to avoid suit (PB21 n.6), but this cuts in the opposite direction. No injunction was needed to accomplish this result. The fact alone that Rexall settled rather than seek imprimatur for its labeling through judicial victory meant that it would engage in labeling changes to avoid future suits on the same issue,

rather than repeatedly letting itself be sued and paying attorneys to settle. In reality, the injunction is for **Rexall's** benefit, by establishing a label that consumers would not be allowed to challenge. Such regulation through litigation may provide Rexall certainty, but it is poor public policy in the best of circumstances. As we see here, class counsel seeks to use any injunction to rationalize huge fees for itself, regardless of whether the injunction has real material benefit to the marketplace, much less is a net positive to the class. If class counsel can profit mightily with a meaningless injunction that establishes the illusion of "relief," it creates perverse incentives to both bring meritless lawsuits that are resolved with Danegeld and labeling tweaks[10] and to settle meritorious lawsuits in ways that permit defendants to engage in future misleading communications.

The district court was thus correct as a matter of law in following *Synfuel*.[11]

---

[10] For example, a class action over Nutella paid attorneys millions for changing the phrase "An example of a tasty yet balanced breakfast" to "Turn a balanced breakfast into a tasty one." Ted Frank, "Nutella class action settlement far worse than being reported," PointOfLaw.com blog (May 14, 2012). *Robert F. Booth Trust v. Crowley* presents another example of illusory injunctive relief as a scaffold for fees. 687 F.3d 314 (7th Cir. 2011).

[11] Frank is not arguing that a class settlement may never have injunctive relief. For example, a 23(b)(2) civil rights claim may seek to change the future behavior of a governmental body or an employer with respect to the class. A settlement might provide retrospective injunctive relief that repairs or replaces a defective product. Or one could bring a class action with a class of current and future consumers that is either separately represented or does not waive damages claims. But that is not what happened here.

Plaintiffs' claim that Frank's "clear purpose" is trying to "eradicate class actions" (PB34 n.13) contradicts the record. A144-A145. Rexall complains that Frank gave Congressional testimony mentioning American exceptionalism in class actions (DB8

## 2. The expert report is inadmissible.

Plaintiffs protest that the district court erred by refusing to credit the Reutter Report. PB29-PB32. But the district court was correct to do so, because the Reutter Report was inadmissible under both *Daubert* and Rule 23(h)(1).

In any event, the Reutter Report suffers from sufficient weaknesses that the district court did not commit reversible error in giving it no weight, as it was entitled to do. *Cf., e.g., Marseilles Hydro Power*, 518 F.3d at 467 ("harmless error" to mistakenly "exclude" expert report in bench trial when court could have "weighed it lightly").

### i. The district court did not abuse its discretion in refusing to credit a junk economic report.

In 2002, Rexall commissioned marketing studies on the effect of restaging its product with different labeling. Those studies predicted that the restaging would have positive price and volume effects for Rexall.

The Reutter report assumes that these 2002 predictions came true. SA88-SA89. This might be a fair assumption in 2003, but in 2013, no reasonable economic expert would premise economic effects on 2002 predictions rather than on 2001-2012 actual data. Did the marketing experts accurately predict a supercompetitive shift in the

---

n.5), but does not identify one thing said in that testimony (or in any of Frank's years of writings and public appearances) that is either incorrect or inconsistent with what this Court has said in cases like *Eubank, Thorogood*, or *Matter of Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293 (7th Cir. 1995). *Ad hominem* should be irrelevant to the merits, but if it matters that one co-appellant's attorney Darrell Palmer has previously been sanctioned (DB9 n.9), Frank suggests his track record of appellate success in class-action settlement cases cuts in his appeal's favor. *Cf. also Eubank*, 2014 U.S. App. LEXIS at *9 (extolling benefits of objectors). Appellees identify nothing improper with Palmer's filings in this case.

marketplace, or was Rexall's newfound advantage competed away over the next ten years by other glucosamine products making identical claims—or never realized? No evidence was presented on this question—but we can infer what the unused data said by the fact plaintiffs chose to have the expert rely upon 2002 predictions, but not 2001-2012 data.[12]

The Reutter report then assumes that the injunction has the effect of completely undoing the restaging proposed by the 2002 marketing studies. SA91-SA92. But there is no basis for this assumption. Neither Reutter nor the marketing experts he relied upon compared the 2002 labels to the settlement's safe-harbor labels. There is no basis to assume that Rexall's 2002 "restaging" was undone by the immaterial changes to the label. There is no evidence in the report or the record that a consumer who purchases glucosamine because he believes it rebuilds cartilage is going to stop because the label now only promises "nourishment" and "support" and "building blocks," especially in the absence of corrective disclosures.

The Reutter report then assumes that the cost to Rexall—assumed to be equal to the opposite of the 2002 predictions on sales and price—is equal to the benefit to consumers. SA91-SA94. This assumes that consumers will, in the face of a labeling change claimed to be material, not substitute to a different brand that has a different

---

[12] Indeed, the 2002 studies are so stale that one wonders how they could conceivably have the economic value to be a trade secret meriting sealing and nondisclosure, especially when plaintiffs demand courts rely upon them. *Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 547 (7th Cir. 2002); *Union Oil Co. v. Leavell*, 220 F.3d 562, 567 (7th Cir. 2000).

label—an assumption that directly contradicts the first assumption that the 2002 marketing study accurately predicted increased sales.  (The fact that a sealed percentage *R* of Rexall customers are repeat purchasers of bottles with the same label (SA92) does not prove that loyalty continues with a label change, especially when plaintiffs contend that the label change affects demand.) Reutter further assumes that generic purchasers are as brand-loyal as brand-name purchasers and specifically seek out one of the dozens of generic brands of Rexall glucosamine, rather than just "a bottle of glucosamine." SA93. If this is true, it is a stunning and innovative development in marketing theory.

Reutter then goes on to make a math error. He takes data showing that *R* percent of Rexall consumers purchase product in more than one year, and concludes that *R* percent of Rexall sales are repeat purchases. SA92. That is a *non sequitur*, even before considering the possibility that "purchase product in more than one year" might mean something like "2006 and 2010."

Finally, as noted above, a reduction in price caused by a leftward shift in consumers' demand curve does not necessarily create an increase in consumer surplus unless supply is substantially more inelastic than demand—as shown by Reutter's own supporting chart, though not his conclusions. SA105.

Garbage in, garbage out. When an expert's methodology is internally inconsistent and based on faulty premises and then faulty reasoning, it does not meet evidentiary standards. There "is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Such a flimsy economic model would not pass muster in peer-reviewed economic literature, and, after *Daubert* and *Kumho Tire*, it does not pass muster in federal court, either. *Daubert v.*

*Merrell Dow Pharm.*, 509 U.S. 579 (1993); *Kumho Tire v. Carmichael*, 526 U.S. 137 (1999). "Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993).

Plaintiffs argue that because fees should be determined in an *ex ante* way, that means that it is error to require an economic expert to perform an *ex post* analysis (PB32), but that is a *non sequitur.* This Court requires *ex ante* analysis to approximate market mechanisms for compensating attorneys; it does not ask for *ex ante* analysis out of a preference for *ex ante* review of data to ignore what has actually happened in the marketplace. *See also* Notes of Advisory Committee on 2003 Amendments to Rule 23 (endorsing deferring "some portion of fee award" until actual benefit to class is known).

The district court did not abuse its discretion in refusing to credit the Reutter Report. It would have been an abuse of discretion to do otherwise.

### ii.    The expert report violated Rule 23(h)(1)'s notice requirement.

The substance and methodology of the report was redacted as under seal, and left undisclosed to absent class members, who had no way to access it. Motions for attorneys' fees must be "directed to class members in a reasonable manner." Fed. R. Civ. Proc. 23(h)(1). This means giving class members an opportunity to object to and respond to a motion and its supporting materials. *See In re Mercury Interactive Sec. Litig.*, 618 F.3d 988, 993-95 (9th Cir. 2010). This cannot be done when it is never disclosed to class members. When class counsel argues for the fairness of a settlement waiving the rights of millions of class members and for a fee five times what the class receives, it must do so with information that it makes public in time for the class to respond. It

would have been legal error for the district court to rely upon material that was never "directed to class members in a reasonable manner."

At a minimum, if the cross-appeal merits remand, Frank must be given a fair opportunity to respond to the expert report in district court, as he was unfairly prejudiced by its redaction and the district court's failure to unseal the document.

### 3.   There was not even evidence that the labeling change was a net benefit to the class.

Plaintiffs attempt to distinguish *Synfuel* by saying that that "settlement did not require the defendant to completely discontinue the offending conduct, unlike here, where Rexall is prohibited from making the false representations at issue." PB25 n.8. Not true, as the chart in the Counter-Statement of Facts above shows. Many representations challenged by plaintiffs' complaint remain on the label; other representations are simply reworded with similar verbs and nouns. Is the new label more or less misleading than the pre-settlement label? There is simply no evidence on this question, either as a matter of empirical medical data or as a matter of consumer surveys or marketing. While "a high percentage of Osteo Bi-Flex purchasers responded that the 'renews and rebuilds' cartilage representations are important to their purchasing decisions" (SA143), there is no data in the record whether the replacement synonyms would change the purchasing decisions. There is no data in the record whether the additional disclaimer added to some labels is material at the margin. Meanwhile, class members lose the right to challenge any elements of the label. There is

not even any evidence that the settlement "prevents" any more "fraud" than was allegedly occurring before the litigation was brought.

So even if class counsel could take credit for socially beneficial injunctive relief at the expense of the class's right to monetary relief, notwithstanding *Synfuel* and Rule 23(a)(4), there was no evidence of such benefit here.

**D.    In the alternative, the settlement is unfair because the claims process precluded the distribution of over $12 million to the class.**

If the parties are going to get away with claiming that this is a settlement "worth" $14.2 million of cash recovery to the class, then the claims process was inherently unfair because it throttled claims instead of simply writing $3 checks. Rexall claims Frank waived this issue because he supposedly asked "only that the court should ask '[t]he parties [ ] to justify why they are not remitting relief on those purchases directly.'" DB30. Rexall's waiver argument slices semantics a bit more finely than this Court is wont to do. *E.g.*, *Dixon v. ATI Ladish LLC*, 667 F.3d 891, 895 (7th Cir. 2012); *Bew v. City of Chicago*, 252 F.3d 891, 895-96 (7th Cir. 2001). Below, Frank repeatedly argued that the settlement was unfair because it was structured as a claims-made settlement to produce little actual relief to ascertainable class members while paying attorneys and third parties a disproportionate amount and to hide this fact from the district court; and further specifically complained that the claims process was intimidating, though it was feasible to directly pay class members. A122-A128; A133-A135; A143. There is no waiver.

Rexall argues that it is possible to have a claims-made settlement. DB32-DB35. But Frank does not dispute this; he merely argues that Rexall cannot have it both ways. Rexall can say (correctly, Frank thinks) that a claims-made settlement is permissible— but then Rexall must live with the legal consequences of a settlement that would actually pay the class less than $0.9 million and the attorneys much more than that. But if Rexall prevails on their argument that the settlement is not disproportionate because it made $14.2 million "available," then the fact that Rexall chose to structure the settlement so they kept most of that money instead of giving it to the class makes the settlement unfair.

### E.     A low number of objections does not imply fairness.

Plaintiffs resort to the low number of objections as evidence of fairness. PB16 n.5. This is hardly probative: *all* consumer class action settlements have a low number of objections and opt-outs. *Eubank*, 2014 U.S. App. LEXIS 10332 at *32; Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class Action Settlements*, 59 FLA. L. REV. 71, 73 (2007); *see also GMC Pick-Up Trucks*, 55 F.3d at 812-13. There is no reason to treat the failure of class members to hire counsel and rise up in objection as indicative of anything other than the high transaction costs of objecting and slim stakes each class member has in the proceeding. *Cf. Dry Max Pampers*, 724 F.3d at 716-17 (reversing approval of abusive settlement though only three objectors and single appellant).

II.    **The reversion of over $2.5 million in a segregated clear-sailing fund to defendants because of an excessive fee request makes this settlement *per se* unfair.**

Since Frank filed his opening brief asking for reversal on this independent ground, *Eubank* correctly noted that it is "questionable" when fees are structured in a separate fund that reverts to the defendant, implying it error for a "judge [to] refuse[] to delete." 2014 U.S. App. LEXIS 10332 at *17; *id.* at *33 (citing *Bluetooth*, 654 F.3d at 946-47). *Eubank* also implicitly criticized the same "clear sailing" clause Frank does by citing precedent on subject. *Compare Eubank*, 2014 U.S. App. LEXIS 10332 at *33 (citing *Bluetooth* and *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518 (1st Cir. 1991)) *with* OB35 (same).

Rexall claims this argument is waived. DB27-DB30. This is wrong. A139-40 (arguing settlement must be rejected because kicker deprives class of overage of excessive fees). Furthermore, Frank specifically objected to the reversion provision citing the leading case, *Bluetooth*, and the leading academic authorities. A132-A133. For example, Professor Lester Brickman deems such provisions *per se* unethical precisely because of the possibility of reversion to the defendant. LAWYER BARONS 522-25 (2011). "A litigant does not forfeit a position just by neglecting to cite its best authority…" *Dixon*, 667 F.3d at 895. If that is true when a litigant neglects to cite its best authority, it is surely true when the litigant *does* cite the best authorities.

Rexall simultaneously complains that Frank did not ask the district court to restructure the settlement to return $2.5 million to the class and that district courts have no authority to rewrite settlements without the agreement of the parties. DB28. Both complaints are true—but the two arguments neutralize each other, because Frank had

no obligation to ask a district court to do something it was without power to do to preserve the issue. Frank's position both here and below is that when a district court is choosing between its only two options of thumbs-up or thumbs-down on a settlement with a kicker that returns cash to the defendant, it must reject the settlement. OB35-37; A132-A133. Here, the district court allowed the settling parties to tie its hands through the fee segregation. It thus committed reversible error.

### III. The district court's approval of a settlement that favored *cy pres* over class compensation was reversible error.

On appeal, Frank raises the purely legal question of whether parties can choose to pay third-party charities instead of identifiable class members that can be compensated. OB38-OB43.

Again, Rexall asks this Court to find waiver (DB39), even though, again, Frank referred the district court to precisely the authority he relies upon here, and argued that

> "[t]he settlement-fund proceeds, having been generated by the value of the class members' claims, belong solely to class members" [and] not to class counsel or third-party cy pres beneficiaries. *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468 (5th Cir. 2011). [A128]

Frank further cited *Baby Prods.* for the proposition any *cy pres* should be small; here, it outstrips the amount to be paid to the class. A128. The discussion of waiver in Sections I.D and II above applies here; Frank preserved the issue. Furthermore, when an issue is purely legal, as it is here where Frank is asking for this Court to adopt the rule of *Klier* and *ALI Principles* § 3.07, this Court can review the resulting purely legal question, because "this question can be answered without resort to the special

factfinding competence of the trial court." *Bailey v. Int'l Bhd. of Boilermakers*, 175 F.3d 526, 529-30 (7th Cir. 1999). Because review here is plenary, and both sides have fully briefed the issue, there is no reason to deem the issue forfeited. *Compare Amcast Indus. Corp. v. Detrex Corp.*, 2 F.3d 746, 749-750 (7th Cir. 1993) *with Robinson v. Alter Barge Line, Inc.*, 513 F.3d 668, 674-675 (7th Cir. 2008); *cf. also McCutcheon v. FEC*, 134 S. Ct. 1434, 1447 n.4 (2014) (appellate court can resolve "purely legal" question not explored below).

The appellees rely on *Kore* to defend the *cy pres*, but Frank has already explained why that case does not help them. OB42-43; pages 16-17, above.

Rexall protests that they had no conflict of interest in this particular case, DB38-DB39, but Frank never argued otherwise. Frank merely noted that *cy pres* has strong potential for conflicts of interest, and that *Turza*'s and § 3.07's rule treating *cy pres* as a disfavored last resort was superior to courts regularly having to divine whether a particular *cy pres* settlement suffered from conflicts of interest. OB44-OB46. This case did present a breach of duty by class counsel, because they favored a third party over their own clients.

Rexall's argument that there would be unfairness in distributing to identifiable class members (DB28, DB34) neither addresses Frank's preemption of that argument (OB41) nor the obvious scenario where Rexall directly distributes to identifiable class members and has a claims-made process for the remaining 7 million class members. Why is a direct distribution to ascertainable class members any more unfair than providing individualized notice only to ascertainable class members? In both cases, the ascertainable class members are advantaged relative to the unknown class members;

there is no dispute that a class member who receives individualized notice is more likely to make a claim.

Rexall does correctly note (DB31 n.17) that Frank was imprecise in arguing (OB40) that the "settling parties knew which class members had purchased which Covered Products." But correcting that phrase to more accurately read "the settling parties knew ~~which~~ that millions of identifiable class members had purchased ~~which~~ Covered Products" changes the merits and reasoning of Frank's argument not a jot.

Rexall argues that a claims process was needed because some class members may not have been injured. DB33. This is an argument that class members are not similarly situated and have individualized claims, and not an argument that Rexall can make consistent with asking for affirmance of a class certification for purposes of settlement approval. Rexall is judicially estopped from arguing that the class is not uniform.

Rexall argues that additional compensation to the class would be a windfall by giving them more than the settlement agreed upon, but, aside from the fact that money could be distributed to tens of thousands of the millions of class members who did not successfully navigate the claims process, a windfall is not measured by the amount of compensation listed in the settlement. *Klier*, 658 F.3d at 479.

Neither appellee addresses *Baby Prods.* or *Klier*, much less gives a reason why this Court should create a circuit split with those decisions. Nor do they argue that § 3.07 is unsound, or even mention § 3.07. Appellees have waived any argument that this Court should not adopt a rule that precludes the *cy pres* scenario of this settlement.

**IV.**    **In the alternative, if the settlement approval is affirmed, the district court's refusal to grant the full $4.5 million fee request is not an abuse of discretion.**

Plaintiffs' cross-appeal is moot because settlement approval was reversible error, and there is no right to Rule 23(h) fees in the absence of an approved settlement. But in the event this Court affirms the settlement approval, it should not accept the cross-appeal's invitation to reverse the fee award. Frank has already addressed most of the cross-appeal's arguments above while arguing for his main appeal, but summarizes and supplements here.

*First*, as noted in the Jurisdictional Statement above, the interim fee award is not a final order, and there is no appellate jurisdiction on the cross-appeal in the absence of waiver of the right to renew the fee request.

*Second*, as discussed above in Section I.C, the district court did not err in refusing to hold the injunctive relief had positive value or to credit the Reutter Report. While plaintiffs argue that additional evidence would be *expensive* (though nowhere near as expensive as the $2.4 million they seek), they do not argue that it is impossible to make the case. It is certainly possible to make a prima facie case and determine whether Rexall revenues have declined because of price decreases and reduced sales. The district court's order, and its comments at the fairness hearing, suggests that it was skeptical that the injunctive relief would be "significant," which is why it asked for additional evidence. A20-A21; A173-A174; A181-A183.

*Third*, plaintiffs complain about the district court's comment that there was no Congressional basis for positively valuing the injunction. PB26; A21. The district court's statement about Congressional intent, while not artfully written, is best read as a

requirement that, in the absence of class counsel proving actual class benefit from an injunction, there must be statutory authority suggesting Congress was concerned about a particular consumer practice before claiming attorneys' fees. *E.g.*, 15 U.S.C. § 1693m(a)(2)(B)(ii); *cf.* 28 U.S.C. § 1711 note §2(a)(3) (criticizing settlements where "counsel are awarded large fees, while leaving class members with … awards of little or no value"). The district court's phrasing is simply a variation of the truism that an injunction is not a benefit *per se*—unless it provides actual benefit to the class or Congress deems otherwise because (say) it is especially concerned with ATM stickers. *Cf. Kore*, 731 F.3d at 674. Given the district court's other findings and the failure of plaintiffs to meet their burden of proof, this is at worst harmless error.

*Fourth,* plaintiffs argue that their ability to badger Rexall into agreeing to pay $4.5 million and obtain clear sailing means that the district court should award the full $4.5 million. PB36. This is highly ironic, given that Frank objects to the clear sailing and kicker (OB18-19; OB35-37; Section II above), and Rexall defends the fairness of the clause by pointing to the fact that the district court here did exercise scrutiny of a Rule 23(h) award even in the absence of defendant's adversarial presentation and that district courts have that general obligation. DB26. *Eubank* fatally undermines Rexall's defense of the red-flag provisions, but that does not save Plaintiffs' frivolous argument.

*Fifth*, plaintiffs argue the district court legally erred in failing to give them attorney-fee credit for the *cy pres*. PB24-25. Not so, *see Baby Prods.*, 708 F.3d at 178-79 (in court's discretion to discount value of *cy pres*). But, more importantly, the district court did not do what plaintiffs claimed it did: the district court gave plaintiffs full credit for the *cy pres* in its calculation of settlement value as over $20 million because it valued the

settlement at the "potential" of $14.2 million. OB43-44. Adding the $1.1 million of *cy pres* to that figure—paid only because there were not actually $14.2 million (or even $0.9 million) of claims would be double-counting.

Every other argument plaintiffs make for reversal rests on plaintiffs' fundamental misunderstanding of the posture and holdings of *Americana Art China*, which Frank has discussed earlier in this brief. In *American Art China*, class counsel appealed *ex parte* from a district court's Rule 23(h) award, seeking augmentation. 743 F.3d at 245. No class members objected on appeal to the attorney award; because of a clear-sailing clause, there was not even an appellee in *Americana Art China*. *Id.* This Court simply held that class counsel was lucky to get as much as they got. *Id.* at 247 (criticizing appeal); *id.* at 245-46 (noting appellant tried to dismiss appeal after oral argument). *Americana Art China* never held that every class counsel was entitled to a 1.5 multiplier (PB35), even if relief was meager. *Id.* at 245. (And plaintiffs again rely upon the non-opinion *Kentucky Grilled Chicken* in their brief. PB35 n.14; *see* Section I.B.2 above.)

Similarly, as noted in Section I.B above, Plaintiffs, citing *Americana Art China*, argue that a fee award calculation must be made *ex ante*, without the 20/20 hindsight of the amount of actual claims, and that therefore the actual claims rate is irrelevant. PB15. The characterization is frivolous and exactly the opposite of *Americana Art China*'s holding. "To our knowledge, we have never forbidden district courts from considering the outcome when engaging in a simulated *ex ante* analysis." 743 F.3d at 247. Plaintiffs' argument that they should not be "penalized" for the low claims rate (PB35) thus ignores their own cited case, as well as the simple facts that paying clients acting *ex ante*

would want to incentivize class counsel not to make the claims process too burdensome. Furthermore, "When the class attorneys succeed in reaping a golden harvest of fees in a case involving a relatively small recovery, the judicial system and the legal profession are disparaged." *Piambino v. Bailey*, 757 F.2d 1112, 1144 (11th Cir. 1985).

*Americana Art China* implied that the fee awarded in that case was too high and that the appeal was reflected ingratitude. It does not create a one-way ratchet where every other abusive settlement gets at least what the *Americana Art China* lawyers got. *Americana Art China* criticized class counsel brazen enough to seek augmentation of a seven-digit award when the settlement relief was so "meager." *Id.* at 245. That plaintiffs repeat that mistake here after receiving a $2.1 million lodestar while citing and relying upon *American Art China* beggars belief.

## Conclusion

For the several independent reasons identified above, this Court should vacate and reverse the settlement approval. If so, the cross-appeal is moot.

In the event that this Court affirms the settlement approval, it should either find that there was not reversible error in refusing to award the full $4.5 million sought by plaintiffs, or dismiss the cross-appeal for lack of jurisdiction.

Dated:  June 27, 2014

Respectfully submitted,

/s/ *Theodore H. Frank*

Theodore H. Frank

CENTER FOR CLASS ACTION FAIRNESS

1718 M Street NW, No. 236

Washington, DC 20036

Telephone:  (703) 203-3848

Email:  tfrank@gmail.com

*In pro per*

LAW OFFICES OF DARRELL PALMER PC

Joseph Darrell Palmer

603 North Highway 101, Suite A

Solara Beach, CA 92075

(858) 792-5600

*Attorney for Appellants McNeal and Paul*

**Certificate of Compliance**
**with Fed. R. App. 32(a)(7)(C)**

Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, Type Style Requirements, and Appendix Requirements:

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2)(A) because:

This brief contains 13,991 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 12-point Palatino font.

Executed on June 27, 2014.

> /s/ *Theodore H. Frank*
> Theodore H. Frank
> Center for Class Action Fairness
> 1718 M Street NW, No. 236
> Washington, DC 20036
> Telephone:  (703) 203-3848
> Email:  tfrank@gmail.com
>
> *In pro per*

**Proof of Service**

I hereby certify that on June 27, 2014, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Seventh Circuit using the CM/ECF system, thereby effecting service on counsel of record who are registered for electronic filing under Cir. R. 25(a).


*/s/ Theodore H. Frank*
Theodore H. Frank
Center for Class Action Fairness
1718 M Street NW, No. 236
Washington, DC 20036
Telephone:  (703) 203-3848
Email:  tfrank@gmail.com

*In pro per*